LEXSEE

JAMES S. VINE, et al., Plaintiffs, v. REPUBLIC OF IRAQ, Defendant. ROBERT SIMON, et al., Plaintiffs, v. REPUBLIC OF IRAQ, et al., Defendants. NABIL SEYAM, et al., Plaintiffs, v. REPUBLIC OF IRAQ, et al., Defendants.

Civil Action 01-02674 (HHK), Civil Action 03-00691 (HHK), Civil Action 03-00888 (HHK)

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

2006 U.S. Dist. LEXIS 63716

September 7, 2006, Decided

**COUNSEL:** [*1] For JAMES S. VINE, DONNA VINE, MICHAEL ANTONELLI, MAE ANTONELLI, ALLEN ANTONELLI, TANIA ANTONELLI, MICHAEL C. BENDER, MARY A. BENDER, TIMOTHY P. BENDER, ROBERT FREDERICK CAMERON, DERIN CAMERON, JOSEPH MARLEE CAMERON, SARAH NILE CAMERON, JOHN O'NEIL GERALD, JOHN THOMAS GORDON, ELMILOUDI HAMID, ROBIN HAMID, CHARLES HODDE, ORMON M. KEATHLEY, CHARLES P. KEEGAN, J. CRAWFORD KERR, As Executor of the Estate of Lloyd L. Culbertson, THOMAS LITRENTA, G. SCOTT MINDRUM, ANTHONY MIRELES, ELEANOR MIRELES, MARIA MIRELES, MIRIAM PRABHAKAR, EMMANUEL PRABHAKAR, JOSHUA PRABHAKAR, STEPHEN PRABHAKAR, OSAMA SHOUFI, JONI SHOUFI, EMIL SKODEN, DOROTHEA SKODEN, CATHERINE SKODEN, On behalf of themselves and all others similarly situated, Plaintiffs (01-02674): Daniel Wolf, SPRENGER & LANG, PLLC, Washington, DC; Steven M. Sprenger, SPRENGER & LANG, PLLC, Washington, DC.

For ALL PLAINTIFFS, FELIPE ALAYON, CONCEPCION ALAYON, JOHN ALEXANDER, ALFRED E. ALLEN, KERRY E.N. ALLEN, SHAWN K.N. ALLEN, FRANCIA MANCERA ANDRE, GERALD W. ANDRE, KEITH SHANE BODIFORD, HEIDI BRILL-EDWARDS, on her own behalf and as Executrix of the Estate of Harry Brill-Edwards, BETTY JEAN BRYANT, MICHAEL CAPPS, JAMES E. CARROLL, SHIRLEY R. [*2] CARROLL, Plaintiffs (01-02674): Daniel Wolf, SPRENGER & LANG, PLLC, Washington, DC.

For REPUBLIC OF IRAQ, Defendant (01-02674): Lawrence Hedrick Martin, FOLEY HOAG LLP, Washington, DC.

For UNITED STATES OF AMERICA, Interested Party (01-02674): Rupa Bhattacharyya, U.S. DEPARTMENT OF JUSTICE, CIVIL DIVISION, Washington, DC.

For ROBERT SIMON, FRANCOISE SIMON, ROBERTO ALVAREZ, ROBERT ALVAREZ, Plaintiffs (03-00691): Stephen A. Fennell, STEPTOE & JOHNSON, LLP, Washington, DC; Anthony A. Onorato, STEPTOE & JOHNSON LLP, Washington, DC; Anthony F. Cavanaugh, STEPTOE & JOHNSON, L.L.P., Washington, DC.

For REPUBLIC OF IRAQ, IRAQI INTELLIGENCE SERVICE, Defendants (03-00691): Lawrence Hedrick Martin, FOLEY HOAG LLP, Washington, DC.

For JAMES S. VINE, Amicus (03-00691): Daniel Wolf, SPRENGER & LANG, PLLC, Washington, DC.

For NABIL SEYAM, Plaintiff (03-00888): Stephen A. Fennell, STEPTOE & JOHNSON, LLP, Washington, DC; Anthony A. Onorato, STEPTOE & JOHNSON LLP, Washington, DC.

For AHMAD SEYAM, YUSEF SEYAM, MELISSA SEYAM, CARRIE SEYAM, Plaintiffs (03-00888):



David Davis Smyth, III, U.S. SECURITIES & EXCHANGE COMMISSION, Washington, DC; Stephen A. Fennell, STEPTOE [*3] & JOHNSON, LLP, Washington, DC; Anthony A. Onorato, STEPTOE & JOHNSON LLP, Washington, DC.

For THE REPUBLIC OF IRAQ, THE IRAQI INTELLIGENCE SERVICE, Defendants (03-00888): Lawrence Hedrick Martin, FOLEY HOAG LLP, Washington, DC.

For JAMES S. VINE, Amicus (03-00888): Daniel Wolf, SPRENGER & LANG, PLLC, Washington, DC.

**JUDGES:** Henry H. Kennedy, Jr., United States District Judge.

**OPINION BY:** Henry H. Kennedy, Jr.

**OPINION:**

**MEMORANDUM OPINION AND ORDER**

These three consolidated actions all challenge the conduct of the Republic of Iraq ("Iraq") during the period prior to the first Gulf War in 1990. Plaintiffs in all three cases allege that, during the course of its invasion of the State of Kuwait, Iraq unlawfully took plaintiffs hostage and, in some cases, tortured them. Before the court are defendants' n1 motions to dismiss, filed in these cases prior to consolidation. Upon consideration of defendants' motions, the oppositions thereto, and the record of the case, the court concludes that defendants' motions should be granted in Civil Actions 03-000691 and 03-00888 and granted in part and denied in part in Civil Action 01-02674.

> n1 In addition to Iraq, Saddam Hussein, then-President of Iraq, and the Iraqi Intelligence Service are named as defendants in Civil Actions 03-000691 and 03-00888. Collectively, the defendants will be referred to as "Iraq."

[*4]

**I. BACKGROUND**

The facts underlying this consolidated action as alleged by plaintiffs are as follows. On August 2, 1990, Iraqi armed forces invaded Kuwait, seizing control of the country. Immediately thereafter, Saddam Hussein, then-President of Iraq, issued a directive prohibiting all foreign nationals, including more than 2,000 American citizens, from leaving Iraq and Kuwait. In both countries, American citizens were denied access to their passports, refused exit visas, and physically prevented from leaving the cities of Baghdad and Kuwait City by the use of roadblocks. Approximately two weeks later, Hussein ordered all American citizens to report to hotels in those two cities. Those who obeyed his order, as well as others captured by Iraqi authorities, were forcibly relocated to strategic sites in Iraq where they served as "human shields" to prevent an attack by the allied forces. Additionally, a large number of Americans sought safe haven from Iraqi military forces by seeking refuge in either diplomatic properties or in private residences and "safehouses" throughout Kuwait and Iraq.

