## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
)
Certain Underwriters at Lloyds )
London, *et al.*, )
)
Plaintiffs, )
)
v. )        **Civil Action No. 06-00731 (GK)**
)
Great Socialist People's Libyan )
Arab Jamahiriya, *et al.*, )
)
Defendants. )
_____)

## PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

**TABLE OF CONTENTS**

Page

**INTRODUCTION AND
RELEVANT PROCEDURAL POSTURE** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1

**STATEMENT OF FACTS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .5

**THE LIBYAN DEFENDANTS' SUPPORT FOR
THE ANO AND THE EGYPT AIR HIJACKING** . . . . . . . . . . . . . . . . . . . . . . . . . . . .8

**ARGUMENT** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

I.    THE LIBYAN DEFENDANTS ARE NOT ENTITLED
      TO SOVEREIGN IMMUNITY UNDER THE FOREIGN
      SOVEREIGN IMMUNITIES ACT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

      A.    STANDARD OF REVIEW. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13

      B.    STATUTORY FRAMEWORK. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .15

      C.    THE LIBYAN DEFENDANTS WAIVED
            THEIR IMMUNITY BY IMPLICATION BECAUSE
            IT WAS REASONABLY FORESEEABLE THAT
            THE PLAINTIFFS WOULD BE INJURED AS A
            RESULT OF THE EGYPT AIR HIJACKING AND
            THAT U.S. COURTS WOULD BE INVOLVED IN
            THE RESULTING LITIGATION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .17

      D.    AS OF THE DATE THAT THE STATE-SPONSORED
            TERRORISM EXCEPTION TO SOVEREIGN IMMUNITY
            WAS ENACTED, THE LIBYAN DEFENDANTS'
            SOVEREIGN IMMUNITY WAS WAIVED BY
            IMPLICATION FOR ACTIONS ARISING OUT OF THE
            DEFENDANTS' MATERIAL SUPPORT FOR TERRORISM. . . . . . . .24

II.   THE COURT IS PROPERLY VESTED WITH JURISDICTION
      TO HEAR THE PLAINTIFFS' CLAIMS AGAINST DEFENDANTS
      AL-SANUSI AND AL-BISHARI. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .26

      A.    DEFENDANTS FAILED TO MEET THEIR BURDEN OF
            DEMONSTRATING THAT THE EXCEPTIONS TO SOVEREIGN
            IMMUNITY DO NOT APPLY IN THIS CASE. . . . . . . . . . . . . . . . . . .26

      B.    THE PLAINTIFFS NEED NOT SET FORTH THE

SPECIFIC ACTS OF MATERIAL SUPPORT BY
AL-SANUSI AND AL-BISHARI FOR THE
EXCEPTIONS TO APPLY.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .30

    1.    Al-Sanusi and Al-Bishari Constitute the "Foreign
        State" for the Purposes of the FSIA.. . . . . . . . . . . . . . . . . . . . . . 31

    2.    Plaintiffs Need Not Plead "But For" Causation
        To Satisfy The Subject Matter Requirements of
        28 § U.S.C. 1605(a)(7). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .31

III.    PLAINTIFFS PROPERLY SERVED ALL OF THE DEFENDANTS
       PURSUANT TO § 1608(a)(3) OF THE FSIA. . . . . . . . . . . . . . . . . . . . . . . . . 35

IV.    THE PLAINTIFFS TIMELY FILED EACH OF THEIR CLAIMS . . . . . . . . . 38

    A.    PLAINTIFFS' FILED THEIR COMMON LAW CAUSES
        OF ACTION WITHIN THE APPLICABLE STATUTE OF
        LIMITATIONS DEADLINE CONTAINED IN THE FSIA. . . . . . . . . . .38

    B.    THE PLAINTIFFS' TIMELY FILED THEIR CLAIMS
        UNDER THE ALIEN TORT CLAIMS ACT. . . . . . . . . . . . . . . . . . . .43

    C.    THE CLAIM BROUGHT UNDER THE ANTI-TERRORISM
        ACT WAS FILED WITHIN THE APPLICABLE STATUTE OF
        LIMITATIONS DEADLINE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .47

V.    PLAINTIFFS HAVE STATED A CLAIM UNDER THE ATA. . . . . . . . . . . . 47

VI.    THE ATCA CLAIM APPLIES TO THE VIOLATIONS OF THE
       LAWS OF NATIONS PLED BY PLAINTIFFS . . . . . . . . . . . . . . . . . . . 48

VII.    THE HEAD-OF-STATE DOCTRINE DOES NOT APPLY IN
        THIS CASE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .50

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

**APPENDIX**

    Exhibit 1: *Baker v. Great Socialist People's Libyan Arab Jamahiriya*, Civil
    Action No. 03-749 (GK) (D.D.C. June 30, 2005 Opinion)

    Exhibit 2: Affidavit of Omar Rezaq

    Exhibit 3: Affidavit of Khaled Ibrahim

Exhibit 4: Affidavit of Mustafa Badra

Exhibit 5: U.S. Dep't of State, Office of the Sec'y of State, Ambassador-at-Large for Counter-Terrorism, *Fact Sheet: Abu Nidal Organization* (February 1989)

Exhibit 6: U.S. Dep't of State, Bureau of Public Affairs, *Libya Under Qadhafi: A Pattern of Aggression* (January 1986)

Exhibit 7: Declassified CIA Report, *NID-Libya: Arms Support for Abu Nidal*

Exhibit 8: Report and Affidavit of Ret. Col. Patrick Lang

Exhibit 9: Plaintiffs' Request for Foreign Service, dated July 21, 2006

Exhibit 10: Plaintiffs' Notice of Proof of Service, filed August 18, 2006

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*Abur v. Rep. Of Sudan,*
    437 F.Supp.2d 166 (D.D.C. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 21, 35

*Almog v. Arab Bank,*
2007 WL 214433 (E.D.N.Y. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .17, 48

*Argentine Republic v. Amerada Hess Shipping Corp.,*
    488 U.S. 420 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Arce v. Garcia.*
    434 F.3d 1254 (11th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .39, 42, 43

*Baker v. Great Socialist People's Libyan Arab Jamahiriya,*
    No. 03-cv-749 (GK) (June 30, 2005 Opinion) ("*Baker I*") . . . . . . . . . . . . . . . .*passim*

*Bettis v. Islamic Republic of Iran,*
    315 F.3d 325 (D.C. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Boim v. Quranic Literacy Ins. And Holy Land Found. For Relief and Dev.,*
    291 F.3d 1000 (7th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Burnett v. New York Central Railroad Co.,*
    380 U.S. 424 (1965) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41, 43, 45

*Collett v. Socialist People's Libyan Arab Jamahiriya,*
    362 F.Supp.2d 230 (D.D.C. 2005) . . . . . . . . . . . . . . . . . . . . . . . . 31, 33, 39, 40, 42, 51

*Cronin v. Islamic Republic of Iran,*
    238 F. Supp. 2d 222 (D.D.C. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Daliberti v. Republic of Iraq,*
    97 F. Supp. 2d 38 (D.D.C. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Doe v. Islamic Salvation Front,*
    275 F. Supp. 2d 115 (D.D.C. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*Doe v. State of Israel,*
    400 F.Supp.2d 86 (D.D.C. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

*Duncan v. Walker,*
    533 U.S. 167 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*EEOC v. O'Grady*,
   857 F.2d 383 (7th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41, 45

*Eisenfeld v. Islamic Republic of Iran*,
   172 F. Supp. 2d 1 (D.D.C. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Elahi v. Islamic Republic of Iran*,
   124 F. Supp. 2d 97 (D.D.C. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Flatow v. Islamic Republic of Iran*,
   999 F. Supp. 1 (D.D.C. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .31, 32, 39, 40

*Flores v. Southern Peru Copper Corp.*,
   414 F.3d 233 (2d Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

*Gillespie v. United States Steel Corp.*,
   379 U.S. 148 (1964) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*Global Index, Inc. v. Mkapa*,
   290 F.Supp.2d 108 (D.D.C. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

*Hartford Fire Insurance Company v. Great Socialist People's Arab Jamahiriya*,
   1999 WL 33589331 (D.D.C. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Hilao v. Estate of Marcos*,
   103 F.3d 767 (9th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*Honey v. George Hyman Const. Co.*,
   63 F.R.D. 443 (D.D.C. 1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

*In re Air Crash off Long Island*,
   209 F.3d 200 (2d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*I.T. Consultants, Inc. v. Republic of Pakistan*,
   351 F.3d 1184 (D.C. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Jean v. Dorelien*,
   431 F.3d 776 (11th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43, 44

*Joseph v. Office of the Consulate Gen'l of Nigeria*,
   830 F.2d 1018 (9th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Jungquist v. Sheikh Sultan Bin Khalifa*,
   115 F.3d 1020 (D.C. Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51, 52

*Kadic v. Karadzic*,
  70 F.3d 232 (2d Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

*Kilburn v. Socialist People's Libyan Arab Jamahiriya*,
  376 F.3d 1123 (D.C. Cir. 2004) ("*Kilburn II*") . . . . . . . . . . . . . . . . . . . . . . . . . . .28, 31

*Kilburn v. Republic of Iran*,
  277 F. Supp. 2d 24 (D.D.C. 2003) ("*Kilburn I*") . . . . . . . . . . . . . . . . . . . . . . . . 32, 33

*Malacca Corp. v. Travelers Indem. Co.*,
  421 F. Supp. 2d 137, 139 (D.D.C. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. Ruckelshaus*,
  719 F.2d 1159 (D.C. Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*Moragne v. States Marine Lines*,
  398 U.S. 375 (1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*Morris v. Khadr*,
  415 F. Supp. 2d 1323 (D. Utah 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .22

*Nikbin v. Islamic Republic of Iran*,
  slip op, 2007 WL 64185 (D.D.C. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .37

*Owens v. Republic of Sudan*,
  412 F. Supp. 2d 99 (D.D.C. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14, 23

*Park v. Shin*,
  313 F.3d 1138 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

*Peterson v. Islamic Republic of Iran*,
  264 F. Supp. 2d 46 (D.D.C. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40, 41

*Phillips v. Heine*,
  984 F.2d 492 (D.C. Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44, 45, 46

*Phoenix Consulting, Inc. v. Republic of Angola*,
  216 F.3d 36 (D.C. Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14, 27, 28, 29

*Price v. Socialist People's Libyan Arab Jamahiriya*,
  294 F.3d 82 (D.C. Cir. 2002) ("*Price II*") . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 28, 42

*Price v. Socialist People's Libyan Arab Jamahiriya*,
  389 F.3d 192 (D.C. Cir. 2004) ("*Price IV*") . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .28

*Price v. Socialist People's Libyan Arab Jamahiriya,*
    384 F.Supp.2d 120 (D.D.C. 2005) ("*Price V*") . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .17

*Princz v. Fed. Repub. Of Germany,*
    26 F.3d 1166 (D.C. Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 26

*Pugh v. Socialist People's Libyan Arab Jamahiriya,*
    2006 WL 2384915 (D.D.C. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

*Republic of Austria v. Altmann,*
    541 U.S. 677 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 20, 49, 50

*Reyton v. Rowe,*
    391 U.S. 54 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Roeder v. Islamic Republic of Iran,*
    333 F.3d 228, 234 (D.C. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Siderman de Blake v. Rep. of Argentina,*
    965 F.2d 699 (9th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 21

*Sisso v. Islamic Rep. of Iran,*
    448 F. Supp. 2d 76, 89-90 (D.D.C. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . .21, 22, 23

*Smith v. Socialist People's Libyan Arab Jamahiriya,*
    101 F.3d 239, 243 (2d Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 19, 20

*Sosa v. Alvarez-Machain,*
    542 U.S. 692 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

*The Schooner Exchange v. McFaddon,*
    11 U.S. (7 Cranch) 116, 3 L.Ed. 287 (1812) . . . . . . . . . . . . . . . . . . . . . . . . .50, 52, 53

*Transaero, Inc. v. La Fuerza Aerea Boliviana,*
    30 F.3d 148, 149050 (D.C. Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*TRW Inc. v. Andrews,*
    534 U.S. 19 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*United States v. Barnes,*
    295 F.3d 1354 (D.C. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*United States v. Moore,*
    613 F.2d 1029 (D.C. Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*United States v. Noriega*,
    117 F.3d 1206 (11th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51, 52

*United States v. Smith*,
    18 U.S. 153 (1820) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

*United States v. Yousef*,
    327 F.3d 56 (2d Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

*Weinstein v. Islamic Republic of Iran*,
    184 F. Supp. 2d 13 (D.D.C. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 53

*Wyatt v. Syrian Arab Republic*,
    362 F.Supp.2d 103 (D.D.C. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 32, 33, 40, 41

**Statutes**

28 U.S.C. § 1603 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 37, 51

28 U.S.C. § 1605 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

28 U.S.C. § 1606 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18

18 U.S.C. § 1608 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

28 U.S.C. § 1350 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

18 U.S.C. § 2333 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 47

18 U.S.C. § 2339A . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

**Federal Rules of Civil Procedure**

Fed. R. Civ. P. 17 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

**Treaties**

1963 Convention on Offences and Certain Other Acts
Committed on Board Aircraft . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

1971 Convention for the Suppression of Unlawful Act
Against the Safety of Civil Aviation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

**Secondary Sources**

S. Rep. 102-342 at 22 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

H.R. Rep. 94-187 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 19

COME NOW the Plaintiffs, by and through counsel, and hereby file this Memorandum of Law with Points and Authorities in Opposition to Defendants'[1] Motion to Dismiss.  In opposition to said Motion, Plaintiffs rely on the following Memorandum.

