# *Certain Underwriters at Lloyds London v. Great Socialist People's Libyan Arab Jamahiriya*

# Case No. 06-cv-731 (GK)

# Plaintiffs' Exhibit 8

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Patrick Scott Baker, et al.

    Plaintiffs,

v.

Socialist People's Libyan Arab
Jamahirya, et al.

    Defendants.

Case Number 03-cv-0749 (GK)

## AFFIDAVIT OF WALTER PATRICK LANG

COMMONWEALTH OF VIRGINIA
                              ) ss
CITY OF ALEXANDRIA

    I, Walter Patrick Lang, Jr. declare under penalty of perjury, as follows:

1. My name is Walter Patrick Lang, Jr.

2. I was the Defense Intelligence Officer for the Middle East, South Asia, and Counter-terrorism at the Defense Intelligence Agency (DIA) and served as a member of Defense Intelligence Senior Executive Service at the DIA.

3. I have been asked to render expert witness testimony with regard to certain facts concerning the Abu Nidal Organization (ANO) attack conducted on an Egyptair jetliner en route from Athens, Greece to Cairo, Egypt on 23 November 1985 and the conclusions reached at that time and subsequently by the United States Intelligence Community.

4. Attached is a complete and accurate copy of my expert report regarding this incident.

I hereby declare under the penalty of perjury that the foregoing and the attachment hereto is true and accurate to the best of my knowledge and belief.

_____
Walter Patrick Lang, Jr.

Subscribed and sworn to before me this the 22 day of ___March___ 2004 by Walter Patrick Lang, Jr. in the Commonwealth of Virginia, City of Alexandria.

_____
Notary Public

My Commission Expires __10/31/06__

\\Clients\Egypt Air\Lang\Lang Affidavit.031904.doc

# WALTER PATRICK LANG, JR

March 18, 2004

Richard D. Heideman, Esq.
Heideman Lezell Nudelman & Kalik, P.C.
1146 19th Street NW
Washington, DC 20036

Dear Mr. Heideman:

    I have been asked to render expert witness testimony with regard to certain facts concerning the "Abu Nidal Organization" (ANO) attack conducted on an Egyptair airliner en route from Athens, Greece to Cairo, Egypt on 23 November 1985 and the conclusions reached at the time and subsequently by the United States Intelligence Community (IC) concerning that event and those leading up to it, the identity of those who carried out the attacks and the governments who substantially supported ANO and this act of terrorism.

    In this particular case, because of both my prior government service and my position at the time of the ANO attack on the Egyptair airliner, which carried three Americans on board, I am perhaps uniquely qualified to give such testimony. As indicated in my attached "Curriculum Vita," (CV) I served in the United States Government (USG) for 32 years. This was roughly from June, 1962 when I was commissioned as an officer of the U.S. Army until my retirement from the Army as a colonel in October, 1988 and then as a member of the "Defense Intelligence Senior Executive Service," (DISES) in the Defense Intelligence Agency (DIA) until my retirement from DIA in late 1994. For my service to the United States in the DISES, in 1992 I was honored to be awarded the "Presidential Rank of Distinguished Executive." It has been said that this is the American equivalent of a British knighthood given to a senior civil servant for excellence of performance.

    In the course of my Army career, I served in the infantry, in U.S. Army Special Forces (the Green Berets) and later in my career became an officer of the Military Intelligence (MI) branch of the Army. I served in Vietnam for two years. At the end of the war in Vietnam, I chose to become a member of a highly specialized officer management program that trained and employed officers for duty in certain parts of the world for which a high level of area expertise was needed. This program was and is called "The Foreign Area Officer" (FAO) program. As a member of that Army program I became a specialist in the "Middle East – North Africa Area" (MENA) while at the same time retaining my membership in Military Intelligence. The training and preparation process for the FAO program was lengthy and thorough. First, I attended the Defense Language Institute (DLI) in Monterey, California for a year to study Arabic. At the end of a year, I attained a perfect (100%) score on the Department of Defense (DoD) language test for Modern Standard Arabic. (MSA). I already spoke French and Spanish well. I was then sent to the Middle East Center of the University of Utah in Salt Lake City where I received a Master of Arts (MA) degree in

Middle East Studies with specialization in Arab literature, modern political history of the Arab World and the social anthropology of the Middle East. My Grade Point Average for the program overall was 4.0 (of a possible 4.0). At the University of Utah I was inducted into the international honors fraternity of Phi Kappa Phi. I served as the Defense and Army Attaché in the United States Embassies in Sanaa, Yemen and Jeddah, Saudi Arabia. I served as the first "Professor of the Arabic Language" in the Department of Foreign Languages of the United States Military Academy at West Point, New York (USMA) where I was the creator of an academic "major" in Arabic and Middle East Studies.

