# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

Certain Underwriters at Lloyds London
Each severally subscribing to insurance
policies each for his own part and
not one for the other
numbered AE2141B and VS5057L
33 St. Mary Axe.
London EC3 8LL
ENGLAND

and

Allianz Cornhill Insurance, PLC, f/k/a
Cornhill Insurance, PLC
c/o Pro Insurance Solutions, Ltd.
One Great Tower Street
London EC3R 5AH
ENGLAND

and

Aviation & General Insurance
Company, Ltd.
c/o Ruxley Ventures Ltd.
2nd Floor, 6 Bevis Marks
London EC3A 7HL
ENGLAND

and

English & American Insurance
c/o Pro Insurance Solutions, Ltd.
One Great Tower Street
London EC3R 5AH
ENGLAND

and

Markel Insurance Company Ltd.,
f/k/a Terra Nova Insurance Company Ltd.
The Markel Building
49 Leadenhall St London EC3A 2EA
ENGLAND

**Civil Action No. 06-00731 (GK)**

and                                          :
                                             :
Minster Insurance Company Ltd.               :
Groupama House                               :
24-26 Minories London EC3N 1DE               :
ENGLAND                                      :
                                             :
and                                          :
                                             :
MMO/New York Marine and General             :
919 Third Avenue:
10th Floor                         :
New York, NY                                 :
                                             :
and                                          :
                                             :
Nippon Insurance Company of                  :
Europe Ltd.                                  :
c/o Pro Insurance Solutions, Ltd.            :
One Great Tower Street London EC3R 5AH       :
ENGLAND                                      :
                                             :
and                                          :
                                             :
Riverstone Insurance (UK) Ltd., successor    :
in interest to Sphere Drake Insurance Ltd.   :
Park Gate                                    :
161-163 Preston Road                         :
Brighton BN1 6AU                             :
ENGLAND                                      :
                                             :
and                                          :
                                             :
Sovereign Marine & General Insurance         :
Company Ltd., c/o Pro Insurance              :
Solutions, Ltd.                              :
One Great Tower Street                       :
London EC3R 5AH                              :
ENGLAND                                      :
                                             :
and                                          :
                                             :
SR International Business Insurance           :
Company Ltd., f/k/a Switzerland             :
Insurance Company (UK) Ltd.                  :
c/o Pro Insurance Solutions, Ltd.            :

2

One Great Tower Street
London EC3R 5AH
ENGLAND

and

Tower Insurance Ltd.
c/o Pro Insurance Solutions, Ltd.
One Great Tower Street
London EC3R 5AH
ENGLAND

and

La Reunion Aerienne
50 Rue Ampere
75017 Paris
FRANCE

                         Plaintiffs,

v.

Great Socialist People's Libyan
    Arab Jamahiriya a/k/a LIBYA
Tripoli, LIBYA

and

Libyan Internal Security a/k/a
al-'Amn al-Dhakhili
Bab-al-Azizyeh
Assur Road
Tripoli, LIBYA

and

Libyan External Security a/k/a
al-'Amn al-Khariji
Bab-al-Azizyeh
Assur Road
Tripoli, LIBYA

and

Mu'ammar al-Qadhafi                          :
Supreme Leader of the Great Socialist        :
People's Libyan Arab Jamahiriya              :
Tripoli, LIBYA                               :
                                             :
and                                          :
                                             :
Major Abdallah al-Sanusi                     :
Chief, Libyan Internal Security              :
Bab-al-Azizyeh                               :
Assur Road                                   :
Tripoli, LIBYA                               :
                                             :
and                                          :
                                             :
Ibrahaim al-Bishari                          :
Chief, Libyan External Security             :
Bab-al-Azizyeh                               :
Assur Road                                   :
Tripoli, LIBYA                               :
                                             :
and                                          :
                                             :
SYRIAN ARAB REPUBLIC                         :
Damascus, SYRIA                              :
                                             :
and                                          :
                                             :
Syrian Air Force Intelligence                :
Kafar Susa Roundabout                        :
Damascus, SYRIA                              :
                                             :
and                                          :
                                             :
General Muhammed Al Khuli                    :
Chief, Syrian Air Force Intelligence         :
Kafar Susa Roundabout                        :
Damascus, SYRIA                              :
                                             :
                                             :
                              Defendants     :
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . :


## SECOND AMENDED COMPLAINT

4

Plaintiffs, Certain Underwriters at Lloyds London each severally subscribing to insurance policies each for his own part and not one for the other numbered AE2141B and VS5057L; Allianz Cornhill Insurance, PLC, f/k/a Cornhill Insurance, PLC, c/o Pro Insurance Solutions, Ltd.; Aviation and General Insurance Company, Ltd., c/o Ruxley Ventures Ltd.; English & American Insurance Company, Ltd., c/o Pro Insurance Solutions, Ltd.; Markel Insurance Company, Ltd., f/k/a Terra Nova Insurance Company, Ltd.; Minster Insurance Company Ltd.; MMO/New York Marine and General; Nippon Insurance Company of Europe Ltd., c/o Pro Insurance Solutions, Ltd.; Riverstone Insurance (UK) Ltd., as successor in interest to Sphere Drake Insurance Ltd.; Sovereign Marine & General Insurance Company Ltd., c/o Pro Insurance Solutions, Ltd.; SR International Business Insurance Company Ltd., f/k/a Switzerland Insurance Company (UK) Ltd., c/o Pro Insurance Solutions, Ltd.; Tower Insurance Ltd., c/o Pro Insurance Solutions, Ltd.; and La Reunion Aerienne, which underwriting companies are hereinafter referred to solely for the sake of convenience and without waiver of the several nature for their subscriptions as "Underwriters and Companies", "Plaintiff Underwriters and Companies" or "Plaintiffs", bring this action pursuant to the provisions of 28 U.S.C. § 1602, et seq., the Foreign Sovereign Immunities Act ("FSIA") 18 U.S.C. § 2333, the Anti-Terrorism Act ("ATA") and 28 U.S.C. § 1350, the Alien Torts Claims Act ("ATCA") seeking compensatory and punitive damages for conversion and trespass of Plaintiffs' property, and seeking compensatory and punitive damages for facilitating acts of terrorism, violations of the laws of nations, including air piracy, as hereinafter set forth.

5

This action arises out of the November 23, 1985 terrorist hijacking of Egypt Air Flight 648, which caused its destruction beyond repair, carried out as described below acting under the instruction and/or control of the Defendants and/or utilizing the funding provided by the governments of Libya and Syria, as state-sponsors of terrorism and others who support terrorism, and to which actions the Defendants rendered material support. Flight 648 was a Boeing 737 airplane covered by insurance policies numbered AE2141B and VS5057L.

Plaintiffs state in support of their Complaint and allege as follows:

1.      Jurisdiction over the subject matter of this case arises under 28 U.S.C. §§ 1605A, 1330(a), 1331, 1350, and 18 U.S.C. § 2333.

2.      Defendants Great Socialist People's Libyan Arab Jamahiriya (hereinafter "Libya"), al 'Amn-al Dhakhili (hereinafter "Libyan Internal Security Agency"), al-'Amn al Khariji (hereinafter "Libyan External Security Agency"), Syrian Arab Republic (hereinafter "Syria"), and Syrian Air Force Intelligence are subject to suit in the courts of the United States as sponsors of the Abu Nidal Organization's activities and as direct participants in the attack pursuant to the Foreign Sovereign Immunities Act, as amended, 28 U.S.C. § 1605A, and related statutes.

3.      Defendants  waived their sovereign immunity under 28 U.S.C. § 1605A when they aided and abetted, conspired with and materially supported the terrorist group that hijacked Egypt Air Flight 648.  The provision of material support by Defendants meets the requirements for subject matter jurisdiction established by 28 U.S.C. § 1605A

4.      28 U.S.C. §1605A(a)(1) provides that a foreign state shall not be immune from the jurisdiction of the courts of the United States in a case where money damages

6

are sought against the foreign state for personal injury or death that was caused by an act

of torture, extrajudicial killing, aircraft sabotage, hostage taking or the provision of

material support or resources for such an act if such act or provision of material support

or resources is engaged in by an official, employee or agent of such foreign state.