On August 19, 1990, President George H.W. Bush declared that all United States citizens [*5] in Kuwait and Iraq, regardless of whether they were in the physical custody of Iraqi forces, were "hostages" because they were being used by Hussein as leverage to prevent the United States and its allies from attacking Iraq and liberating Kuwait. President Bush demanded that Hussein release all American citizens and warned that the Iraqi government would be responsible for their safety and well-being.

By the end of August, Hussein authorized the release of all American women and children and several American male hostages with serious medical conditions. At the same time, Hussein promised to release the remaining hostages in exchange for a promise from the United States not to attack Iraq. The United States refused to accede to Hussein's demands and repeated its call for the release of all American citizens in Kuwait and Iraq.

On September 1, 1990, as a result of the illegal seizure and detention of American citizens in Kuwait and Iraq, the U.S. Department of State designated Iraq a "terrorist state" under 50 U.S.C. § 2405(j).

Between September 1, 1990, and December 1990, Hussein intermittently permitted the release of small groups of the remaining [*6] male hostages for medical and "humanitarian" purposes. The hostage situation ultimately came to an end in the second week of December 1990 when Hussein ordered the release of the

2006 U.S. Dist. LEXIS 63716, *6

last group of approximately 250 American hostages.

During their captivity, the American hostages were subject to conditions of confinement that were "harsh, cruel, degrading, and often terrorizing." *Vine* Third Am. Compl. (Civ. No. 01-674) *("Vine* TAC") P 4. These hostages "lived in constant fear for their lives and suffered from fatigue, depression, severe anxiety and stress, and the loss of the companionship of their loved ones." *Id.*

In 1999, a class action was filed on behalf of hundreds of the American citizens, and their spouses, who were held hostage by Iraq. *Hill v. Republic of Iraq,* Civ. No. 99-3346 (D.D.C.) (Jackson, J.). Iraq failed to appear in this action, and the case proceeded by default before Judge Jackson. On June 29, 2001, Judge Jackson denied the *Hill* plaintiffs' motion for class certification. Subsequently, on December 5, 2001, Judge Jackson imposed a moratorium on the addition of new plaintiffs and assertedly informed plaintiffs' counsel that any other former hostages [*7] who wished to bring claims against Iraq would have to file a separate suit.

Three weeks later, having been precluded from participating in the *Hill* litigation, plaintiffs in one of the consolidated cases in this matter, *Vine, et al. v. Republic of Iraq,* Civ. No. 01-2674 (D.D.C.), filed their complaint. n2 The third amended complaint in *Vine,* which includes class action allegations, names 236 plaintiffs, all of whom were either taken hostage by Iraq in 1990 and/or were spouses of individuals who were taken hostage. n3

n2 Plaintiffs' original complaint was filed on December 27, 2001, by Vine and thirty-four others. Three times thereafter, plaintiffs amended their complaint adding a total of 201 more individuals as plaintiffs.

n3 Two hundred of these plaintiffs were physically present in Iraq or Kuwait on August 2, 1990. Seventy were married to an American hostage who was physically present in Iraq or Kuwait on August 2, 1990. Of these seventy spouses, thirty-four were themselves in Iraq during 1990 but were released prior to their spouses.

[*8]

In 2003, two more related cases were filed in this jurisdiction. The first, *Simon, et al. v. Republic of Iraq, et al.,* Civ. No. 03-691 (D.D.C.), involves allegations that two individuals--Robert Simon, a CBS News reporter, and Roberto Alvarez, a cameraman working for CBS News--were illegally seized and subsequently tortured by Iraqi officials in 1991. The second, *Seyam, et al. v. Republic of Iraq, et al.,* Civ. No. 03-888 (D.D.C.), involves similar allegations by plaintiff Nabil Seyam. The three suits were consolidated in May 2005.

II. ANALYSIS

A. Statutory Framework of the Foreign Sovereign Immunities Act

As a general rule, the Foreign Sovereign Immunities Act ("FSIA"), enacted in 1976, establishes that foreign states (including "a political subdivision of a foreign state or an agency or instrumentality of a foreign state," 28 U.S.C. § 1603(a)), are immune from suit in courts in the United States. 28 U.S.C. § 1604. n4 A limited number of exceptions to this general rule of immunity are enumerated. *Id.* § 1605. The most recent of the exceptions, and the one implicated in this case, provides that a foreign [*9] state "shall not be immune from the jurisdiction of courts of the United States or of the States in any case" where "money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources ... for such an act." *Id.* § 1605(a)(7).

n4 Section 1604 of FSIA, 28 U.S.C. § 1604, states:

Subject to existing international agreements to which the United States is a party at the time of enactment of this Act a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605-1607 of this chapter.

In order for this so-called "state-sponsored terrorism exception" to apply, three criteria must be satisfied: (1) the foreign state must be designated as a state sponsor of terrorism at the time of the terrorist act or as a result of the terrorist act; (2) the foreign [*10] state must be afforded a reasonable opportunity to arbitrate the claim if the act occurred within the foreign state against which the claim has been brought; and (3) either the claimant or the victim must have been a national of the United States at the time of the terrorist act. *Id.* § 1605(a)(7)(A),(B); *see also Cicippio-Puleo v. Islamic Republic of Iran,* 359 U.S. App. D.C. 299, 353 F.3d 1024, 1028-29 (D.C. Cir. 2004).

Section 1605(a)(7) of FSIA is "merely a jurisdiction-conferring provision that does not otherwise provide a cause of action against either a foreign state or its agents." *Cicippio-Puleo,* 353 F.3d at 1032. To determine what causes of action, if any, may be pressed against a non-immune foreign state, FSIA directs courts to pre-existing causes of action. Specifically, § 1606 of FSIA provides, in relevant part:

> As to any claim for relief with respect to which a foreign state is not entitled to immunity ..., the foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances.

28 U.S.C. § 1606. Based on this language, "a plaintiff [*11] should be able to bring a cause of action under state or common law, federal statutes (where Congress has not indicated otherwise), and even possibly the law of a foreign country in a Section 1605(a)(7) case, as long as the plaintiff would be able to bring such a claim against an individual in similar circumstances." *Holland v. Islamic Republic of Iran,* 2005 U.S. Dist. LEXIS 40254, at *35-36 (D.D.C. Oct. 31, 2005).

### B. Subject Matter Jurisdiction

Iraq argues that the court lacks subject matter jurisdiction over the claims of at least 170 of the plaintiffs in the *Vine* litigation, contending that the state-sponsored terrorism exception does not apply to the claims of those plaintiffs because they were not taken "hostage" as FSIA defines that term. Iraq correctly states that the state-sponsored terrorism exception embodied in 28 U.S.C. § 1605(a)(7) "does not abrogate the sovereign immunity of nations the Department of State has designated state sponsors of terrorism for any and all purposes." Def.'s Mot. (Civ. No. 01-2674) at 4. Rather, § 1605(a)(7) only waives the immunity of such states with respect to claims "for personal [*12] injury or death that was caused by an act or torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources ... for such an act." 28 U.S.C. § 1605(a)(7).