## INTRODUCTION AND RELEVANT PROCEDURAL POSTURE

This case stems from the November 23, 1985 terrorist hijacking of Egypt Air Flight No. 648 ("Egypt Air Hijacking") by the Abu Nidal Organization ("ANO"), acting with the material support of and at the direction of the Libyan Defendants, which caused Egypt Air Flight No. 648's destruction beyond repair, and the deaths and injuries of American citizens and others.  Egypt Air Flight No. 648 ("Flight 648" or "Insured Property") was a Boeing 737 airplane covered by Lloyds of London insurance policies numbered AE2141B and VS5057L.  Plaintiffs, Certain Underwriters at Lloyds of London each severally subscribing to insurance policies, each for his own part and not one for the other, numbered AE2141B and VS5057L, *et al.* (hereinafter collectively referred to solely for the sake of convenience and without waiver of the several nature for their subscriptions as "Plaintiffs") brought this action pursuant to the provisions of 28 U.S.C. § 1602, et seq., the Foreign Sovereign Immunities Act ("FSIA") 18 U.S.C. § 2333, the Anti-Terrorism Act ("ATA") and 28 U.S.C. § 1350, the Alien Torts Claims Act ("ATCA") seeking compensatory and punitive damages for conversion of, damage to and trespass of Plaintiffs' property, and seeking compensatory and punitive damages for facilitating and supporting acts of terrorism, violations of the laws of nations, including air piracy.

---

[1] "Libyan Defendants" refers to Defendants the Socialist People's Arab Jamahiriya, the Libyan Internal Security Organization ("LISO"), the Libyan External Security Organization ("LESO"), Mu'ammar al-Qadhdhafi, Major Abdallah al-Sanusi, and Abrahim al-Bishari (hereinafter collectively "Libyan Defendants").

This case presents a question of first impression for the Court: whether a terrorist state, by engaging in an act of state sponsored terrorism found to be judicially cognizable under the state-sponsored exception to sovereign immunity contained in the FSIA, 28 U.S.C. § 1605(a)(7), has implicitly waived its immunity from suit under 28 U.S.C. § 1605(a)(1), for the reasonably foreseeable property damages resulting from such act. Other Courts have begun to examine ancillary claims for damages resulting from acts of state-sponsored terrorism found to be judicially cognizable under the provisions of the Foreign Sovereign Immunities Act, 28 U.S.C. § 1605(a)(7), with inconsistent results. The law here remains unsettled if not unexplored.

Plaintiffs in this case did suffer reasonably foreseeable property damages as a result of a state-sponsored terrorist attack, the Egypt Air Hijacking. This Court has already determined that the Libyan Defendants lack immunity under 28 U.S.C. § 1605(a)(7) for their material support for terrorism in cases brought by U.S. nationals who were personally injured and/or killed in the Egypt Air Hijacking. *Baker v. Great Socialist People's Libyan Arab Jamahiriya*, Civil Action No. 03-749 (GK) (D.D.C. June 30, 2005) ("*Baker I*"), Opinion attached hereto as Plaintiffs' Exhibit 1. As the Plaintiffs discuss below, and as this Court found in *Baker I*,[2] at the time of the Egypt Air Hijacking, not only did the Libyan Defendants[3] provide general material support to the ANO, but they also directly participated in the planning and execution of this hijacking by, at least,

---

[2] The instant matter is filed as a related action to *Baker v. Great Socialist People's Libyan Arab Jamahiriya*, presently pending in this Court as Civil Action No. 03-749 (GK), in which the plaintiffs brought actions for personal injury and/or death arising out of the Egypt Air Hijacking. In *Baker I*, this Court found that it had jurisdiction over Libya for its material support of terrorism.

[3] In addition to the sponsorship and support Libya provided to the ANO at the time of the hijacking, ANO was also separately supported by Syria. Plaintiffs have sued Syria and a default was entered by this Court against the Syrian Defendants on October 4, 2006.

providing the ANO hijackers with the finances, weapons, munitions and travel documents needed to conduct this terrorist attack. *Baker I Op. at 11-13*; Pltfs' Am. Compl. ¶¶ 7, 9-13, 17-20; Affidavit of Omar Rezaq ("Rezaq Affidavit") attached hereto as Plaintiffs' Exhibit 2; Affidavit of Khaled Ibrahim, an ANO terrorist who perpetrated the attack on Rome's Fiumicino Airport on December 27, 1985 ("Ibrahim Affidavit"), attached hereto as Plaintiffs' Exhibit 3; Affidavit of Mustafa Badra, an ANO terrorist who perpetrated the attack on Vienna's Schwechat Airport on December 27, 1985 ("Badra Affidavit"), attached hereto as Plaintiffs' Exhibit 4..  Moreover, the sole surviving hijacker of the Egypt Air Hijacking, Omar Rezaq, stated in his sworn affidavit, attached hereto as Plaintiffs' Exhibit 2, that, among other things, he met with a Libyan government official in an exclusively diplomatic location in Athens prior to the hijacking, without which the hijacking would not and could not have taken place.  Rezaq Affidavit.

The Libyan Defendants filed their Motion to Dismiss the action on December 5, 2006, arguing that (1) the Court lacks subject matter jurisdiction over the Plaintiffs' claims because the Libyan Defendants are entitled to sovereign immunity under the FSIA; (2) Plaintiffs' claims are barred by the statute of limitations of the TVPA and the ATA; (3) the Court should not equitably toll the statute of limitations to allow the Plaintiffs' claims to proceed; (4) Plaintiffs have failed to state a claim under either the ATA or the ATCA; (5) Plaintiffs have failed to state a claim against Defendants Abdallah al-Sanusi and Ibrahaim al-Bishari; (6) service of process against the Defendants was ineffective; and (7) Defendant Qadhafi is entitled to the protection of the common law head-of-state doctrine, and therefore no action may be maintained against him in a U.S. court of law.  This Memorandum is filed in opposition thereto.

As Plaintiffs discuss in detail below, where the stated goals of the state-sponsored terrorism exception to the FSIA are deterrence and compensation, it would be incongruous to prohibit claims for reasonably foreseeable property damage resulting directly from an act of state-sponsored terrorism, otherwise cognizable under 28 U.S.C. § 1605(a)(7). The state-sponsored terrorism exception — which allows compensation to U.S. nationals who press claims for personal injury and death that resulted from state-sponsored terrorism — itself precludes recovery by the Plaintiffs in this case, who, with the exception of one, are non-U.S. nationals seeking compensation for property damages they suffered as a direct result of the Egypt Air Hijacking. The Libyan Defendants waived their sovereign immunity "by implication" under 28 U.S.C. § 1605(a)(1) when they participated in and provided direct material support to the terrorists who perpetrated the attack.

In addition, the Plaintiffs properly served each of the Defendants by DHL delivery pursuant to the appropriate service provision of the FSIA, 28 U.S.C. § 1608(a)(3), and filed the requisite notice and documentation with the Clerk of the Court. Accordingly, this Court is vested with jurisdiction to hear the Plaintiffs' claims.

Plaintiffs' claims are not barred by the statute of limitations because each set of claims has an applicable tolling provision that extended the time for filing. The claims brought by the foreign corporations against the Libyan Defendants as a result of the Libyan Defendants' material support for terrorism as set forth in 28 U.S.C. § 1605(a)(7) are entitled to the benefit of the FSIA's statute of limitations and equitable tolling provision, which applies to all actions brought under 28 U.S.C. § 1605(a)(7). 28 U.S.C. § 1605(f). The causes of action brought pursuant to the Libyan Defendants' waiver "by

implication" are literally dependant on and therefore brought under 28 U.S.C. § 1605(a)(7). The claims against the Libyan Defendants in their individual capacities are asserted under the Alien Tort Claims Act and the Anti-Terrorism Act, and are also entitled to the benefit of tolling provisions that allow these claims to proceed.

Finally, Defendant Qadhafi is not entitled to the protections of the head-of-state doctrine because decisions of sovereign immunity are to be made by the judiciary pursuant to the FSIA, and the Executive Branch has filed no statement otherwise asserting immunity on Defendant Qadhafi's behalf.

Accordingly, the Defendants' arguments are entitled to no merit, and their Motion to Dismiss should be denied.

## STATEMENT OF FACTS

When the Abu Nidal Organization, a brutal terrorist group, conducted its terrorist attacks, it "engage[d] in indiscriminate violence against bystanders, including children." U.S. Dep't of State, Office of the Sec'y of State, Ambassador-at-Large for Counter-Terrorism, *Fact Sheet: Abu Nidal Organization* at 1 (February 1989) (attached hereto as Plaintiffs' Exhibit 5) ("State Department Fact Sheet On The ANO"). Beginning in the early 1980s, Libya developed a relationship with the ANO, providing assistance that allowed the ANO to become "one of the world's most dangerous and violent terrorist organizations." *Id.* Libya supported the ANO generally and for specific terrorist operations by providing "safe haven, finances, weapons, false travel documents and training facilities . . . ." *Id.* at 9. The United States government listed Libya as a "state sponsor of terrorism" on January 19, 1984. (Pltfs' Am. Compl. ¶ 7.)

On November 23, 1985, Libya, through the ANO, conducted one of its most brutal terrorist attacks by carrying out the Egypt Air Hijacking. On that day, three (3) ANO operatives, including Omar Rezaq ("Rezaq"), boarded Flight 648, having used illegal passports provided to them by the Libyan Defendants for the purpose of hijacking the plane. (Pltfs' Am. Compl. ¶ 28.) Shortly thereafter, Flight 648 took off from Athens, Greece, and headed in a southeasterly direction toward Cairo, Egypt, its planned destination. *Id.* ¶ 29. Twenty-two minutes into the flight, the ANO terrorists hijacked the plane using the weapons the Libyan Defendants provided them, and according to the plan the Libyan Defendants set forth. *Id.* ¶ 30.

A mid-flight shootout between an Egyptian Sky Marshall and one of the hijackers ensued, resulted in the death of a hijacker, the wounding of the Sky Marshall and two stewardesses, the piercing of the fuselage, and Flight 648 being diverted to Malta. *Id.* ¶ 31.

At first, the tower at Malta's International Airport refused to let Flight 648 land, but authorities relented after Captain Galal told them that the plane was in imminent danger of crashing into the sea because he was nearly out of fuel. *Id.* ¶ 32. Even so, the runway lights remained off and Captain Galal, with a gun barrel held by the terrorists at his head, could only rely on Flight 648's landing light to illuminate the runway at Malta's International Airport. *Id.* ¶ 33. The tower ordered Flight 648 to taxi to a remote parking area; four police buses then blocked both ends of the runway. *Id.* ¶ 34.

The terrorists demanded that the airport authorities of Malta refuel the plane, but the Maltese authorities refused. *Id.* ¶¶ 35, 36. The terrorists then threatened to shoot one passenger every fifteen minutes unless the Maltese agreed to refuel the plane. *Id.* ¶ 37.

Meanwhile, the terrorists separated the passengers – putting the Americans and Israelis in the first-class cabin.  In response to an appeal from the pilot, the terrorists agreed to release eleven women—seven Filipinos and four Egyptians.  *Id.* ¶ 38. Thereafter, the terrorists identified two Israeli women and shot them in the head, killing one and severely injuring the other.  *Id.* ¶ 39.  Thinking that the women were dead or mortally wounded, the terrorists threw them out of the plane and onto the tarmac. *Id.* ¶ 39.  Every fifteen minutes thereafter, the terrorists brought the three American passengers to the front of the plane, one by one, and when their demands for fuel were not met, the terrorists shot each American in the head and threw each out of the plane onto the tarmac. *Id.* ¶ 40.

Twenty-four hours after the Libyan-sponsored hijacking began, while the aircraft was still on the ground in Malta, Egyptian Commandos stormed the plane in an attempt to rescue the passengers.  *Id.* ¶ 41.  The Egyptian Commandos entered the plane by rigging the passenger doors and the luggage compartment doors with explosives.  *Id.* ¶ 42.  These explosions caused the internal plastic of the plane to catch fire, resulting in widespread suffocation.  *Id.* ¶ 43.  When the hijackers realized that they were being attacked by Egyptian commandoes, they hurled hand grenades into the passenger area, killing and injuring passengers and igniting a fire inside the aircraft.  *Id.* ¶ 44.

As a result of (a) the mid-flight shootout with the Egyptian Sky Marshall, (b) the terrorists' detonation of hand grenades, and (c) the Egyptian Commandos' use of explosives, the airplane was damaged beyond repair and ceased to be suitable for any purpose whatsoever.  *Id.* ¶ 45.