I graduated from the Army War College (Carlisle Barracks, Pennsylvania) in 1985. At the personal request of the Director of DIA, LTG Jim Williams, I then became the "Defense Intelligence Officer for the Middle East, South Asia, and Counter-terrorism." This is a job title not a description of work. In DIA at that time there existed a board of senior officials each titled "The Defense Intelligence Officer for..." (DIO). These officers were the equivalent of generals or admirals in the military services. There were usually nine or ten such people (although the number varied from time to time). Each of them was responsible for the quality and content of all intelligence work done by DIA with regard to his or her area of responsibility. The Director of DIA was their only boss and no analytic documents, briefings or other intelligence products could be released to consumers without the personal approval of the DIOs. The DIOs also led the analytic thinking of the agency, initiating projects and prioritizing work for accomplishment. All information received from the field from DIA's own collection and that of all the other national intelligence agencies, (CIA, NSA, etc.) passed through the hands of the DIOs. The DIO was also the principal liaison for providing support to the Joint Chiefs of Staff (JCS) and the Secretary of Defense (SECDEF) and his staff. Accordingly, as the DIO for the Middle East, South Asia and Counter-terrorism in 1985, at the time leading up to, including and following the Egyptair hijacking by ANO, the various analytic documents, briefings and other intelligence products regarding this particular terrorist event were reviewed by me and included not only in my analysis, but in the overall analysis of the DIA, as I will further set forth in this report.

Because I had a background as a clandestine service "case officer" (agent handler) I also guided closely the "Human Intelligence" (HUMINT) operations of DIA for my area and function. I held this job from August 1985 until October 1992 when I left the job to become head of what became the "Defense HUMINT Service," (DHS) DIA's worldwide human intelligence collection service. I have recently published a textbook on HUMINT operations entitled, "Intelligence: The Human factor.", and have previously been accepted as an expert witness, giving testimony in other cases involving terrorist acts and activities.

As mentioned earlier, I took over the job of DIO for the Middle East in August 1985. In October of that year, the "Front for the Liberation of Palestine" (FLP) under the leadership of Abu al Abbas hijacked the Italian cruise ship "Achille Lauro" in the Mediterranean Sea. After killing American citizen passenger Leon Klinghoffer, the attackers took the ship into Egypt where they were provided with an Egyptair aircraft to fly them to Tunisia where the PLO was then headquartered. En route, the aircraft was intercepted by a flight of U.S. Navy fighters who forced it down into Sigonella, Air Force Base in Sicily. This was an Italian base used by the U.S. Navy under NATO agreement. Once on the base, the hijackers surrendered to the Italians and were released within a few days. This event occurred shortly after I began my duties as DIO/Middle East and I remember the details

quite vividly as well as my unhappiness at the time that DIA had not paid more attention to this disastrous incident and, in my opinion, had not written and briefed enough for our high level clients in the Department of Defense and the Joint Chiefs of Staff. In the aftermath of the "Achille Lauro" attack, I took special pains to insure that if another such incident happened DIA would be ready.

I was called at my Alexandria, Virginia home on 23 November 1985 by the commander of the watch in the DIA current intelligence facility in the Pentagon (J-2). He informed me that another incident involving an Egyptian airliner was underway. This intelligence facility was immediately adjacent to the Operations watch facility (J-3) of the Joint Chiefs of Staff. The DIA facility was much like a TV or newspaper "newsroom" with information flowing into it electronically for evaluation continuously. I called the Director of DIA and went to the Pentagon to oversee our work. It was a Saturday afternoon. Once I arrived in J-2, I read the message "traffic" (telegrams) from the field and discussed the matter with the analysts and supervisors to make sure I agreed with what they were doing. I did. The picture that I had at that point was that unknown hijackers had seized this aircraft, and for some reason the hijackers were taking it to Malta. After I had spent quite a long time in the watch center, the Director of DIA, LT General Leonard Perroots USAF, appeared in the J-2 watch center. He had been in the office of Admiral Crowe, the Chairman of the Joint Chiefs of Staff (CJCS) and had been asked to bring someone to the office that understood Arabic. My Arabic was better than anyone else present and it was my job to advise CJCS, so I went with him to Crowe's office. I had not met Admiral Crowe previously because of my recent arrival at DIA. He was in his E-ring office with advisers around him and the big built-in set of shelves behind him that displayed Crowe's collection of strange hats, given to him around the world by well wishers. Crowe was listening to the telephone on his desk. It was on "speaker phone" setting. One of the generals present explained to me in a corner that the phone circuit was open to Malta, that the plane was on the ground, and that the US ambassador was there as well as people from the U.S. Defense Attaché office in our embassy in Valetta. Also present at the airfield in Malta were the Egyptian troops that had been flown in and at least one Egyptian general officer in command of the situation. The Egyptian ambassador to Malta was there as well, or some Egyptian diplomat of equivalent rank, perhaps a charge d'affaires. By this time the hijackers had killed several passengers and thrown them, with at least one still living, out the door of the airplane and onto the tarmac below.