5.    28 U.S.C. 1605A(a)(2) further provides that a court shall hear a claim if, in

an action that is refiled under this section by reason of Section 1083(c)(3) of the National

Defense Authorization Act for Fiscal Year, as is the case in this matter, the foreign state

was designated as a state sponsor of terrorism when the related action under section

1605(a)(7) was filed.  28 U.S.C. 1605A(a)(2)(A)(i)(II).

6.    Moreover, 28 U.S.C. 1605A(a)(2)(A)(ii) provides that the court shall hear a

claim under this section if the claimant or victim, was at the time the terrorist attack

occurred a national of the United States.

7.    28 U.S.C. 1605A(c) provides that a private right of action may be brought

against foreign states that are or were state sponsors of terrorism, and will be liable to the

victim's legal representatives.

8.    Finally, 28 U.S.C. 1605A(d) provides that after an action has been brought

under 28 U.S.C. 1605A(c), then other actions may be brought for the reasonable

foreseeable property loss, whether insured or uninsured, third party liability, and loss

claims under life and property insurance policies, by reason of the same acts on which an

an action under 28 U.S.C.1605A(c) is based.

9.    As there has been a claim brought by the United States national victims of

the terrorist incidents described herein for the personal injuries and death caused by these

defendants which was originally filed pursuant to 28 U.S.C.1605(a)(7) (*Baker v. Socialist*

*Peoples' Libyan Arab Jamahirya*, Civ. No. 03-cv-0749(GK)(D.D.C.)) and as the

Plaintiffs in this action are now entitled as the property insurers of the aircraft that was

sabotaged by these defendants participation and material support of the terrorist incident

described herein, these Plaintiffs may now bring this private right of action for this

reasonably foreseeable property loss. .

      10.  Defendants General Muhammad al-Khuli, Mu'ammar al-Qadhdhafi, Major

Abdallah al-Sanusi, Ibrahaim al-Bishari, and Major Abdallah al-Sanusi are subject to suit

in the courts of the United States pursuant to the FSIA, the ATA and the ATCA.

      11.  Venue is proper in this District pursuant to 28 U.S.C. § 1391(f)(4).

## THE PARTIES

      12.  Plaintiff Underwriters and Companies provided liability insurance that

covered the hull of Egypt Air Flight 648 pursuant to the aforementioned policies.

Plaintiffs can sue and be sued in this Court.

      13.  Defendant Libya had been designated a state sponsor of terrorism pursuant

to § 6(j) of the Export Administration Act of 1979 (50 U.S.C. App. § 2405(j)) and §

620(A) of the Foreign Assistance Act of 1961 (22 U.S.C. § 2371) from December 29,

1979 until 2006, and during the time of the attack as required by 28 U.S.C. §

1605A(a)(2)(A)(i)(I) and (II).

      14.  Libya at all times pertinent to this action, provided material support and

resources to Abu Nidal. Abu Nidal, at all times pertinent to this action, has operated,

among other things, in Libya, Iraq, Lebanon, Syria and carries out both military

operations and a campaign of terrorism. This terrorist campaign has included, but not

limited to, attacks in 20 countries, killing or injuring almost 900 persons. Targets include

8

the United States, the United Kingdom, France, Israel, moderate Palestinians, the PLO and various other countries. Libya, through its actions is and/or has been a sponsor of Abu Nidal, within the meaning of 28 U.S.C. § 1605A and Public Law 110-181, Section 1083, by providing it with funding, direction and training for its terrorist activities.

15.    Defendant Syria is a foreign state that has been designated and remains designated as a state sponsor of terrorism pursuant to § 60 of the Export Administration Act of 1979 (50 U.S.C. App. § 24050) and § 620(A) of the Foreign Assistance Act of 1961 (22 U.S.C. § 2371) since January 19, 1984 as required by 28 U.S.C. § 1605A(a)(2)(A)(i)(I) and (II).