The *Vine* plaintiffs do not allege that their claims arise from acts of "torture," "extrajudicial killing," or "aircraft sabotage." Rather, their claims all arise from the "hostage taking" that occurred when Saddam Hussein's regime assertedly detained them at the outbreak of hostilities between Kuwait and Iraq in 1990. Hostage taking is defined in § 1605(e) of FSIA to have "the meaning given that term in Article 1 of the International Convention Against the Taking of Hostages." 28 U.S.C. § 1605(e)(2). Article 1 of the International Convention Against the Taking of Hostages, in turn, states:

> Any person who seizes or detains and threatens to kill, to injure, or to continue to detain another person in order to compel a third party, namely, a State, an international intergovernmental organization, a natural or juridical person, or a group of persons, to do or abstain from doing any act as an explicit or implicit condition [*13] for the release of the hostage commits the offence of taking of hostages.

U.N. GAOR, Supp. No. 39, U.N. Doc. A/34/39 (1979). Iraq insists that at least 170 of the *Vine* plaintiffs--those who were not physically held by Iraqi forces but rather received sanctuary at various diplomatic premises or found haven in private safehouses after the invasion of Kuwait--were not "seized" or "detained" by Iraq and that, even assuming they were, the purpose of such "detention" was not to compel a third party to do or refrain from doing something. Accordingly, Iraq insists that FSIA does not waive its immunity with respect to the claims of these plaintiffs and their claims must be dismissed. The court disagrees.

As the Fifth Circuit has held, "a hostage is 'seized' or 'detained' ... when she is held or confined against her will for an appreciable period of time." *United States v. Carrion-Caliz,* 944 F.2d 220, 225 (5th Cir. 1991). n5 In an analogous criminal case, the Second Circuit clarified that the government "need not show that the defendant actually used physical force or violence to restrain that person" in order to prove that a hostage was held against her will. [*14] *United States v. Si Lu Tian,* 339 F.3d 143, 153 (2d Cir. 2003). Rather, all that is necessary is evidence that "the defendant threatened, frightened, deceived or coerced his hostage so as to cause the hostage to remain under the defendant's control." *Id.; see also Carrion-Caliz,* 944 F.2d at 227 (holding that the victims were taken hostage when the defendant "frightened or deceived them sufficiently to cause them to remain in his house").

> N5 In *Carrion-Caliz,* the Fifth Circuit was interpreting the Hostage Taking Act, which provides that "whoever, whether inside or outside the United States, seizes or detains and threatens to kill, to injure, or to continue to detain another person in order to compel a third person or governmental organization to do or abstain from any act ... shall be punished by imprisonment by any term of years or for life." 18 U.S.C. § 1203(a)

Moreover, as Judge Jackson wrote in the *Hill* litigation, the "essence of the tort [*15] of hostage taking is false imprisonment," 175 F. Supp. 2d at 46, which is defined in the District of Columbia as the unlawful "detention or restraint of one against his will, within boundaries fixed by the defendant." *Faniel v. Chesapeake & Potomac Tel. Co.,* 404 A.2d 147, 150 (D.C. 1979); *see also Abourezk v. New York Airlines, Inc.,* 283 U.S. App. D.C. 34, 895 F.2d 1456, 1458 (D.C. Cir. 1990). n6 In this context, a plaintiff is detained whenever the defendant "deprive[s] the plaintiff of his freedom of locomotion for any length of time by force or threat of force." *Dist. of Columbia v. Gandy,* 450 A.2d 896, 899 (D.C. 1982). All the *Vine* plaintiffs, even those not in the physical control of Iraq, are alleged to have been deprived of their freedom of locomotion by being constructively confined, by force or threat of force, to safehouses and diplomatic properties.

> n6 Iraq insists that analogizing "hostage taking" in FSIA to the tort of false imprisonment is inappropriate given the criminal nature of the International Convention Against the Taking of Hostages. Def.'s Reply (Civ. No. 01-2674) at 3. Because the Convention assertedly covers "penal matters," Iraq insists that the rule of lenity applies and that any ambiguity in the language of the statutory definition of "hostage taking" must therefore be resolved in its favor. In making this argument, Iraq fails to recognize that it is a defendant in a case brought under the state-sponsored terrorism exception of FSIA, which waives immunity only for *civil* claims. 28 U.S.C. § 1605(a)(7) (waiving immunity of a foreign state sponsor of terrorism in cases "in which money damages are sought"). The fact that the state-sponsored terrorism exception incorporates a definition from a treaty that covers "penal matters" does not change the fact that Iraq here is susceptible to solely civil penalties. *See United States v. Crippen,* 362 U.S. App. D.C. 19, 371 F.3d 842, 844 (D.C. Cir. 2004) ("[T]he rule of lenity requires that we interpret an ambiguous *criminal statute* in the defendant's favor.") (emphasis added). Because FSIA is not a criminal statute, and Iraq is not a criminal defendant, the rule of lenity has no application.

[*16]

Furthermore, those plaintiffs who were not in the physical custody of Iraq assertedly "spent most of their time in detention hiding in private residences and 'safehouses'" where they lived "under harsh conditions and in constant fear of being discovered by Iraqi security forces." *Vine* TAC P 19. It is a reasonable inference from these allegations that such deprivation of freedom was "against their will." As such, all of the *Vine* plaintiffs--even those not under Iraq's direct control--were "seized" or "detained" within the meaning of the FSIA.

Iraq's second argument--that those plaintiffs who

were not in the physical custody of Iraq were not hostages given that the purpose of their alleged detention was not to compel a third party to do or refrain from doing something--is likewise unconvincing. The *Vine* plaintiffs' Third Amended Complaint certainly includes allegations that all plaintiffs were used to extract concessions from the United States. Specifically, the *Vine* plaintiffs allege that all Americans, including those forced into hiding by Iraq's actions, were used by Saddam Hussein to "compel the United States and other foreign states to abstain from launching an [*17] armed attack upon Iraq as an explicit or implicit condition for the[ir] release." *Vine* TAC P 27. These allegations are sufficient, at this point in the litigation, to establish that those in hiding were used "in order to compel" the United States "to do or abstain from doing an act." n7

> n7 In its reply brief, Iraq argues for the first time that there is a factual dispute as to whether those plaintiffs who were forced into hiding in Iraq and Kuwait were hostages as that term is defined in the FSIA, and that limited discovery is necessary to resolve this issue. Def.'s Reply (Civ. No. 01-2674), at 4-5. The court disagrees that discovery is needed at this time, for in cases where a jurisdictional determination is "inextricably intertwined with the merits of the case," that determination should be postponed until "the merits are heard." *Herbert v. Nat'l Acad. of Sciences*, 297 U.S. App. D.C. 406, 974 F.2d 192, 198 (D.C. Cir. 1992); *see also Lawrence v. Dunbar*, 919 F.2d 1525, 1530 (11th Cir. 1990). This is such a case, given that a showing that plaintiffs were held hostage would resolve the merits of this case. *See Green v. Hill*, 954 F.2d 694, 697 (11th Cir. 1992) ("Jurisdiction and the merits are intertwined if a decision on one would effectively decide the other.").