## THE LIBYAN DEFENDANTS' SUPPORT FOR THE ANO
## AND THE EGYPT AIR HIJACKING

Despite Libya's recent attempts to rejoin the world of law-abiding nations and forego a path of terrorism, this has not always been the case.  The Libyan Defendants sponsored and supported the ANO prior to and at the time of the Egypt Air Hijacking. Am. Compl. ¶¶ 17-20; State Department Fact Sheet On The ANO; U.S. Dep't of State, Bureau of Public Affairs, *Libya Under Qadhafi: A Pattern of Aggression* (January 1986), attached hereto as Plaintiffs' Exhibit 6 ("*Libya Under Qadhafi: A Pattern of Aggression*"); Declassified CIA Report, *NID-Libya: Arms Support for Abu Nidal* ("CIA Grenade Report"), attached hereto as Plaintiffs' Exhibit 7; Rezaq Affidavit; Ibrahim Affidavit; Badra Affidavit.

Since Defendant Mu'ammar al-Qadhafi seized political control of Libya by military coup in 1969, Libya has balked at international norms, abused diplomatic privileges and used terrorism as an instrument of its own foreign policy.  State Department Fact Sheet On The ANO; *Libya Under Qadhafi: A Pattern of Aggression*. Libya has used threats of terrorism, material support and operational assistance for terrorist attacks, and actual terrorist violence as a means of political opposition, specifically targeting the United States, Israel and their allies.

The Libyan Defendants supported radical terrorist groups generally by providing terrorist training outside of Libya and by operating terrorist training camps in Tripoli in order to train, instruct, support and educate terrorists on the use of explosive devices, hijackings, assassinations, and various commando and guerrilla techniques, in addition to abusing Libya's diplomatic privileges by, among other things, storing arms and

explosives at Libya's diplomatic establishments.  Am. Compl. ¶¶ 17-20; State Department Fact Sheet On The ANO; *Libya Under Qadhafi: A Pattern of Aggression*.

Throughout the 1980s, both directly and through material support and resources provided to terrorist organizations such as ANO, the Libyan Defendants engaged in a concerted campaign of terrorist activities directed at the United States, Israel and their allies.  Am. Compl. ¶¶ 17-20; State Department Fact Sheet On The ANO; *Libya Under Qadhafi: A Pattern of Aggression*.

The United States Department of State, Office of the Historian, Bureau of Public Affairs, in its report of Significant Terrorist Incidents, 1961- 2001, lists the Egypt Air Hijacking of November 23, 1985 as being a terrorist act that was conducted by the Abu Nidal Group.  Am. Compl. ¶ 25.  Background Information on Foreign Terrorist Organizations, released by the Office of Counterterrorism, of the United States Department of State, indicates that the Abu Nidal Organization has received considerable support, including safe haven, training, logistic assistance, and/or financial aid from the Libyan Defendants.  State Department Fact Sheet.

Libya's involvement in terrorism was particularly robust from early 1984 through several years after the Egypt Air Hijacking.  State Department Fact Sheet On The ANO; *Libya Under Qadhafi: A Pattern of Aggression*; Ibrahim Affidavit; Badra Affidavit.  In addition to its role in the Egypt Air Hijacking on November 23, 1985, during 1985 Libya was also directly involved in and/or provided material support for numerous terrorist attacks.  State Department Fact Sheet On The ANO; *Libya Under Qadhafi: A Pattern of Aggression*.

The Abu Nidal Organization was, at all times relevant hereto, among the most dangerous and violent of the terrorist organizations supported by the Libyan Defendants, engaging in violence against bystanders, including children.  State Department Fact Sheet On The ANO; *Libya Under Qadhafi: A Pattern of Aggression*.  As of February 1989, the ANO had conducted terrorist attacks in more than 20 countries on three continents, killing more than 300 people and injuring at least 650.  State Department Fact Sheet On The ANO; *Libya Under Qadhafi: A Pattern of Aggression*.  The Libyan Defendants provided substantial material support and sponsorship to the ANO, as well as providing logistical support for the ANO's specific terrorist operations.  Am. Compl. ¶¶ 17-20; State Department Fact Sheet On The ANO; *Libya Under Qadhafi: A Pattern of Aggression*.

The Libyan Defendants provided substantial material support to, and directly sponsored, the ANO by, among other things, assisting and/or providing the following: (1) funds, (2) facilities, (3) airline tickets, (4) free and unobstructed entry into, safe haven in, and exit from Libya by members of ANO, (5) terrorist training in Libyan camps, (6) use of the privilege of Libya's "diplomatic pouch", (7) use of Libya's diplomatic freight privileges, (8) official documents of all kinds, including passports, (9) provision of uniforms, tanks and BM021 multiple rocket launchers, (10) weapons, including hand grenades used in various ANO attacks, and (11) actual operational assistance in pre-positioning of people and supplies for the conduct of terrorist operations.  Am. Compl. ¶ 17-20; CIA Grenade Report; State Department Fact Sheet On The ANO; *Libya Under Qadhafi: A Pattern of Aggression*.

During the year 1985 alone, Abu Nidal, the leader of the ANO, met with Defendant Qadhafi in Libya at least twice, in addition to meeting separately with Qadhafi's chief lieutenant, Abd al-Salam Jallud, and conducting public press interviews from Tripoli, Libya. State Department Fact Sheet On The ANO; *Libya Under Qadhafi: A Pattern of Aggression*. Following these meetings, ANO leadership began to relocate to Libya from Syria for training and support. State Department Fact Sheet On The ANO; *Libya Under Qadhafi: A Pattern of Aggression*. With specific regard to the Egypt Air Hijacking, the Libyan Defendants supported this operation by, among other things, providing the ANO and its terrorists who executed the Egypt Air Hijacking with funding, weapons and passports, which allowed the terrorists to travel freely. Am. Compl. ¶ 17-20; State Department Fact Sheet On The ANO; *Libya Under Qadhafi: A Pattern of Aggression*.

The hand grenades used in the Egypt Air Hijacking bear the same markings as those found on four Libyan terrorists, who were arrested on April 18, 1986, while approaching the U.S. officers' club in Ankara, Turkey, carrying the hand grenades, which they had obtained from the Libyan People's Bureau. CIA Grenade Report; State Department Fact Sheet On The ANO; *Libya Under Qadhafi: A Pattern of Aggression*. The United States Central Intelligence Agency therefore concluded that "[t]he similarities between the grenades seized in 1985 [in the Egypt Air Hijacking, the Rome Airport Attack, the Vienna Airport Attack, and the Café de Paris attack] and those captured in Turkey corroborate previous reporting that Tripoli provides operational support for the Abu Nidal group and uses its diplomatic installations to pass weapons to terrorists." CIA

Grenade Report; State Department Fact Sheet On The ANO; *Libya Under Qadhafi: A Pattern of Aggression*.

Omar Rezaq, the hijacker who led the ANO operatives in the Egypt Air Hijacking, is currently serving a life sentence at a maximum-security federal penal institution in Colorado for his role in the hijacking.  Mr. Rezaq met with counsel for the Plaintiffs at this location.  In a signed affidavit, he states, "[o]nly because of what the Libyan government official [I met with regarding the hijacking] said and did was it possible for the hijacking to take place on 23 November 1985."  Rezaq Affidavit.

The investigation of the Egypt Air Hijacking by the United States Defense Intelligence Agency ("DIA") led to the following conclusions: (1) Libyan government officials pre-positioned the weapons used for the Egypt Air Hijacking at the Athens Airport using Libya's diplomatic pouches; (2) Libya provided illegal Tunisian passports to "at least some" of the ANO hijackers; and (3) ANO conducted the hijacking "in cooperation with," and "at the specific request of the Libyan government."  *See* Report and Affidavit of Ret. Col. Patrick Lang ("Lang Report"), attached hereto as Plaintiffs' Exhibit 8.  Finally, as confirmed by Mr. Rezaq, without Libya's "specific enabling support" for the attack, through "Libya's leader, Qaddafi, and Libyan money, training, assistance, weapons, passports, and general sponsorship," the ANO operatives could not have hijacked Flight 648.  *Id.* at 6.  The evidence in this case is irrefutable and uncontroverted that the Libyan Defendants directed, conducted, sponsored, supported, aided, abetted and caused the Egypt Air Hijacking, the murders and injuries of the victims and the foreseeable resulting damages to the property insured by the Plaintiffs, all

to the damage of the Plaintiffs as more particularly set forth in the Plaintiffs' Amended

Complaint.

## ARGUMENT

### I.    THE LIBYAN DEFENDANTS ARE NOT ENTITLED TO SOVEREIGN IMMUNITY UNDER THE FOREIGN SOVEREIGN IMMUNITIES ACT.

The Defendants argue that this Court lacks jurisdiction over the Plaintiffs' claims

because the Libyan Defendants are entitled to sovereign immunity under the FSIA, which

provides the sole basis for the exercise of jurisdiction over a foreign state in a United

States Court. *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 420, 434

(1989). This argument is without merit because it was a foreseeable consequence of the

Libyan Defendants' actions in providing material support to terrorist organizations for

terrorist attacks aimed at U.S. citizens, such as the Egypt Air Hijacking, that the hijacked

airplane would be damaged, and the conduct of the Libyan Defendants in supporting,

sponsoring and directing the Egypt Air Hijacking is a waiver "by implication" of their

sovereign immunity in U.S. courts.

### A.    STANDARD OF REVIEW

Under the FSIA, the Libyan Defendants bear the burden of showing the Plaintiffs'

allegations that the implied waiver of sovereign immunity in § 1605(a)(1) does not apply

to this case and consequently they should be immune from suit. "Because sovereign

immunity is in the nature of an affirmative defense, the plaintiff need not prove the

absence of sovereign immunity in the first instance; rather, 'the *defendant* bears the

burden of proving that the plaintiff's allegations do not bring its case within a statutory

exception to immunity.'" *Owens v. Republic of Sudan*, 412 F. Supp. 2d 99, 104 (D.D.C.

2006) (quoting *Phoenix Consulting, Inc. v. Republic of Angola*, 216 F.3d 36, 40 (D.C.

Cir. 2000) (emphasis added)).  In attempting to prove the inapplicability of any of the statutory exceptions to immunity on a Rule 12(b)(1) motion to dismiss, the defendant "may challenge either the legal sufficiency *or* the factual underpinning of an exception." *Phoenix Consulting*, 216 F.3d at 40.  When a defendant challenges the factual basis of the court's jurisdiction, the court "must go beyond the pleadings and resolve any disputed issues of fact" that are relevant to the jurisdictional determination.  *Id.*

Here, however, the Libyan Defendants have only challenged the legal grounds for applying the implied waiver provision of the FSIA to the Plaintiffs' claims.  Where only the legal basis for the court's jurisdiction is challenged, the standard of review is similar to that of a motion to dismiss for failure to state a claim: the court must "take plaintiff[s'] factual allegations as true and determine whether they bring the case within any of the exceptions to immunity," *id.*, "keeping in mind that the ultimate burden rests on the *defendant* to persuade the Court that plaintiffs' claims are, as a matter of law, incapable of satisfying any of the FSIA exceptions."  *Owens*, 412 F. Supp. 2d at 104.  The Plaintiffs should therefore "receive the benefit of all favorable inferences that can be drawn from the alleged facts." *Id.* (citing *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 83 (D.C. Cir. 2002) ("[W]here the defendant contests only the legal sufficiency of plaintiff's jurisdictional claims, the standard is similar to that of Rule 12(b)(6), under which dismissal is warranted if no plausible inferences can be drawn from the facts alleged that, if proven, would provide grounds for relief.").  As the Plaintiffs' allegations make clear the Libyan Defendants' conduct, on its face, falls within the ambit of the state-sponsored terrorism exception, the Defendants are deemed to have waived their sovereign immunity "by implication" pursuant to § 1605(a)(1).

### B.     STATUTORY FRAMEWORK

Before Congress enacted the FSIA in 1976, the determination of sovereign immunity was the sole province of the Executive Branch. By enacting the FSIA, Congress transferred the immunity determination to the judiciary, "thereby reducing the foreign policy implications of immunity determinations . . . ." H.R. Rep. 94-187. Congress therefore codified in the FSIA the "restrictive" theory of sovereign immunity already employed by the United States since 1952. *Id.* Under this theory, "the immunity of a foreign state is 'restricted' to suits involving a foreign state's ***public*** acts (*jure imperii*) and does not extend to suits based on its commercial or ***private*** acts (*jure gestionis*)." *Id.* (emphasis added). In contrast to the "classical" or "absolute" theory of sovereign immunity long abandoned by the United States, the restrictive theory of immunity does ***not*** require that a foreign sovereign consent to a U.S. court's exercise of jurisdiction. *Rep. of Austria v. Altmann*, 541 U.S. 677, 689-91 (2004). A foreign sovereign may therefore take actions to relinquish its sovereign immunity even though it did not subjectively intend to do so, a principle which is clear in each of the nine exceptions to sovereign immunity set forth in section 1605 of the FSIA.

The two exceptions to sovereign immunity that are relevant to the Court's exercise of jurisdiction in this case are the "waiver" exception in § 1605(a)(1) and the "state-sponsored terrorism exception" in § 1605(a)(7). The waiver exception to sovereign immunity lifts a foreign state's immunity for cases "in which the foreign state has waived its immunity either explicitly or by implication . . . ." 28 U.S.C. § 1605(a)(1). While the FSIA does not provide a definition of a waiver "by implication", the scope of such a waiver has been described as follows:

> First, such a waiver can mean that an actor intended to waive a protection, even though it did not say so expressly.  Second, an implied wavier might arise whenever an act has been taken under circumstances that would lead a reasonable observer to conclude that the act generally manifests an intent to waive, whether or not the actor had such intent in the particular case.  Both of these meanings involve a requirement of intentionality, the first being subjective and the second objective.  A third meaning is that the law deems an actor to have surrendered a protection, regardless of the actor's subjective or objectively reasonable intent.  "Waiver" in this third sense is more properly termed "forfeiture."  *See Forman v. Smith*, 633 F.2d 634, 638 (2d Cir. 1980).