The reason Crowe wanted me in the room was that in the background of the English language conversation he was having with the Americans present in Malta, one could hear voices talking in Egyptian accented Arabic. He beckoned me over and asked me to listen to what they were saying and translate for him. I did that for an hour or so, and then one of the Americans in Malta said that the Egyptian troops were deploying in some sort of formation facing the airplane. The Egyptian diplomat would not answer questions about what their men were going to do and the Egyptian general did not speak English well. Therefore, I was asked to talk to him for Crowe. After we introduced ourselves I asked him the main question, which was concerning his intentions. He stalled a bit and then under pressure from me, he said that he would do what was necessary to re-take the airplane and that these were his instructions. I translated that for Crowe, and he asked, "What does that mean?" I was about to pass that question to the Egyptian general when a roaring sound of small arms fire erupted out of the "speaker phone." There was a lot of yelling going on in

– 4 –                                      March 19, 2004

Malta and it was only after some time that it was made clear by the Americans on the ground that the Egyptian troops had stormed the plane.

We later learned that 60 of the passengers on the airliner had died one way or another. The hijackers killed some of the passengers because they were Israeli or American and the others died in the Egyptian attack or its aftermath as a result of the attack on the airplane. The identities of the hijackers were not immediately apparent. There was only one survivor and he was not talkative at first. He was probably pretty "high" on stimulants. They had claimed in flight and at Malta that they were members of an obscure Egyptian revolutionary group seeking the release of imprisoned comrades in Egypt. That did not impress us or the Egyptians and investigative work went forward to determine the details of the operation and the personal and organizational identities of the attackers. He was held in Malta, convicted there and served a prison sentence. He was later arrested by the United States, convicted and is presently serving his sentence in the federal penitentiary system. A review of the transcript of his testimony at his trial confirms that he was a member of ANO, and that he was trained as a terrorist by ANO in a camp in the Bekaa Valley. After his arrest, the hijacker began to "talk" and it became very clear that this had been an operation of "Fatah: The Revolutionary Council." This is the official name of the "Abu Nidal Organization," (ANO) a splinter of the main Palestinian Revolutionary movement. ANO had split from the main body of the Arafat led "Palestine Liberation Organization," (PLO) because its leader Sabri al-Banna (Abu Nidal) believed that the regular PLO was not violent enough in its pursuit of the Palestinian revolution's goal of destroying Israel. As part of his strategy for the existence and growth of his movement, Abu Nidal established profitable working relationships with several Arab governments. All of these governments were members of the "rejectionist camp," in other words they completely rejected any kind of phased negotiation with Israel insisting on an "all or nothing approach." Since Abu Nidal favored a "nothing at all" approach, these countries were natural allies for him.

I should reiterate that throughout the period under discussion I was the tasking, reviewing and approving authority for DIA's collection and analytic effort directed at the Abu Nidal Organization and its relationships with the governments of the states of the Arab World. I was also the responsible officer for DIA's participation in Intelligence Community and U.S. Government discussions surrounding this case. It was, and is the judgment of United States Intelligence and the United States Government revealed to me through my then constant access to government papers and computer files and participation in the formation of U.S. Government opinion that (a) Iraq under the Baath, (b) Syria under the Assad family and (c) Libya under Moammar Qaddhafi were all allies of Abu Nidal at one time or another. There was a good deal of "over-lap" in time in the periods of support in which these particular governments provided support to the ANO. Let me explain in chronological order: (a) From 1974 to 1983 the Government of Iraq provided Abu Nidal with real estate, funds, travel documents training support and protection at several facilities in the country of Iraq; (b) From 1983 to 1986 the Government of Syria provided much the same kind of support for the ANO; and (c) Beginning in the early 1980s, the ANO's relationship with Libya "bloomed" into what had become by the time of the Egyptair hijacking the most robust support relationship of all. Qaddhafi's Libya was most eager to, and did provide substantial material support for ANO, assisting with funds, facilities, apartments, airline tickets, free entry and exit of members of ANO, use of its "diplomatic pouch" and diplomatic freight privileges, official documents of all kinds and actual

operational assistance in pre-positioning of people and supplies for the conduct of operations.