16.    Syria at all times pertinent to this action, provided material support and resources to the Abu Nidal Organization ("Abu Nidal"). Abu Nidal, at all times pertinent to this action, and to the present, operates, inter alia, in Libya, Iraq, Lebanon, Syria and carries out both militant terrorist operations and a campaign of terrorism. This terrorist campaign has included, but is not limited to, attacks in 20 countries, killing or injuring almost 900 persons. Targets include persons in the United States, the United Kingdom, France, Israel, as well as moderate Palestinians, the PLO and various other countries. Syria, through its actions is and/or has been a sponsor of Abu Nidal, within the meaning of 28 U.S.C. § 1605A, by providing it with funding, direction and/or training for its terrorist activities.

17.    Defendant Libyan Internal Security is one of the Libyan intelligence services through which Libya sponsored Abu Nidal which caused the terrorist acts described below.

18. Defendant Libyan External Security is one of the Libyan intelligence services through which Libya sponsored Abu Nidal which caused the terrorist acts described below.

19. Defendant Mu'ammar al Qadhdhafi is the leader of Libya and performed acts within the scope of his office which caused the terrorist acts described below.

20. Defendant Major 'Abdallah al-Sanusi was the head of the Libyan Internal Security Agency and performed acts within the scope of his office which caused the terrorist acts described below.

21. Defendant Ibrahaim al-Bishari was the head of the Libyan External Security Agency and performed acts within the scope of his office, which acts caused the terrorist acts described below.

22. Defendant Syrian Air Force Intelligence is the Syrian intelligence services through which Syria sponsored Abu Nidal, which acts caused the terrorist acts described below.

23. Defendant General Muhammed al-Khuli was the chief of the Syrian Air Force Intelligence and performed acts within the scope of his office, which acts caused the terrorist acts described below.

24. Defendants Libya and Syria, as well as the Syrian Air Force Intelligence, the Libyan External Security Agency, Libyan Internal Security Agency, General Muhammad al-Khuli, Mu'ammar al-Qadhdhafi, Major Abdallah al-Sanusi, Ibrahaim al-Bishari, and pursuant to 28 U.S.C. § 1605A(c) and (d) and state law are directly and/or vicariously responsible for the actions of the ANO terrorists and their co-defendants because they

sponsored the Abu Nidal Organization. Accordingly, said Defendants are jointly and severally liable to Plaintiffs.

## DEFENDANTS' SPONSORSHIP AND SUPPORT FOR THE ABU NIDAL ORGANIZATION

25. The government of Libya and also separately the government of Syria sponsored and supported the Abu Nidal Organization, a/k/a Black September, the Fatah Revolutionary Council, the Arab Revolutionary Council, the Arab Revolutionary Brigades, the Revolutionary Organization of Socialist Muslims, (hereinafter "ANO") a known terrorist organization, headed by Sabri Al Bana, a/k/a Abu Nidal, prior to November 23, 1985, the date of the hijacking of Egypt Air Flight 648.

26. The substantial material support to and sponsorship of the ANO by the government of Libya included, but was not limited to, assisting and/or providing the following:

        a.   weapons,

        b.   funds,

        c.   facilities,

        d.   airline tickets,

        e.   free and unobstructed entry into, safe haven in, and exit from Libya by members of ANO,

        f.   terrorist training in Libyan camps,

        g.   use of the privilege of Libya's "diplomatic pouch",

        h.   use of Libya's diplomatic freight privileges,

        i.   official documents of all kinds, and

       j.   actual operational assistance in pre-positioning of people and supplies

for the conduct of the hijacking of Flight 648.

27.    On two separate occasions shortly prior to the hijacking event, one or more of the hijackers met in Athens with a Libyan government official regarding the planned hijacking. In addition, without the material support provided and direct involvement of this Libyan official, this particular terrorist event would not have taken place.