[*18]

For these reasons, the court agrees with Judge Jackson's legal conclusion in the *Hill* litigation--litigation involving identical allegations as those found here--that "American citizens denied permission to leave Kuwait and Iraq from August through mid-December, 1990," including those who took refuge in safehouses and diplomatic properties, were "'hostages' within the meaning of the FSIA" because they were "kept against their will," were "unable to move about freely," and were used "as bargaining commodities--to extract concessions from the United States and its coalition allies in exchange for their release." *Hill*, 175 F. Supp. 2d at 39, 46-47.

In reaching this decision, the court finds comfort in the fact that the position of the executive branch of the United States government at the time of the Kuwait invasion was that the Americans detained in Kuwait and Iraq were, in fact, "hostages" because they were being used by Hussein as leverage to prevent the United States and its allies from attacking Iraq and liberating Kuwait. *See Vine* TAC P 15; *see also* Andrew Rosenthal, *Bush Vows Not to be Cowed by the Taking of "Hostages"; Iraq Shifts them to Targets,* [*19] N.Y. TIMES, Aug. 21, 1990, at A1 (quoting President George H.W. Bush as stating that, when referring to those American trapped in Kuwait and Iraq, because "Saddam Hussein specifically offers to trade the freedom of those citizens ... he holds against their will in return for concessions, there can be little doubt that whatever these innocent people are called, they are in fact hostages"). Although not binding on this court, the executive branch's view is owed some deference. *Cf. Sumitomo Shoji Am. v. Avagliano*, 457 U.S. 176, 185-86, 102 S. Ct. 2374, 72 L. Ed. 2d 765 (1982) ("[T]he meaning attributed to treaty provisions by the Government agencies charged with their negotiation and enforcement is entitled to great weight."). Moreover, in another context, Congress afforded "hostage status" to all U.S. citizens trapped inside Iraq or Kuwait who were "held in custody by governmental or military authorities" of Iraq or who took "refuge within [Iraq or Kuwait] in fear of being taken into such custody." Pub. L. No. 101-513, Tit. V, § 599C, 104 Stat. 1979, 2065 (Nov. 5, 1990).

Having concluded that this court may exercise subject matter jurisdiction over the claims of *all* plaintiffs [*20] against Iraq in this consolidated matter, the court will proceed to address Iraq's other arguments in favor of dismissal.

### C. The Political Question Doctrine

Iraq argues that this case presents a non-justiciable political question. The political question doctrine

"excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch." *Japan Whaling Ass'n v. Am. Cetacean Soc'y,* 478 U.S. 221, 230, 106 S. Ct. 2860, 92 L. Ed. 2d 166 (1986). n8 While the "propriety of what may be done in the exercise of [foreign relations] is not subject to judicial inquiry or decision," *Oetjen v. Cent. Leather Co.,* 246 U.S. 297, 302, 38 S. Ct. 309, 62 L. Ed. 726 (1918), "it is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance." *Baker v. Carr,* 369 U.S. 186, 211, 82 S. Ct. 691, 7 L. Ed. 2d 663 (1962). Iraq suggests that the question of its liability in these cases likewise presents a non justiciable political question, primarily because any decision to award plaintiffs compensation [*21] would undermine the efforts of the President and Congress "to create a stable Iraq." Def.'s Mot. (Civ. No. 01-2674) at 31. The court disagrees.

> n8 For example, the Supreme Court has held that the following foreign policy issues are non-justiciable political questions: a determination of when war begins or when a war ends, *Commercial Trust Co. v. Miller,* 262 U.S. 51, 57, 43 S. Ct. 486, 67 L. Ed. 858 (1923); recognition of foreign governments, *United States v. Belmont,* 301 U.S. 324, 328, 57 S. Ct. 758, 81 L. Ed. 1134 (1937); questions concerning the diplomatic status of individuals claiming immunity, *In re Baiz,* 135 U.S. 403, 431-32, 10 S. Ct. 854, 34 L. Ed. 222 (1890); and the ratification and interpretation of treaties, *Terlinden v. Ames,* 184 U.S. 270, 286, 22 S. Ct. 484, 46 L. Ed. 534 (1902).

This case does not require an evaluation of any executive or congressional policy decision or value judgment. Rather, it involves the liability of a foreign sovereign under a well-defined statutory scheme--a statutory [*22] scheme that was enacted by both houses of Congress and signed by the President. "[G]iven the fact that both the Executive and Legislative Branches have expressly endorsed the concept of suing terrorist [states] in federal court, ... resolution of this matter will not exhibit 'a lack of respect due coordinate branches in government.'" *Klinghoffer v. S.N.C. Achille Lauro,* 937 F.2d 44, 50 (2d Cir. 1991) (quoting *Baker,* 369 U.S. at 217) (holding that the political question doctrine does not apply to claims under the Anti-Terrorism Act for acts of terrorism perpetrated by the PLO).

Moreover, the efforts of the government to rebuild Iraq, simply put, are irrelevant to a determination of Iraq's liability under FSIA. Congress explicitly gave the courts jurisdiction over claims where the defendant, a foreign sovereign, was designated as a state sponsor of terrorism "at the time the act occurred." 28 U.S.C. § 1605(a)(7)(A). By focusing on the foreign sovereign's designation at the time the act occurred, as opposed to when the suit is pending, Congress chose to allow a plaintiff to pursue claims against even those foreign nations [*23] whose sponsorship of terrorism ceases. For these reasons, the court declines to "convert what is essentially an ordinary tort suit into a non justiciable political question" merely because its claims "arise in a politically charged context." *Klinghoffer,* 937 F.2d at 49.

### D. Statute of Limitations

Actions brought under § 1605(a)(7) are subject to a statutory ten-year limitations period. *See* 28 U.S.C. § 1605(f) ("No actions shall be maintained under subsection (a)(7) unless the action is commenced not later than 10 years after the date on which the cause of action arose."). Congress, however, explicitly mandated that "[a]ll principles of equitable tolling, including the period during which the foreign state was immune from suit, shall apply in calculating the limitations period." *Id.* Iraq insists that all three complaints in this consolidated matter are time-barred because none of the plaintiffs filed their complaint within ten years of the date on which their causes of action arose--according to Iraq, by December 9, 1990, at the latest--and because equitable tolling, when properly applied, does not save the complaints. [*24] Although this issue is a close one, the court agrees with Iraq in part and concludes that the *Simon* and *Seyam* complaints were not timely filed.