*Smith v. Socialist People's Libyan Arab Jamahiriya*, 101 F.3d 239, 243 (2d Cir. 1996).

Under the state-sponsored terrorism exception to sovereign immunity, a foreign state will be held to have waived its sovereign immunity for cases "in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources (as defined in section 2339A of title 18) for such an act if such act or provision of material support is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency . . . ."  28 U.S.C. § 1605(a)(7).  For this exception to apply in a claim for personal injury or death, the foreign state must have been designated as a state-sponsor of terrorism at the time of the act or as a result of the act, and either the claimant or the victim must be a U.S. national.  *Id.*

The same activity that amounts to an explicit waiver of sovereign immunity under § 1605(a)(7) constitutes a waiver of immunity under § 1605(a)(1) "by implication".  Here, as discussed *infra* at I.C. and I.D., the Libyan Defendants' material support for terrorism strips the Defendants of their sovereign immunity under the state-sponsored terrorism exception for cases brought by U.S. nationals for their personal injuries and/or

deaths.  By extension, such material support for terrorism also qualifies as an waiver of

immunity by implication that permits the Plaintiffs to bring their property damage claims

that resulted from the destruction of Flight 648, because it was reasonably-foreseeable

that Flight 648 would be damaged during the Egypt Air Hijacking, and that U.S. courts

would be involved in the litigation of resulting claims arising out of the terrorist attack,

since the Libyan Defendants and the ANO intentionally targeted U.S. nationals.

Once a foreign sovereign's immunity has been lifted under § 1605 of the FSIA, §

1606 of that statute provides that "the foreign state shall be liable in the same manner and

to the same extent as a private individual under like circumstances."  28 U.S.C. § 1606.

"Section 1606 acts as a 'pass through' to substantive causes of actions against private

individuals that exist in federal, state or international law."  *Price v. Socialist People's

Libyan Arab Jamahiriya*, 384 F.Supp.2d 120, 132 (D.D.C. 2005) ("*Price V*").

Through the implied waiver of sovereign immunity contained in § 1605(a)(1),

therefore, non-U.S. nationals injured alongside U.S. nationals may bring claims for

property damage against state-sponsors of terrorism when a statute – such as the ATCA –

provides a cause of action.  *Id; see Almog v. Arab Bank*, 2007 WL 214433 (E.D.N.Y.

2007).

> **C.    THE LIBYAN DEFENDANTS WAIVED THEIR IMMUNITY BY
> IMPLICATION BECAUSE IT WAS REASONABLY
> FORESEEABLE THAT THE PLAINTIFFS WOULD BE INJURED
> AS A RESULT OF THE EGYPT AIR HIJACKING AND THAT U.S.
> COURTS WOULD BE INVOLVED IN THE RESULTING
> LITIGATION.**

The conduct underlying the Plaintiffs' causes of action is the Defendants' material

support for and involvement in the Egypt Air Hijacking, which stripped the Libyan

Defendants of any immunity upon the passage of § 1605(a)(7) on April 24, 1996.  28

U.S.C. § 1605(a)(7); *see Baker I*, Opinion at 11-13.  Because the allegations of the Amended Complaint satisfy the requirements of 28 U.S.C. § 1605(a)(7), the Court could properly assert subject matter jurisdiction over the claims of U.S. nationals for personal injury or death.  *See Baker I* Opinion at 11-13.  The operation of 28 U.S.C. § 1606, the "pass-through" provision, therefore reduces the formerly-immune Libyan Defendants to the status of a non-immune private individual before the Court.  A private individual would be liable for property damage caused as a result of his intentional acts.

Having engaged in non-immune conduct, namely the provision of material support that caused the hijacking and the destruction of the aircraft, the Libyan Defendants are now unable to assert immunity from the foreseeable claims of those injured as a result of the same conduct that already created an exception to immunity.  Under the Foreign Sovereign Immunities Act ("FSIA") a foreign state can implicitly waive its immunity from the jurisdiction of United States courts if there is sufficient evidence of the foreign state's intent to waive its immunity.  28 U.S.C. § 1605(a)(1).  Section 1605(a)(1) provides:

> [A] foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case in which the foreign state has waived its immunity either explicitly or by implication, notwithstanding any withdrawal of the waiver which the foreign state may purport to effect except in accordance with the terms of the waiver.

The Libyan Defendants' decision to cause the hijacking at issue manifested an intent to waive their immunity in cases brought by those whose injuries, incidental to the U.S. and principal victims' injuries, were caused by the Defendants' actions but whose claims are not cognizable under section 1605(a)(7).  Under the FSIA a foreign state can be deemed to have implicitly waived its immunity from suit in the U.S. under 28 U.S.C. §

1605(a)(1) if there is sufficient evidence of the foreign state's intent to do so, either explicitly or by implication. *Abur v. Republic of Sudan*, 437 F. Supp. 2d 166, 178 (D.D.C. 2006).

Congress did not define either an explicit or an implicit waiver but did set forth examples of each in the legislative history accompanying the FSIA. As an example of an explicit waiver, Congress stated that "a foreign state may renounce its immunity by treaty . . . ." H.R. Rep. 94-187. For waiver by implication, Congress cited to three non-exclusive examples where courts had previously found a waiver by implication, namely where a foreign state (1) agrees to arbitration in another country, (2) agrees that the law of a particular country should govern a contract or (3) files a responsive pleading in an action without raising sovereign immunity as a defense. *Id.* A waiver by implication can therefore occur although the foreign state did not subjectively intend to waive its immunity:

> [t]he concept of an "implied" waiver can have at least three meanings. First, such a waiver can mean that an actor intended to waive a protection, even though it did not say so expressly. Second, an implied wavier might arise whenever an act has been taken under circumstances that would lead a reasonable observer to conclude that the act generally manifests an intent to waive, whether or not the actor had such intent in the particular case. Both of these meanings involve a requirement of intentionality, the first being subjective and the second objective. A third meaning is that the law deems an actor to have surrendered a protection, regardless of the actor's subjective or objectively reasonable intent. "Waiver" in this third sense is more properly termed "forfeiture." *See Forman v. Smith*, 633 F.2d 634, 638 (2d Cir. 1980).

*Smith v. Socialist People's Libyan Arab Jamahiriya*, 101 F.3d 239, 243 (2d Cir. 1996);

*Siderman de Blake v. Rep. of Argentina*, 965 F.2d 699 (9th Cir. 1992) (finding an implied waiver of immunity based on Argentina's use of U.S. courts to serve the plaintiff with

process for a criminal action pending in Argentina); *Joseph v. Office of the Consulate Gen'l of Nigeria*, 830 F.2d 1018, 1023 n.6 (9th Cir. 1987) (finding an implicit waiver based on Nigeria's entering into a lease agreement containing an adjudication clause, even though the Court found it unclear whether Nigeria intended to waive sovereign immunity). Thus, the behavior of the foreign state is dispositive, rather than explicit proof of a prior conscious intent to waive immunity.

In this case the Libyan Defendants' conduct at a minimum forfeited their immunity, under the *Smith* implied waiver framework, and also were acts that would lead a reasonable observer to conclude that the acts generally manifested an intent to waive. The Libyan Defendants' provision of material support for a terrorist hijacking that targeted US nationals exhibits an objective intent to waive their sovereign immunity.

It is no defense for the Libyan Defendants to say they were immune from litigation in the U.S. at the time of the Egypt Air Hijacking. What matters for a court when analyzing the applicability of the FISA is Defendants' immunity from litigation at the time of the lawsuit. "[T]he legal concept of sovereign immunity, as traditionally applied, is about a defendant's status at the time of suit, not about a defendant's conduct before the suit." *Altmann*, 541 U.S. at 708 (Breyer, J., concurring). The FSIA, including the state-sponsored terrorism exception, is a retroactive statute. *E.g., Wyatt v. Syrian Arab Republic*, 398 F. Supp. 2d 131, 144 (D.D.C. 2005). As of April 21, 2006, when Plaintiffs filed the instant action, not only was the principle of restrictive immunity already well-settled, but Congress had passed the state-sponsored terrorism exception to sovereign immunity, stripping the Libyan Defendants of their immunity based on their involvement in and sponsorship of terrorism.

The restrictive theory of immunity supports the notion that Libya should not be entitled to sovereign immunity for actions arising out of its material support for terrorism: when Libya provided material support to the ANO, it was not acting in its "public" role as a foreign sovereign, although it abused the resources available to it as a foreign state for the purpose of supporting terrorism.  Libya therefore implicitly waived its sovereign immunity by stepping out of the shoes of a foreign sovereign acting in its diplomatic capacity, and into those of a private financier of terrorism, covertly and illegally supplying significant material support to the ANO terrorist organization.  The Libyan Defendants waived their immunity from suit by aiding and abetting and/or conspiring with the ANO to murder U.S. nationals because such activity breached international treaties and obligations, and exposed the Libyan Defendants to not only civil but also criminal prosecution in the United States.  *See* 1971 Convention for the Suppression of Unlawful Act Against the Safety of Civil Aviation; 1963 Convention on Offences and Certain Other Acts Committed on Board Aircraft.

The implied waiver exception acts to vest U.S. courts with jurisdiction over cases against a foreign sovereign where the foreign sovereign actions create a reasonable expectation of "the involvement of United States courts in its dealings with another party," *Siderman*, 965 F.2d at 721[4].  *But see Abur v. Republic of Sudan*, 437 F. Supp. 2d 166, 177-78 (D.D.C. 2006) (declining to find an implied waiver for companion claims under section 1605(a)(1) arising out of non-immune conduct under section 1605(a)(7)), *appeal docketed* as Case No. 06-7122.  When terrorist attacks are directed at U.S. nationals it is reasonably foreseeable that they will be haled into court here.  *Sisso v.*

---

[4] Although the *Siderman* court seemed to confine this holding to cases involving a "written agreement", the court applied this holding to a fact pattern that did not involve any written agreement.  965 F.2d at 721.

*Islamic Rep. of Iran*, 448 F. Supp. 2d 76, 89-90 (D.D.C. 2006); *Morris v. Khadr*, 415 F. Supp. 2d 1323 (D. Utah 2006). Courts analyzing whether it is constitutionally permissible for U.S. courts to exercise jurisdiction over terrorists with no connection to the United States other than their direction of attacks at U.S. citizens have held:

> "[t]errorism cases provide textbook examples of 'unabashedly malignant actions' aimed at the United States whose effects are 'directed at [and] felt here." *Morris*, 415 F.Supp.2d at 1336 (quoting *Mwani*, 417 F.3d at 13). Although most such cases have involved terrorist attacks that targeted U.S. persons or interests . . . it is nonetheless entirely foreseeable that an indiscriminate attack on civilians in a crowded metropolitan center such as Tel Aviv will cause injury to persons who reside in distant locales – including tourists and other visitors to the city, as well as relatives of individuals who live in the area. The ripples of harm that flow from such barbarous acts rarely stop at the banks of the Mediterranean Sea or the Jordan River, and those who engage in this kind of terrorism should hardly be surprised to find that they are called to account for it in the courts of the United States – or, for that matter, in any tribunal recognized by civilized peoples.

*Sisso*, 448 F. Supp. 2d at 90. The Libyan Defendants have waived their sovereign immunity by implication because it is even more reasonable for the Court to find that the Libyan Defendants could have foreseen the involvement of U.S. courts in litigation flowing from the Egypt Air Hijacking, which not only injured U.S. citizens in the attack, but was actually and specifically aimed at innocent U.S. citizens. *See Hartford Fire Ins. Co. v. Great Socialist People's Arab Jamahiriya*, 1999 WL 33589331 (D.D.C. 1999).

    In this case, it is undisputed that the Libyan Defendants, by and through the ANO, targeted U.S. nationals during the Egypt Air Hijacking. It is undisputed that the ANO terrorists singled out the three American citizens traveling on Flight 648, whom they identified from their United States passports, and shot each of them in the head one by one, leaving them to die on the tarmac beneath the plane. Pltfs' Am. Compl. at ¶ 40. The

ANO routinely attacked the interests of the United States whenever and wherever possible, and the Libyan Defendants provided direction and material support to the ANO for the explicit purpose of committing terrorist attacks in furtherance of its goals, which coincided with those of the ANO, and included attacking U.S. interests in as brutal a manner as possible.

The goal of the state-sponsored terrorism exception to punish and deter state-sponsors of terrorism and to compensate its victims is fulfilled by (1) imputing the knowledge to the Libyan Defendants that they would be held liable for the reasonably foreseeable consequences of their material support for terrorism directed at U.S. nationals, and (2) finding that Libya waived its immunity by implication. Thus, the Court should not hold that the Libyan Defendants could not and/or did not foresee that their material support to the ANO might result in litigation in a U.S. court, whether for personal injury or property damage arising out of their sponsorship of terrorism.