The 23 November 1985 attack by ANO was carefully studied both in DIA and in the other agencies of the Intelligence Community (IC). At that time, the IC was engaged in an in depth study of the structure and relationships of the various Arab and Islamic terrorist groups. These groups had become a big problem and this attack fit neatly into the effort involved in trying to understand the group. There were numerous papers and classified analytic articles written in DIA and the other IC agencies at that time which dealt with this attack. I saw them all and approved the ones written in DIA. There were also briefings given on the attack to senior Department of Defense officials (OSD and JCS). I approved those as well. These papers and briefings were based on the IC (and DIA's) in depth data "holdings" on the ANO as well as on specific knowledge derived from Signals Intelligence (SIGINT), human espionage sources (both U.S. and those of allies), and defectors from the Palestinian revolutionary groups who were debriefed with regard to their knowledge of the operation. The evidence provided by these sources showed that in addition to providing substantial material support to ANO in the form of funds, facilities, airline tickets, entry and terrorist training in Libyan camps, the government of Libya had supported this particular operation by (1) transporting to Athens in its "diplomatic pouch" the weapons used by the ANO hijackers to pre-position the weapons in Athens, and (2) providing at least some of the ANO hijackers with Tunisian passports.

The "method of operation" (MO) employed by the ANO always involved the surveillance of the point of attack by a "resident" agent to whom support materials of the kind under discussion were delivered by a seemingly uninvolved party. These support materials were later "picked up" through a "cut-out" by the ANO operational team (the hijackers) when they arrived in the area. In this way, it would be very difficult for investigators to understand the various parts of the plan after the fact. This was the MO followed by ANO in this attack. In this case, the operational team arrived in Athens from various places, Lebanon, Syria, etc. and were provided with mission briefings and their documents and weapons by an ANO leader brought to the area especially for this one task. The weapons used by the hijackers were transported by Libyan government representatives in the Libyan diplomatic pouches and were pre-positioned for pick up at the Athens Airport by the ANO resident agent, who then passed the weapons to the ANO cut-out who passed the weapons and other support material to the ANO leader who provided the weapons and support material to the hijackers. Once the hijackers departed on the Egypt Air flight, the ANO cut-out and the ANO leader, both of whom had been brought to Greece for their particular task, left Greece. This was a classic ANO operation conducted in cooperation with, and at the behest of, its government client, in this case Libya.

In fact, the conclusion of all this intelligence analysis as a result of the interviews conducted, documents reviewed, transmissions received and reviewed by me personally, was that the ANO had conducted the operation at the specific request of the Libyan government. The Libyans asked for this attack because of an ongoing "feud" between Qaddhafi and President Mubarak of Egypt. Quarrels between and among the leaders of states in the Arab World are very common in an atmosphere charged with suspicion and jealousies. It is not unusual for such hostility to become violent. It is also not unusual for

- 6 -                                                                                                     March 19, 2004

heads of states to seek to employ Palestinian or other terrorist groups to act on their behalf in such matters.

I can say with great certainty, both based upon my factual involvement at the time, and in my expert opinion, that U.S. Intelligence analysis of the 23 November attack concluded that both Libya and Syria had each provided general substantial and material support and sponsorship of the ANO in such a way as to give the ANO the capability to launch such attacks. Moreover,, that Libya had provided specific enabling support of this particular attack, and that without the support of Libya's leader, Qaddhafi, and Libyan money, training, assistance, weapons, passports and general sponsorship, the ANO hijackers would not have been able to conduct this particular terrorist attack.

Sincerely,

*Walter Patrick Lang*

Walter Patrick Lang
Colonel (Ret.) U.S. Army

County/City of Alexandria
Commonwealth/State of Virginia
The foregoing instrument was subscribed and sworn before me this 22 day of March, 2004, by Walter P. Lang
(name of person seeking acknowledgement)

Notary Public
My commission expires: 10/31/06