28.    More specifically, in this particular instance the government of Libya supported this operation by, among other things:

       a.   providing at least some of the ANO hijackers with Tunisian passports, which allowed the hijackers to travel and

       b.   transporting to Athens by Libyan government representatives in its "diplomatic pouch" the weapons used by the ANO hijackers to pre-position the weapons in Athens for pick up at the Athens Airport by the ANO resident agent.

29.    The ANO resident agent then passed the weapons and other support material to the ANO "cut-out," who then passed the weapons and materials to an ANO leader, who then provided the weapons and support material to the ANO hijackers.

30.    Once the hijackers departed on the Egypt Air flight, the ANO cut-out and the ANO leader, both of whom had been brought to Greece for their particular task, left Greece.

31.    The sponsorship by the government of Syria included, among other things, the providing of training in Syrian sponsored ANO terrorist training camps, military and

general intelligence, safe haven and free passage in and through Syrian controlled territory.

32.    Syria provided general material support to the ANO by providing ANO with funds, travel documents, training support and protection at several facilities, including those located in the Syrian controlled Bekaa Valley located in Lebanon ("Bekaa Valley"). Syrian military and government intelligence agents were present around the ANO terrorist training camp maintained in the Bekaa Valley.

33.    The Defense Intelligence Agency of the United States Department of Defense, and other intelligence agencies of the United States government, determined that the hijacking of the Egypt Air Flight 648 on November 23, 1985 was conducted by members of the terrorist organization known as the ANO, and that the organization and act were sponsored by (a) the government of Libya, which provided general and specific material support for ANO, thereby enabling ANO to commit this hijacking; and that the ANO was also sponsored by (b) the government of Syria, which provided general material support for ANO and its terrorist members.

34.    The providing of material support for the ANO, a known terrorist organization, by the government of Libya and the government of Syria, acting directly and by and through their individual governmental representatives as named in the Complaint, and by other representatives of the government, constitute violations of numerous applicable United States laws, thereby rendering the government of Libya, and the government of Syria, and their individual governmental representatives named as defendants herein, jointly and severally liable for illegal acts and deeds alleged herein.

## FACTUAL ALLEGATIONS

35.    On or about November 13, 1985, an ANO operative, Omar Rezaq ("Rezaq"), traveled from Beirut to Athens, Greece, for the express purpose of participating in an ANO mission to hijack an airplane.

36.    On November 23, 1985, three (3) ANO operatives, including Rezaq, boarded Egypt Air Flight 648, a Boeing 737 airliner, ("Flight 648" or "Insured Property"), having used illegal passports provided to them by Libya for the purpose of accomplishing the mission of hijacking the plane.

37.    Shortly thereafter, Flight 648, took off from Athens, Greece, and headed in a southeasterly direction toward Cairo, Egypt, its planned destination.

38.    Twenty-two minutes into the flight, terrorists from the Abu Nidal organization, hijacked the plane.

39.    After a mid-flight shootout between an Egyptian Sky Marshall and one of the hijackers, which resulted in the death of a hijacker, the wounding of the Sky Marshall, and two stewardesses, as well as the piercing of the fuselage, Flight 648 was diverted to Malta.

40.    At first, the tower at Malta's International Airport refused to let Flight 648 land, but authorities relented after Captain Galal told them that the plane was in imminent danger of crashing into the sea because he was nearly out of fuel.

41.    Even so, the runway lights were still off and Galal, with a gun barrel at his head, had to rely on his plane's landing light to pierce the darkness as he landed at Malta's International Airport.

42. The tower ordered Flight 648 to taxi to a remote parking area; four police buses then blocked both ends of the runway.

43. The terrorists demanded that the airport authorities of Malta refuel the plane.

44. The airport authorities of Malta refused to comply with the terrorists' demands.

45. At that time, the terrorists threatened to shoot one passenger every fifteen minutes unless the Maltese agreed to refuel the plane.

46. Meanwhile, in a response to an appeal from the pilot, the terrorists agreed to release eleven women—seven Filipinos and four Egyptians.

47. Thereafter, the terrorists identified two Israeli women and shot them in the head. Thinking that the women were dead or mortally wounded, the terrorists threw them out of the plane and onto the tarmac.