Despite the fact that plaintiffs' injuries all occurred more than ten years before any of the complaints at issue were filed, plaintiffs nevertheless insist that their complaints are timely because the statute of limitations on their claims did not begin to run until April 1996, when Congress added the state-sponsored terrorism

exception to FSIA. *See* Pls.' Opp'n (Civ. No. 01-2674) at 12 n.4; Pls.' Opp'n (Civ. No. 03-691) at 3-6; Pls.' Opp'n (Civ. No. 03-888) at 3-6. The *Vine* plaintiffs base this suggestion on the principle that "no cause of action generally accrues until the plaintiff has the right to enforce his cause." *See* Pls.' Opp'n (Civ. No. 01-2674) at 12 n.4 (quoting *United States v. One 1961 Red Chevrolet Impala Sedan*, 457 F.2d 1353, 1358 (5th Cir. 1972)). This argument, however, confuses what it means for a cause of action to "arise" and what it means for a cause of action to "accrue," a distinction important to this case. A claim "arises" on the date that the action in question occurred, yet [*25] does not "accrue" until a prior disability to suit is removed. *See Heinrich v. Sweet*, 118 F. Supp. 2d 73, 79-80 (D. Mass. 2000) (explaining the "subtle, yet important, difference between the two words"); *see also Kaplan v. Shure Bros.*, 153 F.3d 413, 422 (7th Cir. 1998) ("[A] cause of action can 'arise' before it 'accrues.'); *Van Den Hul v. Baltic Farmers Elevator Co.*, 716 F.2d 504, 510 n.4 (8th Cir. 1983) (noting that "in certain contexts, the words 'accrue' and 'arise' have significantly different meanings."); *Abramson v. P.J. Currier Lumber Co.*, 2001 DNH 14, 2001 U.S. Dist. LEXIS 1039, at *2-3 (D.N.H. Jan. 17, 2001) ("The point at which a cause of action 'arises' can be different from the point at which it 'accrues.'"). Given this distinction, plaintiffs' argument that the statute of limitations did not begin to run until 1996 must be rejected, for, according to FSIA, the statute of limitations began when their cause of action "arose," i.e., when the action in question occurred. n9 Plaintiffs' complaints make clear that the actions in question occurred, and therefore their cause of action arose, by December 9, 1990, at [*26] the latest.

 n9 The *Simon* and *Seyam* plaintiffs cite a number of cases that assertedly stand for the proposition that Congress specifically allowed for the bringing of suits, absent tolling, up to ten years from the date of *enactment* of the state-sponsored terrorism exception, rather than ten years from the date the cause of action arose. Pls.' Opp'n (Civ. No. 03-691) at 3-6; Pls.' Opp'n (Civ. No. 03-888) at 3-6. The court notes that the overwhelming majority of the cases cited involve default judgments, for which any statute of limitations argument was necessarily waived. In only three of those cases was the statute of limitations even mentioned, and those references are dicta given the procedural posture of the case. *Peterson v. Islamic Republic of Iran*, 264 F. Supp. 2d 46, 60 (D.D.C. 2003); *Polhill v. Islamic Republic of Iran*, 2001 U.S. Dist. LEXIS 15322, at * 13 n.3 (D.D.C. Aug. 23, 2001); *Cicippio v. Islamic Republic of Iran*, 18 F. Supp. 2d 62, 68-69 (D.D.C. 1998). In one of the two cases cited by plaintiffs that was not decided by default, the defendant failed to raise the statute of limitations defense and therefore waived it as well. *Kilburn v. Republic of Iran*, 277 F. Supp. 2d 24 (D.D.C. 2003). Finally, in the sole disputed matter cited by plaintiffs in which the statute of limitations was raised, the court recognized that the statute of limitations began to run at the time the underlying acts occurred, but were tolled until immunity was waived. *Wyatt v. Syrian Arab Republic*, 398 F. Supp. 2d 131, 2005 U.S. Dist. LEXIS 21744, at *35 (D.D.C. 2005).

In sum, the cases cited by the *Simon* and *Seyam* plaintiffs are insufficient to convince this court that the statute of limitations on plaintiffs' claims did not begin to run when 28 U.S.C. § 1605(f) says they did, i.e., when "the cause of action arose."

[*27]

Having determined that plaintiffs' claims arose, at the latest, in December 1990, plaintiffs had until December 2000 to file their complaint, absent tolling. None of the complaints in this consolidated matter were filed by that date; the complaint in *Vine,* Civ. No. 01-2674, was filed on December 27, 2001; the complaint in Simon, Civ. No. 03-69 1, was filed on March 18, 2003; and the complaint in *Seyam,* Civ. No. 03-888, was filed on April 15, 2003. Accordingly, the court must analyze whether any "principle[] of equitable tolling" acts to extend the period for filing, such that plaintiffs' claims are not time-barred.

Importantly, the D.C. Circuit has held that equitable tolling "does not bring about an automatic extension of

the statute of limitations by the length of the tolling period." *Phillips v. Heine,* 299 U.S. App. D.C. 359, 984 F.2d 489, 492 (D.C. Cir. 1993) (citing *Cada v. Baxter Healthcare Corp.,* 920 F.2d 446, 452 (7th Cir. 1990)). Rather, under *Phillips,* even where a plaintiff establishes circumstances justifying equitable tolling, the plaintiff is given extra time to file a claim *"only* if he needs it." *Id.* (emphasis [*28] in original). If, however, the plaintiff does not "'need it, there is no basis for depriving the defendant of the protection of the statute of limitations.'" *Id.* (quoting *Cada,* 920 F.2d at 452). Therefore, in order to "advance [the] important interests in evidentiary accuracy and repose," a deadline will only be tolled "by a reasonable period after the tolling circumstance [is] mended." *Id.; see also Chung v. U.S. Dep't of Justice,* 357 U.S. App. D.C. 152, 333 F.3d 273, 279 (D.C. Cir. 2003) (stating that equitable tolling "merely ensures that the plaintiff is not, by dint of circumstances beyond his control, deprived of a 'reasonable time' in which to file suit.").

Applying these principles, the D.C. Circuit held in *Phillips* that a plaintiff is not entitled to the benefit of the equitable tolling doctrine when the limitations period has not run by the time the plaintiff discovers all the facts necessary to support her claim. For example, in *Phillips,* the plaintiff discovered the necessary facts on February 26, 1990, and the statute of limitations, without any tolling, expired on March 21, 1990. *Id.* Because nothing had prevented the plaintiff "from gathering [*29] information in the preceding years," and because "more than three weeks remained" in the limitations period after all the necessary facts were discovered, the D.C. Circuit questioned whether there was "any need to extend the statute at all." *Id.* Accordingly, the D.C. Circuit affirmed the district court's decision to dismiss the case on the ground that it was time-barred. *Id.; see also Cada,* 920 F.2d at 453 ("When as here the necessary information is gathered after the claim arose but before the statute of limitations has run, the presumption should be that the plaintiff could bring suit within the statutory period and should have done so.").