Tort law requires that an injury be proximately caused by the defendant in order for liability to attach. This would not be a burdensome test as courts that analyze the applicability of 28 U.S.C. § 1605(a)(7) are constantly engaged in this type of foreseeability analysis. *See, e.g. Owens*, 412 F. Supp. 2d 99, 114. The hijacking and subsequent destruction of Flight 648 proximately caused all of the damages suffered by the Plaintiffs, which were foreseeable regardless of their nationality. *Sisso*, F. Supp. 2d at 90.

It was reasonably foreseeable that the Egypt Air Hijacking would likely result in the destruction of the aircraft and that, since U.S. nationals were targeted during the attack, U.S. courts would become involved in litigation arising out of the Libyan

Defendants' material support for terrorism.  The Libyan Defendants are therefore not entitled to immunity under the FSIA for their non-public and illegal acts, and the Libyan Defendants' Motion to Dismiss on the grounds of sovereign immunity should be denied.

      **D.**      **AS OF THE DATE THAT THE STATE-SPONSORED TERRORISM EXCEPTION TO SOVEREIGN IMMUNITY WAS ENACTED, THE LIBYAN DEFENDANTS' SOVEREIGN IMMUNITY WAS WAIVED BY IMPLICATION FOR ACTIONS ARISING OUT OF THE DEFENDANTS' MATERIAL SUPPORT FOR TERRORISM.**

Under the Plaintiffs' theory of waiver "by implication", it is necessary to also show the Libyan Defendants engaged in acts cognizable under 28 U.S.C. § 1605(a)(7). The Plaintiffs' allegations of the Libyan Defendants' sponsorship of the ANO and the Egypt Air Hijacking are more than sufficient to bring them within the state-sponsored exception to sovereign immunity.  "Material support" as used in section 1605(a)(7) is defined by 18 U.S.C. § 2339A, which includes:

> any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives . . . .

Not only does the Plaintiffs' Amended Complaint identify the general material support the Libyan Defendants provided to the ANO, but it also surpasses the minimum requirements by providing weighty evidence to support their allegations of the Libyan Defendants' direct involvement in the Egypt Air Hijacking.  Pltfs' Am. Compl. ¶¶ 7, 9-13, 17-20; *see also* Plaintiffs' Exhibits 1-8.  Plaintiffs' Amended Complaint lists, among other material support, the Libyan Defendants' provision of weapons, funds, safe haven or safehouses, and stolen documents to the ANO and its terrorist operatives.  Pltfs' Am. Compl. ¶¶ 7, 9-13, 17-20.  Plaintiffs have therefore stated sufficient allegations to allow

the Court to assert subject matter jurisdiction under 28 U.S.C. § 1605(a)(7) over any U.S. national's claims. This same conduct by the Defendants, however, amounts to a waiver of sovereign immunity "by implication" under § 1605(a)(1), and the Defendants' Motion to Dismiss on the grounds of sovereign immunity should be denied.

The Libyan Defendants have misconstrued the Plaintiffs' Amended Complaint in arguing that "Plaintiffs allege that, because the Libya Defendants allegedly participated in terrorist activities, they have violated a *jus cogens* norm [footnote omitted] and have consequently implicitly waived immunity." (Defs' Mot. at 8-9). However, this disregards the fact that Plaintiffs' assertion of subject matter jurisdiction is founded upon the Libyan Defendants' sponsorship of and involvement in terrorism, which also satisfies the requirements of the state-sponsored exception to sovereign immunity, an explicit congressional grant of jurisdiction, and amounts to an implied waiver of sovereign immunity under 28 U.S.C. § 1605(a)(1). (Pltfs' Am. Compl. ¶¶ 2-3). The only relevance of the Egypt Air Hijacking as a *jus cogens* violation is to the Plaintiffs' substantive causes of action under the ATCA. *See* discussion, *infra*, at V; Pltfs' Am. Compl. ¶ 66.

The Libyan Defendants' apparent misunderstanding of the Plaintiffs' jurisdictional allegations explains their reliance upon the holding in *Princz v. Fed. Repub. Of Germany*, 26 F.3d 1166 (D.C. Cir. 1994), that a violation of a *jus cogens* norm does not necessarily constitute an implied waiver of sovereign immunity. (Defs' Mot. at 8-9). Not only is the Libyan Defendants' argument on this point irrelevant, but the holding of *Princz*, which came before the state-sponsored terrorism exception was passed in 1996, is also inapplicable to the Plaintiffs' case.

The plaintiffs in *Princz* argued that international law could create a waiver of immunity by implication.  The *Princz* court rejected this argument and dismissed the plaintiffs' complaint because of its fear that U.S. courts would be open to a tidal wave of litigation for a wide array of human rights violations based upon international law.  The *Princz* court held that "[s]uch an expansive reading of § 1605(a)(1) would likely place an enormous strain not only upon our courts but, more to the immediate point, upon our country's diplomatic relations with any number of foreign nations."  26 F.3d 1166 at 1174.

Here, as discussed *supra* at I.A. – I.C., the Plaintiffs contend that the Court's subject matter jurisdiction is not based on international law but rather premised upon the Plaintiffs' allegations of the Libyan Defendants' material support for the ANO, which satisfy the requirements of section 1605(a)(7), an explicit congressional grant of jurisdiction.  Thus, finding a waiver of immunity under section 1605(a)(1) under Plaintiffs' theory would not increase the litigation load of any U.S. court because there already would be a grant of jurisdiction for a section 1605(a)(7) case.  Those who suffered reasonably-foreseeable damages could then assert their causes of action only if Congress had already provided – as with the ATCA – a substantive cause of action for their claims.

II.     **THE COURT IS PROPERLY VESTED WITH JURISDICTION TO HEAR THE PLAINTIFFS' CLAIMS AGAINST DEFENDANTS AL-SANUSI AND AL-BISHARI.**

    A.     **DEFENDANTS FAILED TO MEET THEIR BURDEN OF DEMONSTRATING THAT THE EXCEPTIONS TO SOVEREIGN IMMUNITY DO NOT APPLY IN THIS CASE.**

The Defendants argue that the Plaintiffs cannot state a claim against either Defendant Al-Sanusi or Defendant Al-Bishari because (1) Al-Sanusi "was not the head of, nor did he have any connection with either LISO or LESO at any time from 1985 to the present" and (2) Defendant Al-Bishari died in a car accident in 1997 (Defs' Mot. at 22-24). Moreover, according to the Defendants, even if the Plaintiffs have correctly identified the official positions of these Defendants as the heads of LESO and LISO, the Plaintiffs must directly trace the "specific acts of aid or material support provided by Abdallah al-Sanusi and Ibrahaim al-Bishari" to the Egypt Air Hijacking in order to properly plead their claims. (Defs' Mot. at 22.) As discussed, *infra* at II.B, it is well-settled that such specificity is not required.

To lift sovereign immunity under the FSIA, the conduct at issue (i.e. the provision of material support or resources to a foreign terrorist organization) must have been "engaged in by an official, employee, or agent of [a] foreign state while acting within the scope of his or her office, employment, or agency . . . ." 28 U.S.C. § 1605(a)(7). As discussed, *supra* at I, once this conduct is established, the foreign state has also waived its sovereign immunity "by implication . . . ." 28 U.S.C. § 1605(a)(1). Therefore, while the Defendants couch their argument that the Plaintiffs failed to properly allege Al-Sanusi was the head of LISO or LESO as one for failure to state a claim, the Defendants have essentially challenged the Court's subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1) rather than under Rule 12(b)(6) for failure to state a claim.

On a Rule 12(b)(1) motion to dismiss in an FSIA case, the defendant may challenge either the legal sufficiency or the factual underpinnings of the relevant exception to sovereign immunity. *Phoenix Consulting,* 216 F.3d 36, 40 (D.C. Cir. 2000).

Here, by arguing that the Plaintiffs' factual allegations relating to al-Sanusi's role within the Libyan government are wrong, the Libyan Defendants have elected to challenge the factual basis for the Court's jurisdiction.

"[W]hen a foreign state defendant raises a dispute over the factual basis of the court's subject matter jurisdiction under the FSIA, the trial court is required to go beyond the pleadings and resolve any disputed issues of fact the resolution of which is necessary to a ruling on the motion to dismiss." *Price II*, 294 F.3d 82, 87 (D.C. Cir. 2002); *see also Phoenix Consulting*, 216 F.3d at 38. However, consistent with the "restrictive view of sovereign immunity reflected in FSIA, the defendant bears the burden of proving that the plaintiff's allegations do not bring its case within a statutory exception to sovereign immunity." *Phoenix Consulting,* 216 F.3d 36, 40 (quotation omitted); *see also Kilburn v. Socialist People's Libyan Arab Jamahiriya ("Kilburn II")*, 376 F.3d 1123, 1131 (D.C. Cir. 2004); *Price v. Socialist People's Libyan Arab Jamahiriya ("Price IV")*, 389 F.3d 192, 197 (D.C. Cir. 2004). The defendant must therefore proffer some affirmative evidence in support of its claim that it retains sovereign immunity; the defendant may not "remain silent in the face of [the plaintiffs' allegations] and still be said to have carried its burden of showing this case does not come within the subject matter jurisdiction of the district court via the terrorism exception to the FSIA." *Price IV*, 389 F.3d at 199 (quoting *Price II* for the proposition that "[w]hen reviewing a plaintiff's unchallenged factual allegations to determine whether they are sufficient to deprive a foreign state of sovereign immunity, we assume those allegations to be true.").

The Court's resolution of the disputed facts is, at this stage of the litigation, "not a conclusive determination" of the facts at bar but is instead "subject to change in light of

further development of the facts." *I.T. Consultants, Inc. v. Republic of Pakistan*, 351

F.3d 1184, 1188 (D.C. Cir. 2003). The Court has "considerable latitude in devising the

procedures it will follow to ferret out the facts pertinent to jurisdiction," but it must give

the plaintiff "ample opportunity to secure and present evidence relevant to the existence

of jurisdiction." *Id.*

    In this case, the Libyan Defendants have provided no evidence to support their

claim that al-Sanusi held no official position within LESO or LISO. The Libyan

Defendants instead expect the Court to accept their factual allegations, without support

by declaration or affidavit or otherwise, that Defendant al-Sanusi (1) did not hold any

office or position within LESO or LISO <u>and</u> (2) is suffering from a cryptic medical

condition and his alleged incapacity essentially prevents the Libyan Defendants from

otherwise finding and/or filing any and all evidence relating to his role within the Libyan

government. According to the Libyan Defendants, "[d]ue to Major Al-Sanusi's medical

condition, as well as his status as a foreign defendant, counsel for defendants is unable to

provide the Court with supporting documentation at this time. To the extent necessary,

defendants will supplement their filing with supporting documentation and proof that

Major al-Sanusi was not the leader of LISO during the relevant time period as soon as it

becomes available." (Defs' Mot. at 12, n.6.) The Defendants have offered no proof

whatsoever to satisfy their burden to prove that "plaintiff's allegations do not bring [this]

case within a statutory exception to sovereign immunity . . . ." *Phoenix Consulting*, 216

F.3d at 40. Such a showing by the Libyan Defendants is "necessary" at this stage and,

failing same, Defendants' Motion to Dismiss must be denied.

With respect to Defendant al-Bishari, assuming *arguendo*, that the Libyan Defendants' assertion is correct that al-Bishari died in 1997, this also does not defeat the Plaintiffs' claims for al-Bishari's actions in the 1980s while he was alive and an active Libyan leader.   Rather, the Plaintiffs will, with leave of court, upon a demonstration as to the identity of the personal representative of al-Bishari's estate, amend their Complaint to substitute Defendant al-Bishari's estate as a defendant in accordance with the Federal Rules of Civil Procedure.

**B.    THE PLAINTIFFS NEED NOT SET FORTH THE SPECIFIC ACTS OF MATERIAL SUPPORT BY AL-SANUSI AND AL-BISHARI FOR THE EXCEPTIONS TO APPLY.**

The Libyan Defendants further argue that the Plaintiffs' Complaint fails to state a claim against the Defendants Abdallah al-Sanusi and Ibrahaim al-Bishari because the Plaintiffs did not "provide any allegations concerning the time or details of the specific acts of aid or material support provided by Abdallah al-Sanusi and Ibrahaim al-Bishari." (Defs' Mot. at 22.)  The Libyan Defendants essentially argue that al-Sanusi and al-Bishari are immune from suit under the FSIA because the Plaintiffs have not identified the specific material support these two individuals provided to the ANO, and have not traced such material support directly to the Egypt Air Hijacking.  To invoke this Court's subject matter jurisdiction, the Libyan Defendants therefore argue for an interpretation of § 1605(a)(7) that would require Plaintiffs to allege facts that demonstrate al-Sanusi and al-Bishari's specific material support of the specific terrorist act at issue, the Egypt Air Hijacking, rather than Libya's material support of the Abu Nidal Organization in general. (Defs' Mot. at 22, 23.)  It is well-settled, however, that this showing is unnecessary to establish subject matter jurisdiction under the FSIA.