48. Next, the terrorists brought to the front of the plane three American passengers, shot each in the head one by one, and threw each of them out of the plane onto the tarmac.

49. Twenty-four hours after the hijacking began, while the aircraft was still on the ground in Malta, Egyptian Commandos stormed the plane in an attempt to rescue the passengers.

50. The Egyptian Commandos entered the plane by attacking the passenger doors and the luggage compartment doors with explosives.

51. These explosions caused the internal plastic of the plane to catch fire, causing widespread suffocation.

52.  When the hijackers realized that they were being attacked, they lobbed hand grenades into the passenger area, killing and injuring passengers and igniting a fire inside the aircraft.

53.  As a result of (a) the mid-flight shootout with the Egyptian Sky Marshall, (b) fire from the use of explosives by the Egyptian Commandos, and (c) the use of hand grenades by the terrorists, the airplane was damaged beyond repair and ceased to be suitable for any purpose whatsoever.

54.  The United States Department of State, Office of the Historian, Bureau of Public Affairs, in its report of Significant Terrorist Incidents, 1961- 2001, lists the Egyptian Airliner Hijacking of November 23, 1985 as being a terrorist act that was conducted by the Abu Nidal Group.

55.  Background Information on Foreign Terrorist Organizations, released by the Office of Counterterrorism, of the United States Department of State, indicates that the Abu Nidal Organization ("ANO") a/k/a Black September, the Fatah Revolutionary Council, the Arab Revolutionary Council, the Arab Revolutionary Brigades, the Revolutionary Organization of Socialist Muslims has received considerable support, including safe haven, training, logistic assistance, and/or financial aid from the States of Iraq, Libya, and Syria, each being a Defendant herein.

## COUNT I - 28 U.S.C. §1605A(d)

### (All Plaintiffs)

56.  Plaintiffs repeat, reallege and incorporate by reference those facts and allegations set forth in all the foregoing paragraphs as if fully set forth herein.

16

57.     On November 23, 1985, members of the ANO willfully, violently and forcefully committed terrorist acts on board Egypt Air Flt 648 with the express purpose of inflicting personal injury, severe pain and suffering, death, and severe emotional injuries.

58.     Upon hijacking Egypt Air Flt 648, it was reasonably foreseeable that the hull of the Egypt Air jetliner would be destroyed during the hijacking event.

59.     The Defendants' actions in supporting and directing the hijacking of Egypt Air Flight 648 interfered with Plaintiffs' right as its rightful owner to control the Insured Property to such extent that the requirement to pay the full value of the property is just, because the Defendants' actions caused the hijacking, as well as the use of hand grenades and other explosives by both the ANO terrorists acting as the Defendants' agents and the Egyptian Commandoes who stormed the airplane in an attempt to rescue the passengers, causing the destruction of the Insured Property beyond repair.

60.     The willful, wrongful and intentional acts of Abu Nidal terrorists were sponsored and directed by Libya, and Syria, as well as the Syrian Air Force Intelligence, the Libyan External Security Agency, and Libyan Internal Security Agency.

61.     Defendants General Muhammad al-Khuli, Mu'ammar al-Qadhdhafi, Major Abdallah al-Sanusi, and Ibrahaim al-Bishari performed acts within the scope of their offices which sponsored the ANO 's terrorist activities, including but, not limited to the Egypt Air Highjacking.

62.     As a direct and proximate result of the willful, wrongful and intentional acts of the ANO members, whose acts were sponsored and directed by Libya and Syria, as well as the Syrian Air Force Intelligence, the Libyan External Security Agency,

17

Libyan Internal Security Agency, General Muhammad al-Khuli, Mu'ammar al-Qadhdhafi, Major Abdallah al-Sanusi, and Ibrahaim al-Bishari, the Egypt Air jetliner hull was destroyed.