As noted above, FSIA was amended in 1996 to allow a plaintiff to pursue a claim against a foreign state for its involvement in certain acts of terrorism. *See* 28 U.S.C. § 1605(f). In doing so, Congress specifically stated that the ten-year limitations period was tolled for "the period during which the foreign state was immune from suit." However, because more than four years remained in the limitations period at the time Iraq's immunity was abrogated, the "presumption" that plaintiffs could have [*30] brought suit "within the statutory period" applies. *See Cada,* 920 F.2d at 452; *Phillips,* 984 F.2d at 492. Accordingly, under D.C. Circuit precedent, the fact that Iraq was immune from suit for the first six years of the statutory period applicable to plaintiffs' claims does not give rise to any equitable reason to toll the statutory deadline. n10

> n10 The court recognizes that Judge Urbina concluded, in *Wyatt v. Syrian Arab Republic,* 398 F. Supp. 2d 131, 2005 U.S. Dist. LEXIS 21744, at *35 (D.D.C. 2005), that a plaintiff was allotted a full ten years after the tolling period to bring her claim under FSIA. As discussed above, this court disagrees, and believes that such a conclusion is inconsistent with the D.C. Circuit's holding in *Phillips.*

Another principle of equitable tolling, however, is applicable here. In 1974, the Supreme Court held that "the commencement of a class action suspends the applicable statute of limitations as to all asserted members of [*31] the class who would have been parties to the suit had the suit been permitted to continue as a class action." *American Pipe & Constr. Co. v. Utah,* 414 U.S. 538, 553-54, 94 S. Ct. 756, 38 L. Ed. 2d 713 (1974); *see also Crown, Cork & Seal Co. v. Parker,* 462 U.S. 345, 103 S. Ct. 2392, 76 L. Ed. 2d 628 (1983) (affirming that *American Pipe* tolling applies to all asserted members of the class, regardless of whether they choose to file their own suits or to intervene in the pending action).

As described previously, the *Hill* litigation before Judge Jackson was a putative class action whose class, had class certification been granted, would have included all of the plaintiffs in these consolidated matters. n11 As such, *American Pipe* tolling applies. n12 The *Hill* litigation was filed on December 15, 1999, before the statute of limitations expired. On June 29, 2001, Judge Jackson denied the *Hill* plaintiffs' motion for class certification. n13 Plaintiffs insist that the statutory deadline was tolled thereafter for eighteen months and fourteen days--an amount of time equal to the time that the class certification issue was pending--until late 2003. Iraq disagrees, contending [*32] that under the holding

in *Phillips,* plaintiffs' claims were only equitably tolled for a reasonable amount of time after the class certification issue was resolved, and that by taking almost six months to file their complaint, plaintiffs' delay was unreasonable.

> n11 Iraq argues that the claims of the "plaintiffs in hiding" were not part of the putative class in *Hill* and thus cannot get the benefit of *American Pipe* tolling. Def.'s Mot. (Civ. No. 01-2674) at 11. The class in *Hill* was described to include "[a]ll American citizens who were present in Iraq or Kuwait at any time between August 2, 1990 through December 1990 and who, during that period, were taken hostage by Defendant." *Id.* (quoting *Hill* Compl. P 41). Therefore, a determination of whether the "plaintiffs in hiding" are included in this class description turns on whether those plaintiffs were "hostages." As the court has already determined that they were, *supra* at 10, Iraq's argument that they may not benefit from *American Pipe* tolling is rejected.

Iraq also argues that the claims of the plaintiffs' spouses cannot benefit from the full 18-month period that the motion for class certification in *Hill* was pending, given that their claims were not added until more than seven months after the original *Hill* complaint was filed. This fact, according to Iraq, reduces the *American Pipe* tolling period for the plaintiffs' spouses to a total of eleven months, a period of time assertedly insufficient to make the plaintiffs' spouses claims timely. This argument, however, fails to recognize that amendments adding a spouse's claim for loss of consortium relate back to the date on which the underlying claim was filed. *See, e.g., Costello v. Balzarini,* 2005 U.S. Dist. LEXIS 10392, at *4 (D. Vt. May 24, 2005); *Hoch v. Venture Enters., Inc.,* 473 F. Supp. 541, 542, 16 V.I. 335 (D.V.I. 1979); *see also* CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 1688 (3d ed. 2001). Moreover, this argument is ultimately irrelevant, given that the court concludes, *infra,* that plaintiffs are not entitled to an automatic extension of the statutory period equal to the time the motion for class certification was pending.

[*33]

> n12 Iraq notes that *American Pipe* tolling typically does not apply to class claims in subsequent class actions. The court makes no findings with regard to the viability of plaintiffs' class claims, reserving such a determination until a motion for class certification is ripe. However, the court does note that all plaintiffs' *individual* claims are subject to *American Pipe* tolling, notwithstanding the fact that they also filed class claims. *See, e.g., Andrews v. Orr,* 851 F.2d 146, 149 (6th Cir. 1988); *Korwek v. Hunt,* 827 F.2d 874, 878 (2d Cir. 1987); *In re Crazy Eddie Sec. Litig,* 747 F. Supp. 850, 856 (E.D.N.Y. 1990).

> n13 In a later filed memorandum opinion, Judge Jackson explained that class certification was denied "in light of the fact that the case was proceeding by default; the uncertainty of the numbers of U.S. citizens who could actually qualify as a victim or claimant; and the significant variations in the experiences of the hostages, including hardships endured and compensable injuries suffered." 175 F. Supp. 2d at 39 n.5.

[*34]

The court agrees with Iraq's legal argument and concludes that the holding in *Phillips*--that "equitable tolling ... merely ensures that the plaintiff is not, by dint of circumstances beyond his control, deprived of a 'reasonable time' in which to file suit." *Chung,* 333 F.3d at 279--applies equally to *American Pipe* tolling as well. That is, a plaintiff who would have been a member of a class action, had it been certified, does not receive an

automatic extension of the statute of limitations by the length of time that the class certification issue is pending. Instead, the deadline is tolled only "by a reasonable period after the tolling circumstance [is] mended." *Phillips,* 984 F.2d at 492. This conclusion inevitably flows from the D.C. Circuit's holding that equitable tolling does not provide an automatic extension of a statute of limitations and the Supreme Court's recognition that *American Pipe* tolling is a type of equitable tolling, see *Irwin v. Dep't of Veterans Affairs,* 498 U.S. 89, 96 n.3, 111 S. Ct. 453, 112 L. Ed. 2d 435 (1990) (citing *American Pipe* as an example of equitable tolling).

While the court agrees with Iraq's legal argument, it [*35] disagrees with its factual suggestion that six months was an unreasonable amount of time for the *Vine* plaintiffs to have waited to file their complaint. A number of factors lead this court to this conclusion. First, the *Vine* plaintiffs suggest that Judge Jackson's class certification decision was not "definitive," and that he later encouraged them to "continue to pursue class certification, which he said he would ... be inclined to grant" had he retained the case. Pls.' Opp'n (Civ. No. 01-2674) at 16-17. Iraq never disputes this claim. Second, and perhaps most importantly, for the eighteen months the class certification motion was pending, and for six months thereafter, Judge Jackson consistently and regularly allowed plaintiffs to amend their complaint to add more named plaintiffs. Under the doctrine of relation back, as embodied in Rule 15(c) of the Federal Rules of Civil Procedure, the claims of these additional plaintiffs "relate back" to the date of the original complaint for purposes of conducting any statute of limitations analysis. See *Leachman v. Beech Aircraft Corp.,* 224 U.S. App. D.C. 326, 694 F.2d 1301, 1308 (D.C. Cir. 1982); *Miller v. Air Line Pilots Ass'n,* 2000 U.S. Dist. LEXIS 8797, [*36] at *9 (D.D.C. Mar. 30, 2000). In light of Judge Jackson's pattern of granting such motions to amend, a plaintiff with a similar claim could reasonably have expected to seek compensation for their injuries by participating in the *Hill* litigation. However, in early December 2001, Judge Jackson indicated that he would not allow any more plaintiffs to be added to the *Hill* matter. Within three weeks, the *Vine* plaintiffs filed their complaint in Civil Action No. 01-2674. Given this procedural history, the court believes that the *Vine* plaintiffs acted diligently and filed their complaint within a reasonable time of discovering that they could not be added to the *Hill* litigation. Accordingly, the court believes that equitable tolling is appropriate and their claims are timely. n14