1.    **Al-Sanusi and Al-Bishari Constitute the "Foreign State" for the Purposes of the FSIA.**

The definition of a "foreign state" under the FSIA "includes a political subdivision of a foreign state or an agency or instrumentality of a foreign state . . . ." 28 U.S.C. § 1603. The FSIA further defines "an agency or instrumentality of a foreign state" to be "any entity (1) which is a separate legal person . . . and (2) which is an organ of a foreign state or political subdivision thereof . . . ." *Id.* This includes not only LESO and LISO, but also Al-Sanusi and Al-Bishari as the heads of those agencies. The Plaintiffs' Complaint alleges that Libya carried out its material support and direct involvement in the ANO's terrorist activities through its instrumentalities such as LESO and LISO, and, therefore, through al-Sanusi and al-Bishari as the heads of LESO and LISO. (*See* Plfs' Am. Compl. at ¶¶ 9-13.) For the purposes of the FSIA, therefore, al-Sanusi and al-Bishari qualify as the foreign state itself, and the material support and direct involvement that the Plaintiffs allege Libya provided is directly attributable to al-Sanusi and al-Bishari.

2.    **Plaintiffs Need Not Plead "But For" Causation To Satisfy The Subject Matter Requirements of 28 § U.S.C. 1605(a)(7).**

Moreover, the Plaintiffs have more than met their pleading requirements, as this Circuit interprets "material support or resources" such that a foreign state's *general support* of a terrorist group is sufficient to bring that state within the parameters of the state-sponsored terrorism exception. *Kilburn II,* 376 F.3d at 1130 (finding that " . . . imposing a jurisdictional requirement that a state sponsor's financial assistance to a terrorist organization must be directly traceable to a particular terrorist act would likely render § 1605(a)(7)'s material support provision ineffectual."); *Baker I Op. at 11-13;*

*Wyatt v. Syrian Arab Republic*, 362 F. Supp. 2d 103, 111 n.1 (D.D.C. 2005) ("A nation

[and its agencies and instrumentalities as defined by the FSIA] loses immunity even if the

support it provides does not directly fund the particular terrorist act that injured or killed

the victim."); *Collett v. Socialist People's Libyan Arab Jamahiriya*, 362 F. Supp. 2d 230,

236 (D.D.C. 2005); *Flatow*, 999 F. Supp. at 18 ("a plaintiff need not establish that the

material support or resources provided by a foreign state for a terrorist act contributed

directly to the act from which his claim arises in order to satisfy [the] statutory

requirements for subject matter jurisdiction . . . [s]ponsorship of a terrorist group which

causes the personal injury or death of a United States national alone is sufficient to

invoke jurisdiction."); *Kilburn v. Republic of Iran*, 277 F. Supp. 2d 24 (D.D.C. 2003)

("*Kilburn I*") (reiterating that the terrorist exception "does not require a direct link

between [the] material support [provided] and the acts in question), *abrogated on other

grounds by* 353 F.3d 1024; *Cronin v. Islamic Republic of Iran*, 238 F. Supp. 2d 222, 229

(D.D.C. 2002) (premising material support on funding, training and direction provided to

terrorist groups, enabling them to "carry out terrorist *activities such as* the kidnapping

and torture" at issue) (emphasis added), *abrogated on other grounds by* 353 F.3d 1024

(D.C. Cir. 2003); *Weinstein v. Islamic Republic of Iran*, 184 F. Supp. 2d 13, 21 (D.D.C.

2002) (finding material support in the provision of technical knowledge and funding to

terrorist group, making it "unlikely" that the attack at issue could have taken place

without such support); *Elahi v. Islamic Republic of Iran*, 124 F. Supp. 2d 97, 107-108

(D.D.C. 2000) (finding that the act was perpetrated by Iran, and acknowledging that

previous courts premised liability under FSIA on general support to terrorist groups);

*Eisenfeld v. Islamic Republic of Iran*, 172 F. Supp. 2d 1 (D.D.C. 2000).

These decisions fully comport with logic, reason and Congressional intent. Congress enacted the state-sponsored terrorist exception to "create a judicial forum for compensating the victims of terrorism, and in so doing to punish foreign states who have committed or sponsored such acts and deter them from doing so in the future." *Bettis v. Islamic Republic of Iran*, 315 F.3d 325, 329 (D.C. Cir. 2003) (internal citation omitted). The Congressional record for § 2333, which, as previously noted, defines "material support or resources," demonstrates an "intention to cut off the flow of money in support of terrorism generally." *Boim v. Quranic Literacy Ins. And Holy Land Foundation For Relief and Development*, 291 F.3d 1000, 1015 (7th Cir. 2002) (citing S. Rep. 102-342 at 22 (1992)). Were Congress to impose upon Plaintiffs the "insurmountable burden" of requiring "but for" causation to establish jurisdiction, Congress' goal would be largely unattainable. *See Kilburn I*, 277 F. Supp. 2d at 31.

The Defendants have erroneously asserted that the Plaintiffs must identify the specific acts of material support by Libya and the Individual Defendants to the ANO which actually and specifically caused the Egypt Air Hijacking in order to invoke the state-sponsored terrorism exception to the FSIA. (Defs' Mot. at 22-24.) It is well-settled that the Plaintiffs need not establish direct causation for the Court to have subject matter jurisdiction over Plaintiffs' claims. *See Baker I* Op. at 11-13*; Wyatt*, 362 F.Supp.2d at 111; *Collett,* 362 F.Supp.2d at 236. Libya's uncontroverted support for the Abu Nidal Organization amounted to a surrender of immunity under the state-sponsored terrorist exception, and neither the foreign state itself – nor its individual officials or employees – can claim immunity from this lawsuit.

Accordingly, as all of the elements of the state-sponsored terrorism exception to the FSIA have been met, the Court is fully vested with subject matter jurisdiction over the Plaintiffs' claims and the Defendants' 12(b)(1) arguments in their Motion to Dismiss should be denied.

III.    **PLAINTIFFS PROPERLY SERVED ALL OF THE DEFENDANTS
        PURSUANT TO § 1608(a)(3) OF THE FSIA.**

The Defendants correctly state that the FSIA dictates the methods for service

upon a foreign state, political subdivision, agency or instrumentality.  28 U.S.C. § 1608.

The FSIA in §§ 1608(a)(1) through (a)(4) sets forth a list of four means of service in

order of preference.  A plaintiff bringing a case under the FSIA must attempt each

available method of service before utilizing the means set forth in the subsequent

subsection.

The first means of service, set forth in § 1608(a)(1), is delivery of the summons

and complaint "in accordance with any special arrangement for service between the

plaintiff and the foreign state."  28 U.S.C. § 1608(a)(1).  If no such arrangement exists, §

1608(a)(2) permits delivery of the summons and complaint "in accordance with an

applicable international convention on service of judicial documents."  28 U.S.C. §

1608(a)(2). In this case, § 1608(a)(3) was the first available method of service on the

Libyan Defendants because there is  no "special arrangement" and no "applicable

international convention on service of judicial documents" with Libya.  28 U.S.C. §1608

(a)(1) and (2).  Section 1608(a)(3) allows a plaintiff to send the summons, complaint, and

a notice of suit (together with a translation of each into the official language of the

foreign state) "by any form of mail requiring a signed receipt, to be addressed and

dispatched by the clerk of the court to the head of the ministry of foreign affairs of the

foreign state concerned."  28 U.S.C. § 1608(a)(3).  Accordingly, the Plaintiffs served all

of the Defendants by requesting that the Clerk's Office "address[] and dispatch[]" the

"summons and complaint and notice of suit, together with a translation of each . . . to the

head of the ministry of foreign affairs of the foreign state concerned."  *See* Plaintiffs'

request for foreign service, dated July 21, 2006, docket entry number 15 and attached hereto as Plaintiffs' Exhibit 9.

Delivery in this case was made upon the Libyan Defendants by DHL, which is recognized as a proper "form of mail" for delivery under the FSIA. *See Abur*, 437 F.Supp.2d at 173. DHL provided the Plaintiffs with a delivery record confirming that, on July 30, 2006, "Taher B Zetu" accepted and signed for the documents at the Libyan Ministry of Foreign Affairs. *See* Plaintiffs' Notice of Proof of Service with DHL delivery record and signature page for the Libyan Defendants attached, docket entry number 17 and attached hereto as Plaintiffs' Exhibit 10. Accordingly, service upon the Libyan Defendants was properly effected as of July 30, 2006, and the Plaintiffs filed the appropriate documents with the Court verifying same on August 17, 2006. *Id.*

Nevertheless, the Libyan Defendants argue that it is "unclear whether a summons, Complaint, and notice was served in accordance with § 1608(a)(3) upon the Government of Libya" and that the Court should require the Plaintiffs to demonstrate that service of process was effected under this provision. (Defs' Mot. at 25.) As the Plaintiffs have already filed the proper documentation with the Court demonstrating service under § 1608(a)(3), and no further demonstration of service is required of the Plaintiffs, the Defendants' Motion to Dismiss should be denied.

The Libyan Defendants further argue, however, that the individual Defendants al-Bishari, al-Sanusi and Qadhafi were improperly served under § 1608(a)(3) because they qualify as the agencies or instrumentalities of Libya.[5] While the Libyan Defendants correctly state that the FSIA provides different service provisions for a foreign state than

---

[5] The Defendants apparently concede that service upon Defendants LESO and LISO was proper under § 1608(a)(3).

for its agencies or instrumentalities, 28 U.S.C § 1608, the analysis of whether a defendant is considered an agency or instrumentality of a foreign state – as opposed to the foreign state itself – is different for the purposes of service of process under § 1608 than for the other provisions of the FSIA. 28 U.S.C. § 1603 ("A 'foreign state,' **except as used in section 1608 of this title**, includes a political subdivision of a foreign state or an agency or instrumentality as defined in subsection (b).") (emphasis added).

"The D.C. Circuit has developed a 'categorical approach' to distinguishing between a foreign state and agencies and instrumentalities for purposes of the FSIA's service-of-process provisions: 'if the core functions of the entity are governmental, it is considered the foreign state itself; if commercial, the entity is a n agency or instrumentality of the foreign state.'" *Nikbin v. Islamic Republic of Iran*, slip op, 2007 WL 64185 at *3 (D.D.C. 2007) (quoting *Roeder v. Islamic Republic of Iran*, 333 F.3d 228, 234 (D.C. Cir. 2003) (citing *Transaero, Inc. v. La Fuerza Aerea Boliviana*, 30 F.3d 148, 149050 (D.C. Cir. 1994)). Therefore, while an individual that acts in his individual capacity may otherwise qualify as an agency or instrumentality under § 1603 of the FSIA, that same individual may nevertheless qualify as the state itself for the purposes of service of process. *Id.*

Here, it is indisputable – and indeed the Libyan Defendants do not dispute – that all of the Libyan Defendants have "core governmental functions" that qualify them as the Libyan state itself for the purposes of service of process under § 1608. Therefore, as the Plaintiffs properly effected service upon all of the Defendants pursuant to 28 U.S.C. § 1608(a)(3), the Defendants Motion to Dismiss should be denied on these grounds as well.

IV.    **THE PLAINTIFFS TIMELY FILED EACH OF THEIR CLAIMS.**

The Libyan Defendants argue that all of the Plaintiffs' claims against all of the

Defendants are time-barred.  The Amended Complaint contains the following three

classes of claims:

1.   the common law causes of action of trespass and conversion against each of the

     Libyan Defendants;

2.   aircraft piracy in violation of the Alien Tort Claims Act ("ATCA"), 28 U.S.C. §

     1350, against the Individual Defendants in their individual capacities; and

3.   committing acts of international terrorism in violation of of the Anti-Terrorism

     Act ("ATA"), 18 U.S.C. § 2333, brought on behalf of the single Plaintiff in this

     case that is a U.S. national against the Individual Defendants in their individual

     capacities.

The Defendants mistakenly argue that the Plaintiffs' claims for conversion, tort,

and aircraft piracy were all brought pursuant to the FSIA and the ATCA.  This is

incorrect, as the Plaintiffs (1) brought their claims for tort and conversion pursuant to

common law (although the applicable statute of limitations is found in § 1605(f) of the

FSIA) and (2) brought their claims for aircraft piracy under the ATCA (whose tolling

provision is found in the TVPA).  Accordingly, the Plaintiffs will separately address the

Defendants' arguments with respect to the ATCA in turn.

A.      **PLAINTIFFS' FILED THEIR COMMON LAW CAUSES OF
        ACTION WITHIN THE APPLICABLE STATUTE OF
        LIMITATIONS DEADLINE CONTAINED IN THE FSIA.**

The Libyan Defendants argue that the Plaintiffs' claims are barred by the statute

of limitations set forth in the FSIA because (1) the Plaintiffs filed their Complaint more

than 10 years after the Egypt Air Hijacking and (2) according to the Defendants, the

principles of equitable tolling should not apply to the Plaintiffs' claims.  (Defs' Mot. at

8).  The FSIA's statute of limitations provision states:

> No action shall be maintained under subsection (a)(7)
> unless the action is commenced not later than 10 years
> after the date on which the cause of action arose.  **All
> principles of equitable tolling, including the
> period during which the foreign state was immune from
> suit, shall apply** in calculating this limitation period.

28 U.S.C. § 1605(f) (emphasis added).  As discussed above, the Plaintiffs claims are

completely dependant on the viability of an action under 28 U.S.C. § 1605(a)(7).  Thus it

can be said that Plaintiffs' claims brought under the waiver "by implication" theory are

literally dependent on and are brought under subsection (a)(7).