63.    28 U.S.C. 1605A(d) provides that Libya and Syria, as well as the Syrian Air Force Intelligence, the Libyan External Security Agency, Libyan Internal Security Agency, General Muhammad al-Khuli, Mu'ammar al-Qadhdhafi, Major Abdallah al-Sanusi, and Ibrahaim al-Bishari, may be held liable for the reasonably foreseeable property losses, whether insured or inusured, when based upon terrorist acts committed against U.S. nationals.

WHEREFORE, Plaintiffs demand judgment against Defendants, jointly and severally, for compensatory damages for conversion and destruction of property in the amount of an excess of **FORTY MILLION DOLLARS ($40,000,000.00),** plus interest, cost and attorney's fees, and such other and further relief as the Court may deem appropriate under the circumstances.

## <u>COUNT  II – CONVERSION</u>

64.    Plaintiffs repeat, re-allege and incorporate by reference those facts and allegations set forth in all the foregoing paragraphs as if fully set forth herein.

65.    The November 23, 1985 hijacking of Egypt Air Flight 648 by the ANO terrorists, acting as agents of the Defendants, constituted a common law conversion of Plaintiffs' Insured Property.

66.    As insurers of Flight 648, the Plaintiffs compensated the original owner, Egypt Air, for the cost of the destroyed airplane.

18

67.     Accordingly, as insurers who fully compensated the insured for the loss of the airplane, the Plaintiffs are the rightful owners of the Insured Property for the purposes of common law conversion.

68.     Defendants wrongfully deprived Plaintiffs of their property interest in the Insured Property by their material support and direct involvement in the hijacking of Egypt Air Flight 648, which was carried out by ANO terrorists acting as the Defendants' agents, resulting in Flight 648's destruction beyond repair.

69.     By causing Flight 648's hijacking and destruction, the Defendants wrongfully exercised control and dominion over the Insured Property to the exclusion of its rightful owners, the Plaintiffs herein.

70.     The Defendants' actions in supporting and directing the hijacking of Egypt Air Flight 648 interfered with Plaintiffs' right as its rightful owner to control the Insured Property to such extent that the requirement to pay the full value of the property is just, because the Defendants' actions caused the hijacking, as well as the use of hand grenades and other explosives by both the ANO terrorists acting as the Defendants' agents and the Egyptian Commandoes who stormed the airplane in an attempt to rescue the passengers, causing the destruction of the Insured Property beyond repair.

WHEREFORE, Plaintiffs demand judgment against Defendants, jointly and severally, for compensatory damages for conversion and destruction of property in the amount of an excess of **FORTY MILLION DOLLARS ($40,000,000.00)**, plus interest, cost and attorney's fees, and such other and further relief as the Court may deem appropriate under the circumstances.

## COUNT III – TRESPASS

71. Plaintiffs repeat, re-allege and incorporate by reference those facts and allegations set forth in all the foregoing paragraphs as if fully set forth herein

.

72.    The November 23, 1985 hijacking of the Boeing 737 constituted an intentional and unlawful trespass upon the personal property of Plaintiffs' insured, to which Plaintiffs' insured did not consent.

73.    Defendants intentionally used and intermeddled with the property of Plaintiffs' insured when the ANO terrorists hijacked the airplane.

74.    Defendants intentionally used and intermeddled with the property of Plaintiffs' insured when the hijackers pierced the fuselage of the airplane while engaged in a shootout with an Egyptian Sky Marshall.

75.    Defendants intentionally used and intermeddled with the property of Plaintiffs' insured when the hijackers took control over the navigation of the airplane.

76.    Defendants intentionally used and intermeddled with the property of Plaintiffs' insured when the terrorists took full control over the passengers on the airplane, shot certain American and Israeli passengers, threatened to shoot one more passenger every fifteen minutes, and prevented all but the thirteen released passengers from exiting the aircraft.

77.    Defendants intentionally used and intermeddled with the property of Plaintiffs' insured when Defendants caused the Egyptian Commandos to use the explosives in an attempt to rescue the passengers, which caused the internal plastic of the plane to catch fire and burn the airplane beyond repair.

20

78.    Plaintiffs' insured never authorized Defendants or their agents to use and intermeddle with their property, and at all times objected to such actions.