> n14 The *Vine* plaintiffs have amended their complaint three times and have moved to add additional plaintiffs on at least two other occasions. As noted above, those plaintiffs' claims are timely under the doctrine of relation back. *Leachman,* 694 F.2d at 1308.

[*37]

The plaintiffs in *Simon* and *Seyam,* however, were not so diligent. They waited until 2003 to file their complaint, almost two years after Judge Jackson denied class certification in *Hill* and more than a year after he indicated in writing that he would not allow any more plaintiffs to join the *Hill* litigation. Under the principles espoused in *Phillips,* this length of time exceeds what was reasonably necessary and, therefore, precludes the application of equitable tolling. Accordingly, the complaints in *Simon* and *Seyam* are time-barred and must be dismissed.

### E. Failure to State a Claim

In their third amended complaint, the *Vine* plaintiffs assert a claim based on federal statutory law, three claims based on federal common law, three claims based on state common law, and four claims based on foreign law. Iraq insists that these claims are either not legally cognizable or are not applicable to the facts at hand, and accordingly moves to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure. n15 Based on the following analysis, the court agrees in part, and will dismiss the federal statutory and federal common law claims.

> n15 A court may grant a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Martin v. Ezeagu,* 816 F. Supp. 20, 23 (D.D.C. 1993) (internal quotations omitted); *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957) (stating that a complaint should not be dismissed "unless it appears beyond doubt that the plaintiff can prove

no set of facts in support of his claim which would entitle him to relief"). In addition, the court must construe the complaint in a light most favorable to the plaintiff and must accept as true all reasonable factual inferences drawn from well-pleaded factual allegations. *In re United Mine Workers Employee Benefit Plans Litig.,* 854 F. Supp. 914, 915 (D.D.C. 1994); *Schuler v. United States,* 199 U.S. App. D.C. 23, 617 F.2d 605, 608 (D.C. Cir. 1979).

[*38]

*1. Federal Statutory Law*

Count II of the *Vine* TAC alleges that Iraq violated the so-called Flatow Amendment, through which Congress created a specific cause of action against any "official, employee, or agent of a foreign state" for acts over which the court may maintain jurisdiction under the state-sponsored terrorism exception to sovereign immunity. 28 U.S.C. § 1605 note. The Flatow Amendment is not a statute of "general application" but instead, by its plain language, limits its scope to "officials or agents of foreign states." *Dammarell v. Islamic Republic of Iran,* 2005 U.S. Dist. LEXIS 5343, *93 (D.D.C. Mar. 29, 2005). Recognizing this limitation, the D.C. Circuit has held that neither the state-sponsored terrorism exception of FSIA, "nor the Flatow Amendment, nor the two considered in tandem, creates a private right of action against a foreign government." *Cicippio-Puleo,* 353 F.3d at 1033. As the sole defendant in the *Vine* matter is a foreign government, and not an official or agent of that foreign government, Iraq moves to dismiss the Flatow Amendment claim in the *Vine* TAC.

Despite the fact that [*39] the text of the Flatow Amendment does not directly create a cause of action against a government defendant, the *Vine* plaintiffs nonetheless argue that Iraq can be held liable indirectly, by way of § 1606 of FSIA. Section 1606 provides that, as to any claim for relief with respect to which a foreign state is not entitled to immunity, "the foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 1606. n16 This judicial officer has previously rejected a similar argument and held that the Flatow Amendment should not be expanded to apply to foreign states through application of § 1606. *Pugh v. Socialist People's Libyan Arab Jamahiriya,* 2006 U.S. Dist. LEXIS 58033, at *35-42 (D.D.C. May 11, 2006). In so holding, this court adopted the reasoned decision of Judge Bates in *Dammarell v. Islamic Republic of Iran,* who had provided four reasons why "the cause of action in the Flatow Amendment cannot be read to apply to foreign states through section 1606": (1) the text of the Flatow Amendment applies only to officials, employees, or agents of a foreign state, not a [*40] foreign state itself; (2) the legislative history does not contain any indication that Congress nonetheless intended to create a private cause of action against a foreign state; (3) the statute does not "obviously extend to *private individuals* within the meaning of section 1606," 2005 U.S. Dist. LEXIS 5343, at *97-98 (emphasis added); and (4) such a holding would be "in at least some tension with *Cicippio-Puleo,*" *id.* at 97; see also *Holland,* 2005 U.S. Dist. LEXIS 40254, at *41-44 (Kollar-Kotelly, J.) (similarly adopting Judge Bates's reasoning in *Dammarell* and refusing to hold a foreign government liable under the Flatow Amendment). n17

---

n16 The effect of section 1606 on the liability of foreign states under the Flatow Amendment was not explicitly addressed in *Cicippeo-Puleo.*

n17 The court notes that Judge Jackson, in *Dodge v. Islamic Republic of Iran,* reached a contrary conclusion and held, without elaboration, that a plaintiff, pursuant to section 1606, may sue a foreign state "under *any* cause of action arising from common law, foreign law, or federal statute which might ordinarily give rise only to individual liability," including the Flatow Amendment. 2004 U.S. Dist. LEXIS 29045, at *12 (D.D.C. Aug. 25, 2004) (emphasis added).

---

[*41]

Today, this court reiterates its agreement with Judge Bates and Judge Kollar-Kotelly and again concludes that Congress did not intend to create a cause of action under the Flatow Amendment against foreign states through § 1606 of FSIA. As the D.C. Circuit stated, "it is for Congress, not the courts, to decide whether a cause of

action should lie against foreign states." *Cicippio-Puleo,* 353 F.3d at 1036. In situations where "Congress has not expressly recognized" a cause of action against foreign states, courts should "decline to imply" one. *Id.* Accordingly, the court dismisses the *Vine* plaintiffs' claim against Iraq under the Flatow Amendment.

2. *Federal Common Law*

Additionally, Iraq argues that the three federal common law claims found in Counts I, VI, and VII must also be dismissed for failure to state a claim. The *Vine* plaintiffs disagree, contending that "it is plain that the complaint states a viable federal common law cause of action against Iraq" in light of the recent decision by the Supreme Court in *Sosa v. Alvarez-Machain,* 542 U.S. 692, 124 S. Ct. 2739, 159 L. Ed. 2d 718 (2004). Pls.' Opp'n (Civ. No. 01-2674) at 32.