Congress's purpose behind the state-sponsored terrorism exception was to punish

and deter state-sponsors of terrorism and to compensate its victims, such that the

equitable tolling provision of § 1605(f) should apply to claims brought as a result of

state-sponsored terrorism, whether based on personal injury or property damage and

whether brought by U.S. nationals or foreign corporations.  As discussed *infra* at IV.C.,

the FSIA's equitable tolling provision should apply to all cases arising out of state-

sponsored terrorism, and not just those brought under § 1605(a)(7), as courts have

applied the FSIA's equitable tolling provision to claims under the TVPA and ATCA.

Thus, the FSIA's statute of limitations provision should apply to the Plaintiffs' claims,

which, although cognizable under the implied waiver provision of the FSIA, nevertheless

arise out of the same conduct – material support for terrorism – that would lift Libya's

immunity for suits brought by U.S. nationals for their personal injuries and/or deaths.

Because the destruction of Egypt Air Flight 648 was a reasonably foreseeable result of the Egypt Air Hijacking, the purpose of the state-sponsored terrorism exception and the FSIA's equitable tolling provision would be fulfilled by permitting the Plaintiffs to maintain their suit, which could not have been maintained before April 24, 1996, when Libya was stripped of its immunity for its material support for terrorism.

Settled precedent regarding the interpretation of equitable tolling provisions in general instructs that the statute under which a case is brought defines the statute of limitations and equitable tolling analyses, which should effectuate Congress's legislative intent. *Arce v. Garcia*, 434 F.3d 1254, 1261 (11th Cir. 2006) (citing *Burnett v. New York Central Railroad Co.*, 380 U.S. 424, 426 (1965)). The state-sponsored terrorism exception to the FSIA is the predicate to the implied waiver of immunity in the FSIA and consequently must control the statute of limitations analysis here.

Subsection 1605(f) mandates that "[a]ll principles of equitable tolling, including the period during which the foreign state was immune from suit, shall apply in calculating" the limitations period. 28 U.S.C. § 1605(f). The decisions in this Circuit overwhelmingly hold that § 1605(f) commands the tolling of the statute of limitations until April 24, 1996, the date that the state-sponsored terrorism exception to foreign sovereign immunity was passed. *Collett*, 362 F. Supp. 2d at 242; *Wyatt*, 398 F. Supp. 2d at 145; *Peterson v. Islamic Republic of Iran*, 264 F. Supp. 2d 46, 60 (D.D.C. 2003) (holding that the plaintiffs' actions were not time-barred because "28 U.S.C. § 1605(f) provides for a statute of limitations of '10 years after the date on which the cause of action arose,' and provides for equitable tolling during the 'period during which the

foreign state was immune from suit.'") (quoting 18 U.S.C. § 1605(f)); *Flatow*, 999 F. Supp. at 23.

Here, the Libyan Defendants were immune from suits arising out of their material support of terrorism until April 24, 1996, when the state-sponsored terrorism exception was enacted. The FSIA thus halted the running of the ten-year statute of limitations period and allowed Plaintiffs to file this action at any time until at least April 24, 2006, ten years from Congress's enactment of § 1605(f), instead of ten years from the actual Egypt Air Hijacking. The years when Libya was immune from suit are entirely excluded from the statute of limitations calculation. "Accordingly, the statute of limitations for the plaintiffs' claims must be tolled to begin when the defendants were stripped of their immunity with the 1996 enactment of 28 U.S.C. § 1605(a)(7)." *Collett*, 362 F. Supp. 2d at 242; *Wyatt*, 398 F. Supp. 2d at 145; *Peterson*, 264 F. Supp. 2d at 60 ; *Flatow*, 999 F. Supp. at 23.

Relying on settled precedent in this Circuit, the Plaintiffs filed suit on April 21, 2006, within ten years of the date that Congress passed the state-sponsored terrorism exception, stripping the Libyan Defendants of their immunity. Accordingly, the Plaintiffs' Complaint was timely filed and is not time barred.

The Libyan Defendants' reading of § 1605(f) to require the limitations period to run from the date of the Egypt Air Hijacking, when the Libyan Defendants were immune from suit, would also violate important canons of statutory construction. "It is 'a cardinal principle of statutory construction' that 'a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous,

void, or insignificant.'" *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (citing to *Duncan v. Walker*, 533 U.S. 167 (2001)). Subsection 1605(f) includes the mandate that:

> [a]ll principles of equitable tolling, including the period during which the foreign state was immune from suit, shall apply in calculating this limitation period.

This is not an invitation to toll the statute of limitations only under "extraordinary circumstances" as the Libyan Defendants argue. These words are a command from Congress to employ the principles of equitable tolling in the calculation of the limitation period itself. The overwhelming majority of the decisions that have construed subsection 1605(f) have done so.

Congress passed the "state-sponsored terrorism exception" to the FSIA for the purpose of to deterring and punishing state-sponsored terrorism. *Price II*, 294 F.3d at 88; Pub. L. No. 104-132 § 221 (a), (Apr. 24 1996), 110 Stat. 1214. Congress also sought to create a judicial forum so that the victims of state-sponsored terrorism could seek full compensation. *Daliberti v. Republic of Iraq*, 97 F. Supp. 2d 38, 50 (D.D.C. 2000). The state-sponsored terrorism exception to the FSIA, which was passed for the purposes of deterring state-sponsored terrorism and compensating its victims, requires a more expansive interpretation when a court calculates the applicable statute of limitations.

Policy interests weigh heavily in the favor of plaintiffs who bring cases as a result of acts of state-sponsorship of terrorism. The interest of the Plaintiffs in obtaining justice fulfills Congress's legislative purpose behind the FSIA, which outweigh the Defendants' interest in repose. *EEOC v. O'Grady*, 857 F.2d 383, 393 (7th Cir. 1988) ("Although statutes of limitations protect defendants from the burden of defending stale claims, this

interest may be outweighed 'where the interests of justice require vindication of the plaintiff's rights.'") (quoting *Burnett*, 380 U.S. at 426).

As it is clear that the equitable tolling provision of the Foreign Sovereign Immunities Act applies to the Plaintiffs' claims, and the Plaintiffs have filed their Complaint within the statutory ten-year period provided by Congress in 28 U.S.C. § 1605(f), this Court should deny the Libyan Defendants' Motion to Dismiss.

> **B.      THE PLAINTIFFS' TIMELY FILED THEIR CLAIMS UNDER THE ALIEN TORT CLAIMS ACT.**

The Plaintiffs' third count for air piracy under the ATCA also enjoys a 10-year statute of limitations with a generous equitable tolling provision that applies to the Plaintiffs' case.  Because the ATCA does not contain its own limitations provision, courts have applied the 10-year statute of limitations of the TVPA.  *Doe v. Islamic Salvation Front*, 257 F. Supp. 2d 115 (D.D.C. 2003).   Although the TVPA does not contain its own equitable tolling provision, courts apply that of the FSIA to toll the running of the TVPA's 10-year statute of limitations until April 24, 1996, when the state-sponsored terrorism exception to sovereign immunity was passed, because Congress enacted the TVPA to address violations of international human rights abroad.  *Collett*, 362 F. Supp. 2d 230; *Arce*, 434 F.3d at 1261-62.

Both the TVPA and the state-sponsored terrorism exception have broad, remedial purposes.  Such remedial statutes must be broadly construed, consistent with their plain meaning.  *Reyton v. Rowe*, 391 U.S. 54 (1968).  Courts also may not obstruct the purpose of a statute with an overly restrictive reading.  *United States v. Moore*, 613 F.2d 1029, 1044 (D.C. Cir. 1979).  Courts deciding the application of equitable tolling to TVPA cases, like the courts that have decided equitable tolling in FSIA cases, have therefore

excluded periods of immunity from the statute of limitations calculation. *Arce*, 434 F.3d at 1264; *Jean v. Dorelien*, 431 F.3d 776, 780 (11th Cir. 2005) (approving the *Collett* court's interpretation of § 1605(f) that found "the statute of limitations for the plaintiffs' claims must be tolled to begin when the defendants were stripped of their immunity."); *Hilao v. Estate of Marcos*, 103 F.3d 767, 773 (9th Cir. 1996) (finding that "[a]y action against Marcos for torture, 'disappearance', or summary execution was tolled during the time Marcos was president.")  The Court should do the same in the instant action, as the statute of limitations that governs the Plaintiffs' ATCA claims arises from the TVPA.

The Libyan Defendants' argument against the Court's application of equitable tolling is based on *Phillips v. Heine*, which discusses equitable tolling in the context of the Death on the High Seas Act ("DOHSA").  984 F.2d 489 (D.C. Cir. 1993).  The DOHSA, however, is a very different statute from the TVPA (or the state-sponsored terrorism exception of the FSIA), both in its structure and Congressional purpose. "A 'statute should ordinarily be read to effectuate its purposes rather than frustrate them.'" *United States v. Barnes*, 295 F.3d 1354, 1364 (D.C. Cir. 2002) (quoting from *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. Ruckelshaus*, 719 F.2d 1159, 1165 (D.C. Cir. 1983)). This is also true of accompanying equitable tolling provisions.  *Arce,* 434 F.3d at 1261 (holding that "[i]n order to determine congressional intent [on the question of equitable tolling], we must examine the purposes and policies underlying the limitation provision, the Act itself, and the remedial scheme developed for the enforcement of the rights given by the Act.") (quoting *Burnett*, 380 U.S. at 426).  The interpretation of the TVPA should effectuate its expansive and remedial legislative intent.

The *Phillips* decision, drawn from the conservative DOHSA legislative scheme, does not support the Libyan Defendants' theories of how this Court should interpret the FSIA and the state-sponsored terrorism exception. "The legislative history of the Death on the High Seas Act discloses a clear congressional purpose to leave 'unimpaired the rights under State statutes as to deaths on waters within the territorial jurisdiction of the States.'" *Gillespie v. United States Steel Corp.*, 379 U.S. 148, 165 (1964) (citation omitted). The DOHSA was intended to maintain the status quo by leaving existing state remedies in place and creating a federal remedy only where there was no coverage by already-existing remedies. *Moragne v. States Marine Lines*, 398 U.S. 375, 398 (1970). The existing state remedies were usually more generous than the new and less-substantial federal right created under the DOHSA. *In re Air Crash off Long Island*, 209 F.3d 200, 209 (2d Cir. 2000). The conservative nature of the DOHSA's provisions and its equally conservative Congressional purpose stand in sharp contrast to that of the TVPA, which has a broad, remedial purpose and which looks to the FSIA to equitably toll its 10-year statute of limitations. Accordingly, the *Phillips* holding is inapposite to the Plaintiffs' case.

Should the Court nevertheless agree with the Libyan Defendants that the *Phillips* framework binds the equitable tolling analysis in this case, it should still deny the Defendants' Motion because the Plaintiffs filed their claims within a "reasonable period" as a result of the peculiar circumstances surrounding this case. In an equitable tolling analysis, a court must weigh the balance between the competing interests of the plaintiff and defendant. The principal interest of defendants protected by a statute of limitations is their interest in evidentiary accuracy. *Phillips*, 984 F.2d at 492. In cases involving

foreign governments and their sponsorship of terrorism, such as the case at bar, the

tendency is for the quantity and quality of information to improve with time, not to

deteriorate, thus ***improving*** the accuracy of the evidence plaintiffs present.  This is due in

part to the fact that the passage of time permits classified evidence to become available

once unclassified, and often helps witnesses, and perpetrators, in their willingness to

disclose pertinent facts, as they have done here.  *See*, *e.g.*, Plaintiffs' Exhibits 1-9

Moreover, the interest of the public in the Libyan Defendants being held

accountable for their sponsorship of terrorism, and in victims of Libyan terrorist

activities, including those who suffered property damage or other economic loss as a

direct result and foreseeable consequence, being compensated for their losses, far

outweigh those of the Libyan Defendants.  The fact that the state-sponsored terrorism

exception to the FSIA was enacted by Congress for the specific purposes of deterring and

punishing state-sponsors of terrorism only further weighs in favor of the Court denying

the Defendants' Motion to Dismiss.  *EEOC*, 857 F.2d at 393 ("Although statutes of

limitations protect defendants from the burden of defending stale claims, this interest may

be outweighed 'where the interests of justice require vindication of the plaintiff's

rights.'") (quoting *Burnett*, 380 U.S. at 426).

As it is clear that the equitable tolling provision of the Foreign Sovereign

Immunities Act applies to the Plaintiffs' claims, and the Plaintiffs have filed their

Complaint within the statutory 10-year period provided by Congress in 28 U.S.C. §

1605(f), this Court should deny Defendants' Motion to Dismiss.

**C.    THE CLAIM BROUGHT UNDER THE ANTI-TERRORISM ACT WAS FILED WITHIN THE APPLICABLE STATUTE OF LIMITATIONS DEADLINE.**

Libya's argument that the single U.S. national[6] to file a claim under the Anti-Terrorism Act ("ATA") is defeated by its tolling provision, which expanded the applicable statute of limitations deadline to allow the Plaintiff to file timely on April 21, 2006.  The ATA's tolling provision provides:

> The time of the absence of the defendant from the United States or from any jurisdiction in which the same or a similar action arising from the same facts may be maintained by the plaintiff, or of any concealment of the defendant's whereabouts, shall not be included in the 4-year period set forth in subsection (a).