79.    The Plaintiffs' sustained substantial harm because their property, the airplane, was burned, damaged by explosives, pierced by bullets, and otherwise damaged beyond repair.

80.    The damages to the airplane were the direct and proximate result of the trespass upon the Plaintiffs' property by agents of the Defendants. Defendants' actions of facilitating the hijacking of the airplane, causing a mid-flight shootout with an Egyptian Sky Marshall, causing the Egyptian Commandoes to use explosives to enter the airplane, and the hijackers' use of hand grenades caused the destruction of the airplane beyond repair.

WHEREFORE, Plaintiffs demand judgment against Defendants, jointly and severally, for compensatory damages for destruction of property resulting from trespass in the amount of an excess of **FORTY MILLION DOLLARS ($40,000,000.00)** plus interest, costs and attorney's fees, for business interruption losses, and the expenses in the form of payments to passengers and third victims claims for death and injuries to passengers, punitive damages in an amount to be determined at trial, and such other and further relief as the Court may deem appropriate under the circumstances.

### COUNT IV – AICRAFT PIRACY

81.    Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

82.    At the time aircraft hijacking, aircraft piracy was recognized as a clear and definite norm of international law which was and is universally accepted by the civilized

21

world and such conduct is so widely condemned that it has achieved the status of a

universally recognized or *jus cogens* violation, and, therefore, is a violation of the law of

nations such that the commission of air piracy by a party subjects it to liability to aliens in

United States courts under the ATCA.  See 49 U.S.C. §§ 46501, 46502.

83.     General federal common law recognizes complicit liability for violations

of the law of nations under theories of aiding and abetting, conspiracy, agency, vicarious

liability and joint venture.

84.     Plaintiffs were injured as a result of Defendants' actions in contravention

of this universally international accepted norm.

85.     Plaintiffs assert a cause of action of air piracy against General Muhammad

al-Khuli, Mu'ammar al-Qadhdhafi, Major Abdallah al-Sanusi, Ibrahaim al-Bishari, and

Major Abdallah al-Sanusi in their individual capacities under applicable federal common

law, state common law, federal statutory law, foreign law, and foreign statutory law.

WHEREFORE, Plaintiffs demand judgment against General Muhammad al-

Khuli, Mu'ammar al-Qadhdhafi, Major Abdallah al-Sanusi, Ibrahaim al-Bishari, and

Major Abdallah al-Sanusi in their individual capacities, jointly and severally, for

compensatory damages for destruction of property resulting from trespass and/or aircraft

piracy in the amount of an excess of **FORTY MILLION DOLLARS ($40,000,000.00)**,

plus interest, cost and attorney's fees, and such other and further relief as the Court may

deem appropriate under the circumstances, for business interruption losses, and the

expenses in the form of payments to passengers and third victims claims for death and

injuries to passengers, punitive damages in an amount to be determined at trial, pre- and

post- judgment interest, costs of this action, attorney's fees and such other and further

relief as the Court may deem appropriate under the circumstances.

## ADDITIONAL RELIEF REQUESTED

Plaintiffs request leave of Court to amend this Complaint, and for such further and

other relief to which the Plaintiffs may appear entitled, as the interests of justice require

Dated: February 22, 2008

Respectfully Submitted,

HEIDEMAN NUDELMAN
  & KALIK, P.C.
1146 19th Street, NW, 5th Floor
Washington, DC 20036
Telephone: 202-463-1818
Telefax:    202-463-2999

By:    */s/ Richard D. Heideman*
       */s/ Tracy Reichman Kalik*
    Richard D. Heideman (No. 377462)
    Noel J. Nudelman (No. 449969)
    Tracy Reichman Kalik (No. 462055)


    */s/ Steven R. Perles*
Steven R. Perles (No. 326975)
Edward MacAllister (No. 494558)
PERLES LAW FIRM, PC
1146 19th Street, NW, 5th Floor
Washington, DC 20036
Telephone: 202-955-9055
Telefax:    202-955-3806