In *Pugh,* [*42] this court discussed at length, and rejected, the argument that federal common law provides a viable cause of action against a foreign sovereign under FSIA. *See Pugh,* 2006 U.S. Dist. LEXIS 58033, at *42-49. Specifically, this court noted that, in 2003, the D.C. Circuit "strongly signaled that a federal common law of tort is incompatible with section 1606 of FSIA ... because section 1606 'instructs [courts] to find the law, not to make it.'" *Id.* at *45 (quoting *Bettis v. Islamic Republic of Iran,* 354 U.S. App. D.C. 244, 315 F.3d 325, 338 (D.C. Cir. 2003)). As such, the D.C. Circuit's holding "reflect[ed] the modem rule that the federal common law should only be employed in the rarest of circumstances." *Id.* (quoting *Dammarell,* 2005 U.S. Dist. LEXIS 5343, at *78); *see also* ERWIN CHEMERINSKY, FEDERAL JURISDICTION § 6.1, at 354 (4th ed. 2003) ("There long has been a strong presumption against the federal courts fashioning common law to decide cases.").

Moreover, this court also rejected the argument that the *Pugh* plaintiffs' allegations fell "within the narrow category of cases that the Supreme Court has recently [*43] pronounced to be actionable" in *Sosa,* in large part because *Sosa* arose in the context of the Alien Tort Claims Act ("ATCA"), and not FSIA. *Pugh,* 2006 U.S. Dist. LEXIS 58033, at *47. That difference was "fatal" to the *Pugh* plaintiffs' argument. *Id.* Because FSIA, unlike the ATCA, details "'precisely the sort of claims that a plaintiff may bring when suing under a waiver of immunity provided by the FSIA,'" *id.* (quoting *Dammarell,* 2005 U.S. Dist. LEXIS 5343, at *90), the justification for exercise of federal common law was absent. *Id.* (citing 19 CHARLES ALAN WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE § 4514, at 480-81 (2d ed. 1996)("Insofar as one important justification for the exercise of federal common law is that Congress has not spoken on the matter before the court, that justification is removed once Congress has spoken on a particular matter.")); *see also City of Milwaukee v. Illinois,* 451 U.S. 304, 312, 101 S. Ct. 1784, 68 L. Ed. 2d 114 (1981) (stating that the Supreme Court has "always recognized that federal common law is subject to the paramount authority of Congress" and may be resorted [*44] to only "[in] absence of an applicable Act of Congress") (internal quotations and citations omitted). Because Congress had spoken on the particular matter at issue, by enacting section 1606 of FSIA, this court denied the plaintiffs' request to fashion a cause of action against Iraq under federal common law. *Pugh,* 2006 U.S. Dist. LEXIS 58033, at *48.

The logic in *Pugh* is equally applicable to this matter. Congress has addressed the claims that are available against a foreign country whose immunity has been waived, by enacting FSIA, and therefore this court may not resort to federal common law. Accordingly, plaintiffs' federal common law claims are dismissed.

3. *State Common Law and Foreign Law Claims*

In Counts III through IX, the *Vine* plaintiffs asserts three state common law claims--false imprisonment, intentional infliction of emotional distress, and loss of consortium--and four claims based on the law of Iraq and Kuwait. In the wake of the D.C. Circuit's opinion in *Cicippio-Puleo,* district courts in this jurisdiction have uniformly held that state or foreign law may be used to hold foreign states liable for acts of terrorism. *See, e.g.,* [*45] *Holland,* 2005 U.S. Dist. LEXIS 40254, at *63-65; *Price v. Socialist People's Libyan Arab Jamahiriya,* 384 F. Supp. 2d 120, 132 (D.D.C. 2005); *Dammarell,* 2005 U.S. Dist. LEXIS 5343, at *55-56.

Iraq contends that these cases are in error, suggesting that Congress preempted state and foreign law by enacting the Flatow Amendment. Def.'s Mot. (Civ. No. 01-2674) at 23-25. Iraq's argument is untenable, for as other courts in this jurisdiction have held, neither the text nor the legislative history of the Flatow Amendment supports the assertion that the Congress intended to "occupy the field" to the exclusion of state or foreign law. *Dammarell,* 2005 U.S. Dist. LEXIS 5343, at *50-53.

Rather, "[f]ar from *preempting* state law in section 1605(a)(7) cases, the FSIA *invites*" the application of state and foreign law "through section 1606." *Id.* at *51 (emphasis in original); *see also Holland,* 2005 U.S. Dist. LEXIS 40254, at *51-52; *Price,* 384 F. Supp. 2d at 132-33. Accordingly, the court denies Iraq's motion to dismiss the *Vine* plaintiffs' state common law and foreign law claims. n18 [*46]

> n18 In each of the cases cited above, the courts recognized that foreign law was an available avenue of relief under FSIA, but determined, after applying choice of law principles to the facts at hand, that application of state law was more appropriate. This court makes no finding as to whether state law or foreign law should be applied in this case, but rather simply concludes that neither are preempted by the Flatow Amendment. Any choice of law analysis will have to wait until after the parties have briefed the issue.

### III. CONCLUSION

For the aforementioned reasons, it is this 7th day of September, 2006, hereby

**ORDERED** that Iraq's Motion to Dismiss in Civil Action 01-2674 [# 44] is **GRANTED IN PART** and **DENIED IN PART**, as set forth in this Memorandum Opinion; and it is further

**ORDERED** that Counts I and II of the Third Amended Complaint in Civil Action 01-2674 are **DISMISSED;**

**ORDERED** that Iraq's Motion to Dismiss in Civil Action 03-691 [# 14] is **GRANTED;** [*47] and it is further;

**ORDERED** that Iraq's Motion to Dismiss in Civil Action 03-888 [# 14] is **GRANTED.**

Henry H. Kennedy, Jr.

United States District Judge

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

JUDGMENT - Civil Action 03-00691 (HHK)

Pursuant to Rule 58 of the Federal Rules of Civil Procedure, and for the reasons stated by the court in its memorandum opinion docketed this same day, it is this 7th day of September 2006, hereby

**ORDERED and ADJUDGED** that the complaint in this case is **DISMISSED;** and it is further

**ORDERED** that, pursuant to Fed. R. Civ. P 54(b), this judgment is a final judgment, there being no just reason for delay.

Henry H. Kennedy, Jr.

United States District Judge

JUDGMENT - Civil Action 03-00888 (HHK)

Pursuant to Rule 58 of the Federal Rules of Civil Procedure, and for the reasons stated by the court in its memorandum opinion docketed this same day, it is this 7th day of September 2006, hereby

**ORDERED and ADJUDGED** that the complaint in this case is **DISMISSED;** and it is further

**ORDERED** that, pursuant to Fed. R. Civ. P 54(b), this judgment is a final judgment, there [*48] being no just reason for delay.

Henry H. Kennedy, Jr.

United States District Judge