18 U.S.C. § 2335.  The Plaintiff's ATA claim is pressed against the individual Defendants, none of whom have ever entered either the United States or another jurisdiction "in which the same or a similar action arising from the same facts may be maintained by the plaintiff . . ."  The Plaintiff's claim therefore is not time-barred.

**V.    PLAINTIFFS HAVE STATED A CLAIM UNDER THE ATA.**

The Defendants correctly assert that the ATA only applies to claims of U.S. nationals.  18 U.S.C. § 2333.  The Plaintiffs wish to clarify for the Court, therefore, that the only Plaintiff who would assert a cause of action pursuant to the ATA is, in fact, a U.S. national, MMO/New York Marine and General.  The Defendants further argue, however, that none of the Plaintiffs in this case has standing to bring a claim under the ATA – regardless of the Plaintiff's nationality – because the causes of action in this case belong to Egypt Air, a foreign national, as the insured.  According to the Defendants, "[a] subrogated insurer takes nothing by subrogation but the rights of the insured."  (Defs'

---

[6] The single US national Plaintiff is MMO/New York Marine and General.

Mot. at 19) (quoting *Malacca Corp. v. Travelers Indem. Co.*, 421 F. Supp. 2d 137, 139

(D.D.C. 2006).

This is not true in terms of the Court's determination of whether or not a plaintiff

has standing to bring a cause of action U.S. courts.  Where an insurer has become

subrogated to the rights of an insured, the subrogated insurer is the real party in interest

and the suit must be maintained in the subrogated insurer's name.  Fed. R. Civ. P. 17(a);

*United States v. Aetna Cas. & Ins. Co.*, 338 U.S. 366 (1949); *Honey v. George Hyman

Const. Co.*, 63 F.R.D. 443, 447-48 (D.D.C. 1974).  Therefore, while Egypt Air as a

foreign national may not have been able to bring a claim under the ATA, MMO/New

York Marine and General, as a subrogated insurer who is a U.S. national and the real

party in interest, may do so.  Accordingly, the Defendants' argument should be denied.

To the extent that the Court accepts the Defendants' argument regarding

subrogation, however, Plaintiff MMO/New York Marine and General will, with leave of

court, amend the Complaint to assert a claim under the ATCA instead of the ATA.  *See*

discussion, *infra* at V.

## VI.    THE ATCA CLAIM APPLIES TO THE VIOLATIONS OF THE LAWS OF NATIONS PLED BY PLAINTIFFS.

The Libyan Defendants incorrectly argue that the Plaintiffs base their ATCA

claims on common law torts.  This is not true, as only the Plaintiffs' claims for air piracy

are based on the ATCA.  (Amended Complaint at p. 19).  The ATCA, 28 U.S.C. § 1350,

"confers federal subject-matter jurisdiction when the following three conditions are

satisfied: (1) an alien sues (2) for a tort (3) committed in violation of the law of nations

(i.e., international law)."  *Kadic v. Karadzic*, 70 F.3d 232, 238 (2d Cir. 1995).  Here, the

Plaintiffs bringing claims under the ATCA are aliens, and they have sued for torts arising

out of the destruction of Flight 648.  The first two requirements of the statute are therefore satisfied.

In the context of the ATCA, the term "law of nations" may be used interchangeably with the phrases "international law" and norms of international law", but is a broader term that encompasses "customary international law", or *jus cogens*.  *Almog*, 2007 WL 214433 at * 9, n. 15 (citing *Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004); *United States v. Yousef*, 327 F.3d 56, 104 n.38 (2d Cir. 2003); *Flores v. Southern Peru Copper Corp.*, 414 F.3d 233, 237 n.2 (2d Cir. 2003)).  Aircraft piracy or the hijacking of a commercial aircraft for the purpose of killing, injuring and kidnapping its passengers in an act of international terrorism is an act with a direct historical antecedent and is analogous to, piracy, which was recognized by the First Congress and the Supreme Court in *United States v. Smith*, as a violation of the law of nations.  18 U.S. 153, 161 (1820). Furthermore, international terrorism itself, of which air piracy is a mere subspecies, is against the law of nations.  *Almog*, 2007 WL 214433 at * 22 (holding that murderous attacks on innocent civilians intended to intimidate or coerce a civilian population violate established norms of international law).  Accordingly, because the destruction of Flight 648 took place during and as a foreseeable consequence of the Egypt Air Hijacking, which constitutes an act of air piracy or terrorism in violation of the law of nations, Plaintiffs have properly pled their ATCA claims and the Defendants Motion to Dismiss should be denied.

## VII.    THE HEAD-OF-STATE DOCTRINE DOES NOT APPLY IN THIS CASE.

The Defendants argue that Defendant Qadhafi is immune from suit as the leader

of Libya because of the Head-of-State Doctrine.  (Defs' Mot. at 27-30.)  The Head-of-

State Doctrine is the common law doctrine that, on a case-by-case basis, would entitle

recognized leaders of foreign states that are friendly to the U.S. to immunity in U.S.

courts for their official acts.  The doctrine originated from the Supreme Court decision in

*The Schooner Exchange v. McFaddon*, 11 U.S. (7 Cranch) 116, 3 L.Ed. 287 (1812),

which articulated certain principles of customary international law pertaining to the

immunity of foreign states and their leaders.

From its inception in *Schooner*, head-of-state immunity was considered to be part

of sovereign immunity: while sovereign immunity is grounded in the principles of equal

dignity and comity of nations, head-of-state immunity is grounded in the idea that a

foreign state and its leader are one and the same.  *Id.*  In creating the doctrine, therefore,

the Supreme Court made no distinction between the head of a foreign sovereign and the

sovereign itself, holding that a ruler could not be seen to "degrade the dignity of his

nation by placing himself or its sovereign rights within the jurisdiction of another."  *The*

*Schooner Exchange*, 11 U.S. (7 Cranch) 116.

Until the FSIA was enacted in 1976, the determination of immunity was the sole

province of the Executive Branch.  *Altmann*, 541 U.S. at 678.  It is now generally

recognized, however, that "[the FSIA] codified the State Department's general criteria for

making suggestions of immunity and transferred the responsibility for case-by-case

application of these principles from the Executive Branch to the Judicial Branch."  *United*

*States v. Noriega*, 117 F.3d 1206, 1212 (11th Cir. 1997); *see also Altmann*, 541 U.S. at 678; *Pugh v. Libya*, 2006 WL 2384915 at *8 (D.D.C. 2006).

According to the Libyan Defendants, the determination of whether a leader of a foreign state is entitled to immunity should still be made by the Executive Branch, as they erroneously conclude that "the FSIA does not apply to foreign heads of state. Rather, the determination as to whether a foreign head of state enjoys immunity from suit rests with the Executive Branch. The U.S. Attorney General has not determined whether the head-of-state doctrine applies to Qadhafi. Therefore, plaintiffs should be barred from proceeding with their claims against Defendant Mu'Ammar al-Qadhafi subject to the Executive Branch's decision regarding Qadhafi's immunity under the head-of-state doctrine." (Defs' Mot. at 34.) This argument does not accurately reflect the outcome when the Head-of-State Doctrine is analyzed within the context of a FSIA lawsuit, particularly one against a state designated as a state-sponsor of terrorism.

Heads of foreign states are covered by the provisions of the FSIA. "Individuals acting in their official capacities are considered "agencies or instrumentalities of a foreign state . . . ." *Jungquist*, 115 F.3d at 1027 ; *Baker I*, Op. at 20 (quoting *Global Index, Inc. v. Mkapa*, 290 F. Supp. 2d 108, 110 (D.D.C. 2003)). In *Global Index*, the district court evaluated the president and prime minister of Zanzibar as "foreign states" under the FSIA. 290 F.Supp.2d at 110 (finding "[t]here is little question, therefore, that defendants are a 'foreign state' for purposes of analysis under the FSIA.").

Although the FSIA does not specifically address whether foreign heads of state are immune from suit, it does expressly set forth that its immunity provisions apply with equal force to "agencies and instrumentalities" of a foreign sovereign. 28 U.S.C. § 1603.

The FSIA applies to individual government officers, agents and employees, so long as the suit arises out of acts taken by an individual in his official capacity. *Jungquist*, 115 F.3d at 1027; *Park v. Shin*, 313 F.3d 1138, 1144 (9th Cir. 2002). There is no distinction within the FSIA for the hierarchy of government officials, and no exception for foreign heads of state. Moreover, where a foreign sovereign's immunity has already been stripped, as is the case with Libya due to its material support for terrorist activities, there is no reason to believe that its ruler would "degrade the dignity of his nation by placing himself or its sovereign rights within the jurisdiction of another." *The Schooner Exchange*, 11 U.S. (7 Cranch) 116.

Although, as discussed above, the FSIA ensured that foreign sovereign immunity is the province of the judiciary, foreign relations are still the responsibility of the Executive Branch. Therefore, in cases where the Executive Branch makes an express determination that a foreign sovereign should be immune from suit in U.S. courts, that conclusion is determinative. *Doe v. State of Israel*, 400 F.Supp.2d 86, 110 (D.D.C. 2005). It is only when "the Executive Branch has filed a Suggestion of Immunity as to a recognized head of a foreign state, the jurisdiction of the Judicial Branch automatically ceases." *Id.* Absent such an affirmative statement by the Executive Branch, however, a head of state should not be entitled to immunity where it is removed by an exception to the FSIA. *Noriega*, 117 F.3d at1212. No such head-of-state filing has occurred in the instant matter.

Accordingly, the Court in *Collett*, in analyzing whether head-of-state immunity should apply to Qadhafi, noted that it was awaiting a "potentially dispositive statement from the Executive Branch on head-of-state immunity . . . ." 362 F. Supp. 2d at 237-38.

It therefore denied Libya's motion to dismiss Qadhafi for lack of personal jurisdiction underline(without prejudice), permitting the Defendants to refile said motion if the Executive Branch decided that head-of-state immunity should apply.  Moreover, other courts have determined that the head-of-state doctrine does not apply to Qadhafi (or to other heads of state unless asserted by the Executive Branch) and that Qadhafi can be sued if the other requirements of the FSIA are met.  *See Baker I*, Op. at 19 (holding that the Plaintiffs may properly assert punitive damages claims against the individual defendants Mu'ammar al-Qadhafi, Major Abdallah al-Sanusi and Ibrahaim al-Bishari); *Weinstein v. Iran*, 184 F. Supp. 2d 13, 24 n.1 (D.D.C. 2002) (same for punitive damages claims against agencies or instrumentalities of a foreign state).

The Executive Branch has not at any time, nor in any case, affirmatively asserted head-of-state immunity for Defendant Qadhafi, nor has it done so here, nor has it indicated its intention to do so.  Justice mandates that the Court allow the Plaintiffs' claims against Defendant Qadhafi to proceed.  Moreover, when considering that the purpose behind the doctrine is to preserve the dignity of the nation itself by providing its leader with immunity, *The Schooner Exchange*, 11 U.S. (7 Cranch) 116, it is clear that there are no reasons for this Court, especially in the absence of a suggestion of immunity, to render Defendant Qadhafi immune.  Congress previously stripped Libya of its sovereign immunity for cases brought under the state-sponsored terrorism exception by enacting § 1605(a)(7).  In doing so, it also intended that, absent a contrary statement from the Executive Branch, Defendant Qadhafi be held to answer for his support of terrorism.

The Plaintiffs should be permitted to properly proceed with their claims against Defendant Qadhafi, and the Defendants' Motion to Dismiss should be denied.

## <u>CONCLUSION</u>

For the reasons set forth above, Plaintiffs respectfully request that the Court deny

the Defendants' Motion to Dismiss in its entirety.

Dated:  February 2, 2007                          Respectfully Submitted,

                                                  HEIDEMAN NUDELMAN & KALIK, P.C.
                                                  1146 19th Street, NW, 5th Floor
                                                  Washington, DC 20036
                                                  Telephone:  202-463-1818
                                                  Telefax:      202-463-2999

                                                  By:   */s/ Richard D. Heideman*_____
                                                      *__/s/ Tracy Reichman Kalik*_____
                                                      Richard D. Heideman (No. 377462)
                                                      Noel J. Nudelman (No. 449969)
                                                      Tracy Reichman Kalik (No. 462055)

                                                  PERLES LAW FIRM, PC
                                                  1146 19th Street, NW, 5th Floor
                                                  Washington, DC 20036
                                                  Telephone: 202-955-9055
                                                  Telefax:      202-955-3806

                                                  By:   */s/ Steven R. Perles*_____
                                                      Steven R. Perles (No. 326975)
                                                      Edward MacAllister (No. 494558)

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this the 2nd day of February, 2007, I caused the above Opposition to Defendants' Motion to Dismiss to be electronically filed and served on the following counsel for the Defendants:

Thomas J. Whalen, Esq.
Mark A. Johnston, Esq.
Eckert Seamons Cherin & Mellott, LLC
747 Pennsylvania Ave, NW
Twelfth Floor
Washington, DC  20006

Wendy West Feinstein, Esq.
Eckert Seamons Cherin & Mellott, LLC
600 Grant Street, 44th Floor
Pittsburgh, PA  15219

*Tracy Reichman Kalik, Esq.*