UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| Certain Underwriters at Lloyd's London, *et al.*, | ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 06-cv-731 (JMF) |
| Great Socialist People's Libyan Arab Jamahiriya, *et al.*, | ) ) ) | |
| Defendants. | ) ) | |
| _____ | ) ) | |
| Certain Underwriters at Lloyd's London, *et al.*, | ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 08-cv-504 (JMF) |
| Socialist People's Libyan Arab Jamahiriya, *et al.* | ) ) ) | |
| Defendants. | ) ) | |
| _____ | ) | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

## I.    INTRODUCTION

Before me at this time are two actions:  <u>Certain Underwriters at Lloyd's London v. Great Socialist People's Libyan Arab Jamahiriya</u>, No. 06-CV-731, which was filed on April 4, 2006 ("<u>Certain Underwriters I</u>"), and <u>Certain Underwriters at Lloyd's London  v. Great Socialist People's Libyan Arab Jamahiriya</u>, No. 08-CV-504, which was filed on March 24, 2008 ("<u>Certain Underwriters II</u>").  The named Libyan defendants were dismissed from each of these actions pursuant to the enactment of the Libya Claims Resolution Act, Pub. L. No. 110-301, 122 Stat. 2999 (2008), but the plaintiffs' claims remain pending against the following defendants:  the Syrian Arab Republic; the Syrian Air Force Intelligence Agency (Idarat al-Mukhabarat al-

Jawiyya); and Syria's Director of Military Intelligence (General Muhammad al-Khuli)

(hereinafter collectively the "Syrian defendants" or "Syria").  These actions came before this

Court as the subject of an evidentiary hearing held on May 3-7, 2010.[1]  Pursuant to those

hearings and the evidence before me, the Court has made the following findings of fact and

conclusions of law.

## II.    SUMMARY OF FINDINGS

These actions seek judgment and an award of damages for acts of state-sponsored

terrorism that resulted in the hijacking of EgyptAir Flight 648 on November 23, 1985, while the

aircraft was bound for Cairo, Egypt from Athens, Greece, and the complete destruction of the

EgyptAir Flight 648 aircraft, insured by the Certain Underwriters plaintiffs, that resulted from

that hijacking.

The Court, having heard and reviewed the evidence, does hereby determine (i) that the

hijacking of EgyptAir Flight 648 on November 23, 1985 (the "EgyptAir hijacking") was an act

of international terrorism; (ii) that the terrorist shootings of the American victims of the EgyptAir

hijacking—Patrick Baker, Jackie Pflug, and Scarlett Rogenkamp—were acts of international

terrorism that occurred during and as a result of the November 23, 1985 terrorist hijacking; (iii)

the hijacking resulted in the reasonably foreseeable complete destruction of the aircraft owned by

EgyptAir and insured by plaintiffs; (iv) that said hijacking was committed by terrorist operatives

of the Abu Nidal Organization ("ANO"), which has been designated by the U.S. Department of

State as a Foreign Terrorist Organization; (v) that the ANO, at the time of and prior to the

EgyptAir hijacking, was sponsored and supported by Syria, which has been designated by the

U.S. Department of State as a State Sponsor of Terrorism; and (vi) that the Syrian Arab

---

[1] The hearing coincided with the hearing in related case Baker v. Great Socialist People's Libyan Arab Jamahirya, 775 F. Supp. 2d 48 (D.D.C. 2011).

Republic, the Syrian Air Force Intelligence Agency, Idarat al-Mukhabarat al-Jawiyya, and Syria's Director of Military Intelligence, General Muhammad al-Khuli, conspired with and provided substantial and material support to the ANO terrorist organization, and that the Syrian defendants caused and are liable for the acts of international terrorism against the plaintiffs and the resultant damages, for which the Court will award damages as set forth below.

The Court further finds that the Syrian defendants provided material support and resources and conspired with the ANO in the planning, training, support for, and commission of the EgyptAir hijacking, and that the lead ANO terrorist operative, Omar Ali Rezaq, was trained and supported by the Syrian defendants. The Court finds that the Syrian defendants intended that their support of the ANO would promote and cause extrajudicial killings of American citizens, as well as necessarily result in the property destruction of the EgyptAir airplane incidental to the goals and objectives of the Syrian defendants and the ANO terrorists. The Court finds that Syria's actions could not have occurred without the explicit authorization by then-Syrian President Hafiz al-Asad. Accordingly, the Court will enter judgment and grant an award of damages on behalf of the plaintiffs against the Syrian defendants as set forth below.

III.     STATEMENT OF THE CASE

Plaintiffs brought this action pursuant to the provisions of the Foreign Sovereign Immunities Act ("FSIA"), codified at 28 U.S.C. § 1602, *et seq.*[2] The Syrian defendants were served with process on June 28, 2003.[3] The Syrian defendants have neither answered nor appeared.

---

[2] All references to the United States Code or the Code of Federal Regulations are to the electronic versions that appear in Westlaw or Lexis.

[3] Service upon each of the Syrian defendants in <u>Certain Underwriters I</u> was perfected under 28 U.S.C. § 1608(a)(3) through delivery of the required documents (accompanied by Arabic translations) to the Head of the Ministry of Foreign Affairs via international courier service,

A five-day hearing on liability and damages was held, commencing on May 3, 2010.[4]

During the hearing, this Court accepted evidence in the form of, *inter alia*, live testimony, live

video-link testimony, affidavit, *de bene esse* deposition, and original documentary evidence.  The

Court also accepted credible expert testimony from eight well-qualified experts on various

subjects related to the issues pending before the Court in this matter.[5]  Accordingly, this Court

makes the following findings of fact and conclusions of law.

---

evidenced in the August 17, 2006 <u>Notice of Proof of Service pursuant to 28 U.S.C. § 1608(a)(3)</u> [#17], including tracking information and a delivery record from the international courier service indicating that the shipment, containing two copies of the summons and the complaint, a notice of suit, and a translation of each into the official language of the foreign state was signed for by "Esam" at the Syrian Ministry of Foreign Affairs for the defendants on July 30, 2006. #17 at 1-2.  On March 28, 2008, Judge Kessler ordered that the <u>Certain Underwriters I</u> complaint be amended to include plaintiffs' § 1605A claims, deeming the amended complaint to be a re-filing of plaintiffs' claims under § 1605A(d). <u>Minute Order</u> (1) of Mar. 28, 2008.  The issues surrounding service of process of an already-existing claim under 28 U.S.C. § 1605A will be addressed at greater length in the Conclusions of Law section, *infra*.

[4] The hearing transcripts are separately docketed for each day of the hearing, from May 3 (day 1) to May 7 (day 5), 2010, at document numbers 101-105.  Citations to the transcript are identified as "name, T-day #-page," *i.e.*, witness name, T-day 1 to 5-page number.

[5] The experts accepted by the Court are as follows:

<u>Marius Deeb, Ph.D.</u> - Professor Deeb was accepted as an expert witness by this Court concerning the following topics:  the Syrian government, Syrian government structure, Syrian government's foreign policy, the Syrian government's past and continuing active support for terrorism, including but not limited to the Syrian government's designation as a State Sponsor of Terrorism and the Syrian government's support of the Abu Nidal terrorist organization, which committed (a) the EgyptAir Flight 648 hijacking, and separately (b) the Rome and Vienna Airport attacks one month later. (Deeb, T-2-196-197).

<u>Patrick Lang</u> - Col. Lang was accepted as an expert witness by this Court in the fields of terrorism, counterterrorism, Middle Eastern affairs, and politics.  He also rendered his opinion on the sponsorship by Syria of terrorism, Syria as a designated State Sponsor of Terrorism, Syria's sponsorship of the Abu Nidal Organization, a Foreign Terrorist Organization, and the terrorist hijacking of Egypt Air Flight 648, committed on November 23, 1985 by the Abu Nidal Organization with Syrian sponsorship and separately the Rome and Vienna Airport attacks of December 27, 1985, committed by the Abu Nidal Organization with Syrian sponsorship. (Lang, T-2-122).

<u>David Long, Ph.D.</u> – Dr. Long was accepted as an expert witness by this Court regarding terrorism, counterterrorism, Middle Eastern affairs, and politics.  He also testified as to the

IV.    **FINDINGS OF FACT**

     **A.    The EgyptAir Flight 648 Hijacking**

1.    On November 23, 1985, plaintiffs Baker, Pflug, and Rogenkamp, each of whom were American nationals, boarded EgyptAir Flight 648, which departed Athens at 9:05 pm Athens time. (Baker, T-2-47; Pflug, T-1-33; Rezaq, Pltf's Exh. 34 at 2741; Pltf's Exh. 35.)

2.    EgyptAir Flight 648 was scheduled to fly directly to Cairo from Athens. (Baker, T-2-47; Pltf's Exh. 3.)

3.    Approximately 10 minutes after leveling off, the plane was hijacked. (Baker, T-2-47-48.)

4.    One of the hijackers began to taunt passengers on board by attempting to pull a pin out of a hand grenade while simultaneously brandishing a firearm. (Baker, T-2-48-51.)

5.    During this time, Pflug was struck over the head with a gun by a hijacker. (Pflug, T-1-34.)

6.    At 8:28 pm Malta time, three ANO hijackers, including Omar Mohammed Ali Rezaq,

---

sponsorship by Syria of terrorism, its sponsorship of ANO, the Abu Nidal Organization, and the commitment by the Abu Nidal Organization with Syrian sponsorship of the hijacking of EgyptAir Flight 648, and separately the Rome and Vienna Airport attacks. (Long, T-3-199.)

James Markham, Ph.D. - Dr. Markham was accepted as an expert witness by this Court in the field of forensic economics.  He was also deemed qualified to testify regarding the damage calculations for each of the killed or injured plaintiffs. (Markham, T-4-105.)

Ambassador Robert Oakley - Ambassador Oakley was accepted as an expert witness by this Court in the fields of terrorism, counterterrorism, Middle Eastern affairs, politics, and Syria's sponsorship of the Abu Nidal Organization prior to, during, and following the EgyptAir Flight 648 hijacking, and Rome and Vienna Airport attacks. (Oakley, T-4-10.)

Yoram Schweitzer, Ph.D. - Dr. Schweitzer was accepted as an expert witness by this Court in the field of terrorism, counterterrorism, Middle Eastern affairs, politics, and Syria's sponsorship of the Abu Nidal Organization prior to, during, and following the EgyptAir Flight 648 hijacking, and Rome and Vienna Airport attacks. (Schweitzer, T-4-30).

Jack Spector, Ph.D., M.D. - Dr. Spector was accepted as an expert witness by this Court in the field of clinical neuropsychology. (Spector, T-3-19).

Gary K. Stimac, M.D., Ph.D. - Dr. Stimac was accepted as an expert medical witness by this Court.  Dr. Stimac gave testimony concerning Baker's traumatic head injuries and their direct link to being shot execution style by Omar Rezaq during the hijacking.  Dr. Stimac also testified that, "based upon [his] review of the MRI findings, available records of Mr. Baker, and [his] expertise, it [was his] opinion to a reasonable degree of medical certainty that the MRI abnormalities are the result of the physical injuries that Mr. Baker sustained during the hijacking on November 23rd, 1985." (Stimac, T-2-100; Stimac, Pltf's Exh. 33).

took control of the EgyptAir airliner. (Baker, T-2-84; Pflug, T-1-35; Pltf's Exh. 3.)

7.   The ANO hijackers directed an EgyptAir flight attendant to go onto the aircraft intercom and say, "[w]e're being hijacked by the Egypt Revolution, and if you do what you are told, you will not get hurt." (Pflug, T-1-36.)

8.   After taking control of EgyptAir Flight 648, the ANO hijackers began searching the passengers, collecting their passports and reseating them. (Baker, T-2-5; Pflug, T-1-39.)

9.   The hijackers worked their way from the front of the plane to the back of the plane. (Pflug, T-1-39.)

10.   Approximately thirty minutes after taking control of the plane, at approximately 9:00 pm Malta time, there was a shootout between an EgyptAir sky marshal (who was onboard the aircraft) and the hijackers. (Baker, T-2-52, 84; Pflug T-1-39; Pltf's Exh.3.)

11.   The aircraft's fuselage was punctured by bullets, and the plane rapidly descended. (Baker, T-2-52-53; Pflug, T-1-41.)

12.   Because of the need for fuel, EgyptAir Flight 648 landed at Malta's Luqa Airport at 10:16 pm. (Baker, T-2-84; Pltf's Exh. 3; Pflug, T-1-50; Baker, T-2-55.)

13.   Shortly after landing in Malta, stairs were brought to the EgyptAir aircraft, and a medic was allowed onboard. (Baker, T-2-56.)

14.   The medic certified that one of the hijackers shot during the shootout with the Egyptian air marshal was dead. (Baker, T-2-56.)

15.   While the medic was taking the injured Egyptian air marshal off of the aircraft, Rezaq shot the air marshal in the back. (Baker, T-2-56.)

16.   The hijackers then demanded fuel, and indicated that they were prepared to execute passengers in order to ensure their demands were met. (Lang, T-2-157.)

17.   As the hijackers were waiting for the fuel to arrive, they called forward and released some of the passengers based on their nationalities, as determined from their respective passports. (Baker, T-2-57.)

18.   The hijackers threatened to shoot a passenger every fifteen minutes if they did not receive fuel. (Pltf's Exh. 34 at 2783.)

19.   Shortly after releasing some of the passengers, Omar Rezaq summoned the first Israeli passenger, Tamar Artzi, and shot her in the head, throwing her body off the aircraft onto the tarmac.  It was midnight Malta time on November 24, 1985. (Baker, T-2-84; Pltf's Exh. 3.)

20.   Approximately fifteen minutes after Artzi was shot, at 12:15 am, a second Israeli passenger, Nitzan Mendelson, was dragged to the front of the aircraft and shot in the head

by Omar Rezaq. (Baker, T-2-85; Pltf's Exh. 3.)

21. Her body was also thrown from the aircraft onto the tarmac. (Baker, T-2-58.)

22. Approximately 15 minutes after shooting the two Israeli passengers, the hijackers called the three American passengers—Baker, Pflug, and Rogenkamp—to the front of the plane. (Pflug, T-1-52; Baker, T-2-59.)

23. The three American passengers' hands were tied behind their backs with neckties, and they were seated in the first row on the starboard side of the plane. (Baker, T-2-59; Pflug, T-1-52.)

24. Shortly before 12:30 am Malta time, Baker was taken to the door of the aircraft. (Baker, T-2-60; Pltf's Exh. 3).

25. While standing at the door, Baker overheard a radio transmission broadcast from the Malta control tower: ""There is to be no more killing. The fuel is on its way." Baker was allowed to sit down again. (Baker, T-2-60.)

26. Four and a half hours after the EgyptAir Flight 648 aircraft departed Athens, and four hours into the hijacking, after having witnessed the execution-style shooting of two other passengers, Baker was again brought to the door of the aircraft. Shortly after 12:30 am Malta time, he was shot point-blank in the head by Rezaq. (Baker, T-2-60-61, 85; Pflug, T-1-53; Pltf's Exh. 3.)

27. Baker's body was thrown down the stairway to the airplane. He landed approximately halfway down the stairs; the hijackers came down the stairs, carried his limp body back up to the aircraft, and threw him down to the tarmac a second time. (Baker, T-2-61.)

28. At 4:30 am Malta time, eight and one-half hours after the EgyptAir flight 648 aircraft had departed Athens and eight hours into the hijacking, and after witnessing the execution-style shooting of three other passengers, a second American passenger, Rogenkamp, was brought to the front of the aircraft, where she was shot in the head and killed by Rezaq. (Pflug, T-1-54, 56-57; Pltf's Exh. 3.)

29. Rogenkamp's body was also thrown onto the tarmac after the shooting. (Pflug, T-1-57.)

30. At 10:00 am Malta time, fourteen hours after the EgyptAir flight 648 aircraft had departed Athens and thirteen and one-half hours into the hijacking, and after witnessing the execution-style shooting of four other passengers, Pflug, the third American passenger onboard, was called forward and shot in the head by Rezaq. (Pflug, T-1-57-60; Pltf's Exh. 3.)

31. Like the other Israeli and American victims who were shot in the head, Pflug was thrown onto the tarmac. (Pflug, T-1-61.)

32. On the second day of the hijacking, at 8:15 pm Malta time, Egyptian commandos stormed the hijacked airplane in an attempt to rescue the remaining passengers and bring about the

end of the hijacking. (Lang, T-2-170-71.)

33.   As a result of this rescue attempt, the aircraft was almost completely destroyed, and approximately 60 passengers were killed. (Pltf's Exh. 3; Lang, T-2-170-172; Baker, T-2-86.)

### B.   The Abu Nidal Organization Perpetrated the EgyptAir Flight 648 Hijacking

34.   Omar Ali Rezaq, the sole surviving hijacker, was injured in the rescue attempt by Egyptian commandos, and was subsequently treated at a Maltese hospital. (Pltf's Exh. 34 at 2567-2571.)

35.   Rezaq was tried and convicted in Malta and served time in prison. (Pltf's Exh. 34 at 2792-2793.)

36.   Subsequent to his release from the Malta prison, Rezaq was tried in Washington, DC, before Judge Royce C. Lamberth in the U.S. District Court for the District of Columbia. (Ex 34.)

37.   Rezaq's criminal trial was styled United States of America v. Omar Mohammed Ali Rezaq No. 93-CR-284. (Pltf's Exh. 34.)

38.   During his criminal trial, Rezaq did not deny the fact that he got on EgyptAir Flight 648, that he went into the cockpit, that he intentionally forced the plane to divert Malta, and that he shot EgyptAir Flight 648 passengers on the ground in Malta. (Pltf's Exh. 34 at 2781.)

39.   During his criminal trial, when asked if Rezaq remembers shooting people on EgyptAir Flight 648, Rezaq testified, "[its] [s]omething I cannot forget." (Pltf's Exh. 34 at 2782.)

40.   Subsequently, in a signed affidavit, Omar Rezaq admitted that he was convicted of air piracy as the terrorist who hijacked EgyptAir Flight 648. (Pltf's Exh. 35.)

41.   Rezaq admitted that the operation had been carried out by the ANO, of which he was a member. (Pltf's Exh. 35, Pltf's Exh. 34.)

42.   Rezaq also admitted that he was trained in an ANO training camp in the Syrian-controlled Baaka Valley. (Pltf's Exh. 35, Pltf's Exh. 34.)

43.   Rezaq also admitted that this terrorist hijacking took place at the instigation of and with the support of the governments of Syria and Libya. (Pltf's Exh. 34, Pltf's Exh. 35.)

44.   Omar Rezaq is currently serving a life sentence at the Federal Maximum Security Prison, ADX, Federal Bureau of Prisons, in Florence, Colorado, having been convicted of air piracy as a result of his involvement as an ANO terrorist in the EgyptAir Flight 648 hijacking on November 23, 1985. (Pltf's Exh. 35.)

**C.      The Abu Nidal Organization is a Foreign Terrorist Organization**

45.   The ANO was established and led by Sabri al-Banna, a/k/a Abu Nidal. (Lang, T-2-141.)

46.   Abu Nidal was originally a member and operative of Yasser Arafat's Fatah organization and a part of the Palestine Liberation Organization ("PLO"). (Deeb, T-2-203-204.)

47.   In October 1974, when Abu Nidal was serving as Arafat's Fatah organization representative in Baghdad, Iraq, he broke away from the movement and formed his own, more radical organization, which he called the Fatah-Revolutionary Council, a.k.a. the Abu Nidal Organization. (Deeb, T-2-203.)

48.   Abu Nidal broke away from Arafat in opposition to Arafat's support of the Middle East peace process. (Deeb, T-2-208-209.)

49.   Abu Nidal was a violent individual, and the ANO was brutal; their documented methodology for the commission of terrorist attacks was bloodshed. (Long, Pltf's Exh. 52 at 2.)

50.   During the relevant period surrounding the November 23, 1985 hijacking of EgyptAir Flight 648 and the December 27, 1985 attacks at both the Leonardo da Vinci Airport at Rome, Italy and the Schwechat Airport at Vienna, the ANO became one of the most sophisticated terrorist groups of its day, with a global network of operations. (Long, Pltf's Exh. 52 at 2.)

51.   One of the primary reasons that the ANO was so effective was the high level of internal security Abu Nidal achieved within his organization. (Long, Pltf's Exh. 52 at 2.)

52.   Compartmentalization within the ANO was rigid, both horizontally and vertically; personnel were organized into small cell groups, with minimal interaction between members. (Pltf's Exh. 52 at 2.)

53.   The ANO was run like a commercial enterprise, with different departments, including secret service, military, archives, and foreign relations. (Badra, Pltf's Exh. 34 at ¶10.)

54.   ANO terrorists used assumed names, along with matching forged identification and travel documents; the names were changed constantly so that no one could be sure of the real names of ANO members. (Pltf's Exh. 52 at 2.)

55.   The ANO would not have been able to operate or conduct the attacks without the support of foreign governments. (Lang, T-2-175.)

56.   The ANO was known by the United States government in 1985 and 1986 to be a brutal, violent, and dangerous terrorist organization, and was subsequently designated as a Foreign Terrorist Organization ("FTO") by the U.S. Department of State. (Deeb, T-2-226.)

57.   According to the FTO list released by the Department of State on November 24, 2010,

ANO remains designated as a FTO. (Pltf's Exh.43.)[6]

**D.    Syria Sponsored and Supported the Abu Nidal Organization**

58.    The head of the Syrian Air Force Intelligence, General Muhammad al-Khuli, in his official capacity, invited Abu Nidal and his organization to move to Syria in January 1981. (Deeb, T-2-206-208.)

59.    When al-Khuli officially invited the ANO to be based in Syria, he was following the orders of Syrian President Hafiz al-Asad. (Deeb, T-2-206-208.)

60.    Prior to the hijacking and continuing to the present, Syria has been run as a police state under the al-Asad family. (Deeb, T-2-191.)

61.    While the ANO was based in Syria, its actions and terrorist operations would not have been possible without the full knowledge and support of the Syrian regime. (Deeb, T-2-207.)

62.    In the beginning of 1983, the ANO established itself more concretely in Syria with physical headquarters and bases for training.  This coincided with the exponential growth of ANO attacks around the world. (Deeb, T-2-228.)

63.    ANO operations expanded to include attacks in the greater Middle East, Turkey, Pakistan, and Western Europe. (Deeb, T-2-228.)

64.    The ANO's establishment of a base of operations in Syria in 1983 also marked a dramatic increase in the number of ANO terrorist attacks; more than a dozen ANO attacks in 1984, and twice that number in 1985. (Pltf's Exh. 47.)

65.    The extensive support and infrastructure provided by the Syrian defendants enabled the ANO to expand its scope of operations, resulting in more terrorist attacks. (Pltf's Exh. 52 at 4.)

66.    The ANO, from 1982 through at least the fall of 1985, trained its terrorist squads in the Syrian-controlled Baaka Valley in Lebanon, maintained safe houses and headquarters in Damascus, Syria, and operated under the watchful eye and with the permission of the Syrian government and the Syrian defendants. (Deeb, T-2-212-14; Lang, T-2-143-44.)

67.    Syria provided the ability for ANO to train and house and dispatch its operatives, who were also given passage to return to Syria or the Syria-controlled Baaka Valley in Lebanon for further terrorist training and operations. (Lang, T-2-144;  Rezaq, Pltf's Exh. 34, 2756, 2763-2764, 2769; Ibrahim, Pltf's Exh. 36.)

68.    Both before and after the November-December 1985 time period during which the EgyptAir hijacking and the Rome and Vienna Airport attacks occurred, Syria provided logistical support to the ANO including, but not limited to, permitting the ANO to

---

[6] http://www.state.gov/s/ct/rls/other/des/123085.htm (last visited June 2, 2011).

maintain offices and safe houses in Syria, maintaining training camps in Syria-controlled territory including the Baaka Valley in Lebanon, and providing identification and travel documents to ANO operatives. (Lang, T-2-143-145; Oakley, T-4-25; Rezaq, Pltf's Exh. 34 at 2756, 2763-2764, 2769; Ibrahim, Pltf's Exh. 36.)

69.     Syria also allowed the ANO to move about freely in Syria and in Syria-controlled Lebanon and in this regard permitted ANO operatives to travel to and from both the Damascus international airport and the Beirut, Lebanon airport. (Deeb, T-2-218; Lang, T-2-155.)

70.     Moreover, Syria also permitted ANO agents the freedom to travel on military highways between training camps in Syria-controlled Lebanon and Damascus without passport control. (Lang, T-2-144.)

71.     Surviving ANO terrorists from the EgyptAir hijacking and the Rome and Vienna Airport attacks have corroborated, through sworn depositions and/or filed affidavits admitted into evidence by the Court, Syria's specific logistical support and sponsorship of the ANO during the time period surrounding the attacks. (Pltf's Exh. 35; Pltf's Exh. 36; Pltf's Exh. 37; Pltf's Exh. 38.)

72.     Syria participated in the planning, including the timing and the methodologies, and the operations involved in both the EgyptAir hijacking and the Rome and Vienna Airport attacks. (Deeb, T-2-216-217.)

73.     The Syrian government, both directly and acting through Syrian Air Force Intelligence, provided support to the ANO organization, and specifically sponsored the ANO EgyptAir hijacking and the Rome and Vienna Airport attacks. (Lang, T-2-145.)

74.     The EgyptAir hijacking and the Rome and Vienna Airport attacks could not have taken place without Syria's direct support for the ANO. (Lang, T-2-145; Deeb, T-2-229; Long, Pltf's Exh. 52 at 4; Schweitzer, Pltf's Exh. 53 at 35; Schweitzer, Pltf's Exh. 54 at 35.)

75.     The ANO was materially and substantially supported in its terrorist activities by the Syrian defendants beginning in 1981-1983, and continuing through and including the November 1985 EgyptAir hijacking and the December 1985 Rome and Vienna Airport attacks.

### E.     Syria is a State Sponsor of Terrorism

76.     Prior to and during the relevant period surrounding the hijacking of EgyptAir Flight 648 and the Rome and Vienna Airport attacks, terrorism was an integral foreign policy tool for the Syrian regime. (Deeb, T-2-197; Lang, T-2-128.)

77.     Syria became actively and directly involved in sponsoring terrorist activities beginning in the mid-1970s. (Deeb, T-2-197.)

78.     Historically, Syria has provided material support to terrorist groups primarily in order to achieve foreign policy goals, such as pushing the United States and its allies out of the

region. (Deeb, T-2-198.)

79.  Syria opposed the Middle East peace process between Israel and Egypt. (Schweitzer, Pltf's Exh. 54.)

80.  Syrian-sponsored terrorist activities were, and continue to be, primarily directed against any entity supportive of that process, including moderate Arab states such as Egypt, pro-Yassir Arafat Palestinian groups, and U.S. and Israeli targets. (Deeb, T-2-198; Pltf's Exh. 54 at 31-32.)

81.  Syria supported the ANO's operations against Arab countries that supported the Israel-Egypt peace treaty. (Schweitzer, Pltf's Exh. 54.)

82.  In this regard, Syria has used terrorist groups as a means of achieving foreign policy goals without resorting to conventional methods of warfare, which it could not, and still cannot, afford to wage against either Israel or the United States. (Deeb, Pltf's Exh. 50 at 2, 7.)

83.  As a result of its past support of terrorism, Syria was among the first countries designated in 1979 by the United States Department of State as a State Sponsor of Terrorism. (Oakley, T-4-11.)

84.  Syria was designated as a State Sponsor of Terrorism on December 29, 1979. (Pltf's Exh. 41.)

85.  Syria, as a result of its ongoing, current and continuous sponsorship of terrorism, today remains designated by the State Department as a State Sponsor of Terrorism. (Pltf's Exh. 41.)

86.  During the period encompassing the EgyptAir hijacking of November, 1985, and the Rome and Vienna Airport attacks of December, 1985, Syria remained one of the primary state sponsors of terrorism. (Oakley, T-4-9.)

87.  During the same time period, the United States considered Syria one of the worst sponsors of terrorism in the world. (Oakley, T-4-22.)

88.  During the relevant time period, Syria began to increasingly rely on terrorist groups comprised of non-Syrians in order to deflect detection of Syria's support and liability for the actions of its terrorist surrogates. (Deeb, T-2-201.)

89.  During the relevant period surrounding the EgyptAir hijacking and the Rome and Vienna Airport attacks, President Hafiz al-Asad ruled Syria under an authoritarian government, whereby all organs of the state were directly under his control. (Deeb, T-2-214, 216.)

90.  One of the primary organizations al-Asad utilized to sponsor terrorist organizations, such as the ANO, was the Syrian Air Force Intelligence agency, Idarat al-Mukhabarat al-Jawiyya. (Oakley, T-4-13.)

91.     The Syrian Air Force Intelligence agency acted more as a presidential intelligence service than an instrumentality of the Air Force, and was of paramount importance because it functioned as the highest intelligence organization in Syria. (Deeb, T-2-206, 226.)

92.     The head of the Air Force Intelligence, General Muhammad al-Khuli, was the most powerful intelligence chief within Syria. (Deeb, T-2-206-208.)

93.     Syria remains a major sponsor of terrorism today. (Deeb, T-2-197.)

94.     At present, according to the testimony received by the Court from Dr. Deeb, Syria, as a state sponsor of terrorism, spends between US $500,000,000 (at a minimum) and US $700,000,000 annually on terrorism-related expenditures. (Deeb, T-2-235.)

95.     Syria's current and ongoing support of international terrorism includes, but is not limited to, providing material support to HAMAS and Hezbollah, each of which have been designated by the U.S. Department of State as Foreign Terrorist Organizations. (Deeb, T-2-160-161.)

**F.      The Total Destruction of the EgyptAir Aircraft was Reasonably Foreseeable**

96.     The shootout between an EgyptAir sky marshal and the hijackers resulted in a punctured fuselage, and the plane descended rapidly. (Baker, T-2-52-53, 84; Pflug T-1-39, 41; Pltf's Exh.3.)

97.     The hijacking itself and the events that took place up to the time that the plane arrived in Malta caused a great deal of property damage. (Lang, T-2-176.)

98.     Aircraft such as the EgyptAir-owned Boeing 737-200 ADV passenger airplane ("the EgyptAir aircraft"), like all aircraft, can be damaged to the point of total loss can require massive reconstruction; in an operation such as a violent hijacking, it is reasonable to believe the aircraft would be destroyed completely. (Lang, T-2-176.)

99.     The ANO was known to be amongst the most violent and destructive of terrorist organizations, and the ANO's participation in a hijacking operation virtually guaranteed that there would be a great deal of damage and injury. (Lang, T-2-177.)

100.    Complete destruction of the aircraft would be reasonably foreseeable following Syria's sponsorship of the ANO to commit the EgyptAir hijacking. (Lang, T-2-177.)

**G.      Losses Sustained by Certain Underwriters, _et al_.**

101.    Ian Durrant offered his testimony by sworn affidavit. (T-5-18-28; Pltf's Exh. 84.)

102.    He has accumulated 32 years of insurance claims experience working for insurance companies and managing agents for syndicates in Lloyd's of London, much of that experience in the aviation insurance sector. (Pltf's Exh. 81 at 1.)

103.   His area of concentration is products and liability work on catastrophic losses, which involves evaluating, settling, and/or recovering fair and covered claims through negotiation, mediation, or litigation.  This work necessarily involves the review and understanding of the universe of basic documents such as insurance policies, broker policy slips, settlement memoranda, and the usual correspondence between the players in such settings, such as the original insurer, their broker, the reinsurers, the claims surveyor, adjustors, and lawyers—all of whom played a role in this damage claims process subsequent to the aircraft's destruction. (Pltf's Exh. 84 at 1-2).

104.   Ian Durrant is competent to discuss the Lloyd's of London insurance company markets' complex, unusual daily workings and matters directly relating and relevant to the losses suffered by Certain Underwriters.

105.   Neil McGilchrist offered his testimony by sworn affidavit. (T-5-3-9; Pltf's Exh. 86.)

106.   He has practiced law, including aviation insurance law, for 41 years. (Pltf's Exh. 86 at 1.)

107.   The Chambers UK, an independent guide to UK legal service providers, named him as a "Senior Statesman" in 2009, and described him as "a seasoned authority on the entire gamut of aviation insurance matters."  The Chambers UK further described him as "being particularly well-known for his experience in advising on major international air accidents." (Pltf's Exh. 86 at 1.)

108.   McGilchrist worked on the aviation damage claims resulting from the November 23, 1985 hijacking of the the EgyptAir aircraft with registration number SU-AYH and serial number 211191.  That airplane was forced to land in Malta during the hijacking, and was destroyed beyond repair in the subsequent attempt to retake control of the airplane at the Malta airfield. (Pltf's Exh. 86 at 1.)

109.   McGilchrist was a solicitor at Beaumont & Son, and, following the hijacking and destruction of the EgyptAir aircraft, he was tasked with representing MISR Insurance Company ("MISR"), the original insurer of the aircraft owned by EgyptAir, along with MISR's reinsurers and their appointed loan adjustors in connection with the insurance claim for the loss of the aircraft. (Pltf's Exh. 86 at 2.)

110.   During the course of his work on this case in 1985-1987, acting on behalf of the reinsurers of the EgyptAir aircraft, he communicated and negotiated with:  the London aviation insurance broker Leslie & Godwin (which facilitated the reinsurance of the policy), the government of Malta, MISR, and all the underwriters, including Certain Underwriters, who are plaintiffs in this action, to cover their sustained losses. (Pltf's Exh. 86 at 2).

111.   His qualifications, which were introduced into evidence, make him competent to testify based both upon his skills, expertise and his personal knowledge.

112.   Robert Burge offered his testimony by sworn affidavit. (T-5-11-18; Pltf's Exh. 88.)

113.    He has worked in the London aviation insurance market since 1969 as an insurance adjuster, and later served in more senior roles. (Pltf's Exh. 88 at 1.)

114.    He worked with Lloyd's of London for approximately 10 years, initially as a surveyor, subsequently promoted to Senior Surveyor, in which capacity he worked around the world on aircraft losses, reported back to the London Market, and negotiated claims and investigated causes on Lloyd's behalf. (Pltf's Exh. 88 at 1.)

115.    After rejoining Lloyd's' Aviation Department as Senior Surveyor in 1981, he was eventually promoted to Deputy Principal Surveyor, and in 1985 was promoted to the position of Principal Surveyor responsible for the department, including reporting to the market and being part of the Senior Management of the Corporation of Lloyd's. (Pltf's Exh. 88 at 1.)

116.    At the time of the EgyptAir hijacking, Burge was the Principal Surveyor and Adjuster for Lloyd's' Aviation Department; the role required him to be familiar with the underlying insurance policies, the identities of the re-insurers and various parties to the insurance policies, and parties relevant to the claims adjustment problem subsequent to the destruction of the aircraft. (Pltf's Exh. 88 at 2.)

117.    His qualifications, which were introduced into evidence, make him competent to testify based both upon his skills, expertise and his personal knowledge.

118.    There is, as there was in 1985, a very large insurance market with regard to aircraft and all other aspects of aviation insurance.  Located in London, this insurance market is made up of many insurance companies.  This is a central trading place for insurance brokers who place risks for their clients, the policyholders.  Within Lloyd's there are syndicates that are owned by Managing Agents.  The syndicates employ Underwriters, who underwrite risks for the syndicate in the aviation business. (Pltf's Exh. 84 at 2.)

119.    Owners of aircrafts first insure their airplanes against loss and damage by contracting directly with Lloyd's syndicates via a broker or, as in this EgyptAir hull war risk, a re-insurance of the initial local insurance company MISR. (Pltf's Exh. 84 at 1.)

120.    This company then reinsures its risk by contacting an insurance broker, most likely in London, who would place the risk as a reinsurance of the "ceding" insurance company, MISR, with various Lloyd's syndicates and other insurance companies.  This is done against a quote of premium for underwriting the risk. (Pltf's Exh. 84 at 2.)

121.    Each syndicate or company would contract through the policy of insurance, or reinsurance in this case, and underwrite a certain percentage of the overall risk.  The original insurer's risk can be ceded (reinsured) 100% worldwide through insurance and reinsurance markets to various Lloyd's syndicates and London insurance companies.  London insurers and reinsurers may be ceded 100% of the risk or a percentage thereof.  The rest is ceded to other so called "foreign" insurance markets.  In 1985, London insurers quite often underwrote the greater percentage of the risk for aircraft around the world. (Pltf's Exh. 84 at 2.)

122.  Durrant testified that he reviewed Leslie & Godwin's original file on the reinsurance of the EgyptAir aircraft, its hijacking on November 23, 1985, by ANO terrorists, and its subsequent destruction.  He confirmed the following: in this case, EgyptAir, the owner of the EgyptAir aircraft, contracted with an Egyptian insurance company, MISR, located in Cairo, Egypt, which then sought to reinsure its risk by contracting with several insurance underwriters through the London broker Leslie & Godwin. (Pltf's Exh. 84 at 2-3.) McGilchrist and Burge testified to the same. (Pltf's Exh. 86 at 2; Pltf's Exh. 88 at 2.)

123.  Leslie & Godwin facilitated this complex transaction by communicating and contracting the reinsurance of MISR with many syndicate underwriters at Lloyd's and other insurance companies.  Most of these underwriters, who contracted to reinsure the MISR policy, are the plaintiffs in this litigation.  The risk insured by the reinsurers was for damage faced by MISR should the airplane be destroyed or damaged within the terms of the aviation hull war policy.  Leslie & Godwin, the aviation insurance broker, created a "Slip Policy Reinsurance" that delineates which reinsurer covered what percentage of the risk. (Pltf's Exh. 84 at 2-3; Pltf's Exh. 84A.)

124.  The plaintiffs' reinsurers, who each took shares in the policy that covered the aircraft hull at issue in this case, are as follows: Certain Underwriters at Lloyd's London (each severally subscribed to insurance policies each for its own part and not one for the other, numbered AE2141B and VS5057L); Allianz Cornhill Insurance, PLC, f/k/a Cornhill Insurance, PLC, c/o Pro Insurance Solutions, Ltd.; Aviation and General Insurance Company, Ltd., c/o Ruxley Ventures Ltd.; English & American Insurance Company, Ltd., c/o Pro Insurance Solutions, Ltd.; Markel Insurance Company, Ltd., f/k/a Terra Nova Insurance Company, Ltd.; Minster Insurance Company Ltd.; MMO/New York Marine and General; Nippon Insurance Company of Europe Ltd., c/o Pro Insurance Solutions, Ltd.; Riverstone Insurance (UK) Ltd., as successor in interest to Sphere Drake Insurance Ltd.; Sovereign Marine & General Insurance Company Ltd., c/o Pro Insurance Solutions, Ltd.; SR International Business Insurance Company Ltd., f/k/a Switzerland Insurance Company (UK) Ltd., c/o Pro Insurance Solutions, Ltd.; Tower Insurance Ltd., c/o Pro Insurance Solutions, Ltd.; and La Réunion Aérienne.[7]  (Pltf's Exh. 84 at 3, 5-6; Pltf's Exh. 84A.)

---

[7] Some of the plaintiff insurance companies are listed in the complaint as "f/k/a," meaning "formally known as," because the companies changed their names when taken over by another company.  Several of the companies are identified with "c/o," meaning "in care of," which describes the relationship between the insurance company and a company called Pro Insurance Solutions Ltd., formerly known as Portfolio Run Off Limited ("PROL").  PROL has changed its name to Pro Insurance Solutions Ltd., and purchases companies that are either in difficulties or have ceased trading, but are solvent and want another company to run off their book of business.  Pro Insurance Solutions Ltd. also deals with companies who have entered into a solvent scheme of arrangement.  Thus, a few of the plaintiff insurance companies, whose old corporate identities may be found on the "Slip Policy Reinsurance" (Pltf's Exh. 84A), are now no longer autonomous insurance companies, but operate under the care of Pro Insurance Solutions Ltd., such as Nippon Insurance Company of Europe Ltd. and Sovereign Marine & General Insurance Company Ltd.  The original corporate name of each plaintiff is found upon

125.   The companies each subscribed to a hull war risk policy, a type of insurance policy that covered the aircraft owned by EgyptAir for "[a]ny act of one or more persons, whether or not agents of a sovereign power, for political or terrorist purposes and whether the loss or damage resulting therefrom is accidental or intentional." (Pltf's Exh. 84 at 4; Pltf's Exh. 84B; Pltf's Exh. 86F.)

126.   The value of the aircraft under the insurance policy was $14,000,000 USD.  (Pltf's Exh. 84 at 5; Pltf's Exh. 84C; Pltf's Exh. 84F; Pltf's Exh. 86 at 2; Pltf's Exh. 88 at 2.)

127.   The aircraft was declared a "constructive total loss" as a result of the damage sustained during the attempt to retake the aircraft from the hijackers. (Pltf's Exh. 84 at 7; Pltf's Exh. 84F; Pltf's Exh. 86 at 2; Pltf's Exh. 86A; Pltf's Exh. 88 at 2-3; Pltf's Exh. 88A.)

128.   The salvage sale of the aircraft produced an offsetting recovery of $3,502,033 USD for the insurers. (Pltf's Exh. 86 at 3; Pltf's Exh. 86C; Pltf's Exh. 88 at 4; Pltf's Exh. 88F.)

129.   This figure was reduced by $45,000 due to equipment missing from the salvage avionics, which resulted in a refund by the reinsurers to the buyer; thus, the total loss was $10,542,967.  (Pltf's Exh. 88 at 4.)

130.   The reinsurers, including plaintiff-underwriters, incurred a cost of £36,848.86 as of June 1987 arising from the work performed by solicitors Beaumont & Sons. (Pltf's Exh. 86 at 3; Pltf's Exh. 86D; Pltf's Exh. 88 at 4.)  This figure converts to $61,113.83 at the prevailing exchange rate on that date. (Pltf's Exh. 93 at 2.)

131.   The claims survey process whereby the damage to the aircraft was assessed and payments distributed under the applicable policy for insurance and reinsurance caused the reinsurers, including plaintiff-underwriters, to incur a further cost of £87,036.58 as of July 24, 1987. (Pltf's Exh. 86 at 3; Pltf's Exh. 86E; Pltf's Exh. 88 at 4.)  This figure converts to $139,580 USD at the prevailing exchange rate on that date. (Pltf's Exh. 93 at 2.)

132.   The amount of $300,000 was paid to the government of Malta for storage costs associated with the destroyed aircraft.  (Pltf's Exh. 86 at 2-3; Pltf's Exh. 88 at 4.)

133.   From the insurance loss of $14,000,000, and after deducting the salvage recovery value of $3,457,033 and adding the costs of $61,113.83, $139,580, and $300,000 as set forth above, the total recoverable loss is $11,043,660.83, plus any applicable interest. (Pltf's Exh. 93.)

134.   The loss would have been distributed among the reinsurers according to their percentage of the risk. (Pltf's Exh. 84 at 7.)

---

the "Slip Policy Reinsurance" (Pltf's Exh. 84A).  The only entity named as a plaintiff whose name in the Amended Complaint does not divulge the plaintiff's corporate name at the time of the incident, as found on Pltf's Exh. 84A, is MMO/New York Marine and General, whose name at the time of the incident was Mutual Marine New York.

135.    The plaintiff underwriters in the litigation, with the exception of La Réunion Aérienne, combined to reinsure almost the entire 75.55% portion of the risk reinsured through Leslie & Godwin. (Pltf's Exh. 84 at 5.)

136.    La Réunion Aérienne reinsured a further 8.5% of the risk outside of the 75.55%. (Pltf's Exh. 87 at 1; Pltf's Exh. 87A).[8]

137.    The following chart identifies the percentage of the 75.55% portion of the risk held by each underwriter, as identified by the underwriters' stamps on Pltf's Exh. 84A:

| Underwriter Insurance Company | Reinsurance Policy Reference # | Share of 75.55% of London Order |
|---|---|---|
| Various Lloyd's Syndicates | AE2141 | 70.919% |
| Sedgwick Aviation – Various Lloyd's syndicates | VS5057 | 9.088% |
| Aviation & General Insurance Company, Ltd. [c/o] Ruxley Ventures Ltd. | W8501890 | 1.136% |
| English & American Insurance Company, Ltd. [c/o] Pro Insurance Solutions, Ltd. | 850017WAL15 | 2.363% |
| Nippon Insurance Company of Europe, Ltd. [c/o] Pro Insurance Solutions, Ltd. | 850017WAL15 | 0.727% |
| SR International Business Insurance Company Ltd., f/k/a Switzerland Insurance Company (UK) Ltd. [c/o] Pro Insurance Solutions, Ltd. | 850017WAL15 | 0.364% |
| Tower Insurance Co., f/k/a National Insurance New Zealand [c/o] Pro Insurance Solutions, Ltd. | 850017WAL15 | 0.182% |
| Minster Insurance Company Ltd. | AV850325 | 1.363% |
| Riverstone Insurance (UK) Ltd., f/k/a Sphere Drake Insurance Ltd. | SWAEG00056Z | 1.0904% |
| Allianz Cornhill Insurance, PLC, f/k/a Cornhill Insurance, PLC [c/o] Pro Insurance Solutions, Ltd. | 277331 | 0.547% |

---

[8] Thus, the identity of 84% of the reinsurers has been established:  75.5% covered by Certain Underwriters at Lloyd's London (each severally subscribed to insurance policies each for its own part and not one for the other, numbered AE2141B and VS5057L) and the other named insurance companies, with the exception of La Réunion Aérienne, which covered another 8.5 % outside of that 75.5%.

| | | |
|---|---|---|
| Sovereign Marine & General Insurance Company Ltd. [c/o] Pro Insurance Solutions, Ltd. | 277331 | 0.725% |
| Markel Insurance Company, Ltd., f/k/a Terra Nova Insurance Company, Ltd. | 85MA82399HA | 1.727% |
| MMO/New York Marine and General, f/k/a Mutual Marine New York | NS | 3.181% |
| Dominion * | | 0.682% |
| AEGON * | | 0.227% |
| Ins. Corp Of Ireland * | | 1.136% |
| Dutch Pool * | | 1.136% |
| Tokyo Marine * | | 0.454% |
| Frankona Munich * | | 0.682% |
| Tunis RE * | | 0.454% |
| EL Banco * | | 0.136% |
| Abeille Paris * | | 0.091% |
| AA Mutual Johannesburg * | | 0.182% |

* = not a plaintiff in this case

(Pltf's Exh. 84 at 5-6; Pltf's Exh. 84A; Pltf's Exh. 85A; Pltf's Exh. 94 at 3.)

## V.    CONCLUSIONS OF LAW

In 2008, the National Defense Authorization Act for Fiscal Year 2008, Pub. L. No. 110-181, § 1083, 122 Stat. 3, 338-344 (2008) (hereinafter "2008 NDAA") revised the FSIA framework under which state-sponsored terrorism cases may be brought by substituting 28 U.S.C § 1605A in place of 28 U.S.C. § 1605(a)(7).  Perhaps most important, it furnished a cause of action against state sponsors of terrorism, while the earlier law, § 1605(a)(7), could only be used as a "pass-through" for plaintiffs seeking to bring suit in federal court against foreign sovereigns for terrorism-related claims; the claims themselves had to be based in state law. Murphy v. Islamic Republic of Iran, 740 F. Supp. 2d 51, 56 (D.D.C. 2010).

A.      **Retroactive Application of 28 U.S.C. § 1605A under Section 1083(c) of the 2008 NDAA**

One of the reasons why the creation of a federal cause of action was so important was because of the frequent disparities between state laws.  Plaintiffs who were victims of the same terrorist attack could be subject to different levels of recovery, or even no recovery at all, based entirely on their state of domicile at the time of the incident.  See In re:  Islamic Republic of Iran Terrorism Litig., 659 F. Supp. 2d 31, 46-47 (D.D.C. 2009) (hereinafter "Terrorism Litig.").  Thus, in an effort to rectify the potential for further uneven treatment, the 2008 NDAA also provided for the retroactive application of the § 1605A cause of action for certain pending cases.  Under § 1083(c)(2), captioned "Prior Actions," cases that were brought under § 1605(a)(7) that were before the courts as the time of the enactment of the 2008 NDAA could, on plaintiffs' motion, be given effect "as if the action had originally been filed" under § 1605A. 2008 NDAA § 1083(c)(2).  Under § 1083(c)(3), captioned "Related Actions," if an action arising out of an incident had been timely commenced under § 1605(a)(7),[9] any other action arising out of the same incident could be brought under § 1605A. 2008 NDAA § 1083(c)(3).

Parties seeking to take advantage of the new federal cause of action and punitive damages allowance under the 2008 NDAA found themselves somewhat confused by the new statute; some missed filing deadlines because they thought retroactivity was automatic, whereas others seemed unclear as to whether they should file under § 1083(c)(2) or (3), and thus filed under both.  See Terrorism Litig. at 66-67.  The latter approach is what Chief Judge Lamberth, in his omnibus In re: Islamic Republic of Iran Terrorism Litig. opinion, referred to as the "belt and suspenders" approach.  Id.

---

[9] Under 28 U.S.C. § 1605A(b), the related action must have been commenced under 28 U.S.C. § 1605(a)(7) not later than the latter of (1) 10 years after April 24, 1996; or (2) 10 years after the date on which the cause of action arose. 28 U.S.C. § 1605A(b).  The complaint in this action was filed on April 21, 2006.  See Certain Underwriters I, Complaint [#1].

The original complaint, filed in <u>Certain Underwriters I</u> on April 21, 2006, asserted subject matter jurisdiction for the case under 28 U.S.C. § 1605(a)(7). <u>Certain Underwriters I</u>, <u>Complaint</u> [#1] at ¶¶ 2-5. In 2008, the Court granted plaintiffs' motion to amend the complaint filed in <u>Certain Underwriters I</u>, restating subject matter jurisdiction for the case under 28 U.S.C. § 1605A. <u>Certain Underwriters I</u>, <u>Minute Order</u> of Mar. 28, 2008; <u>Second Amended Complaint</u> [#60] at ¶¶ 1-5. The original complaint in the <u>Certain Underwriters II</u> case, filed on March 24, 2008, asserted subject matter jurisdiction under 28 U.S.C. § 1605A. <u>Certain Underwriters II</u>, <u>Complaint</u> [#1] at ¶¶ 1-5. The <u>Certain Underwriters II</u> complaint does not contain any plaintiffs or claims other than those pled in the <u>Certain Underwriters I</u> original or amended complaints.

Thus, these cases have taken the "belt and suspenders" approach. As it is clear that plaintiffs are able to receive retroactive treatment for <u>Certain Underwriters I</u>, the earlier action, as much as for <u>Certain Underwriters II</u>, it would be a waste of judicial resources to proceed with both cases. Therefore, the <u>Certain Underwriters II</u> case shall be dismissed. <u>See</u> <u>Terrorism Litig.</u> at 97-98; <u>Baker</u>, 775 F. Supp. 2d at 73.

**B.      Service of Process**

Service under the FSIA is governed by 28 U.S.C. § 1608. Subsection (a) governs service upon a foreign state or political subdivision of a foreign state, while subsection (b) provides for service upon an agency or instrumentality of a foreign state. In determining whether a foreign entity is to be treated as the state itself or as an agency or instrumentality, courts employ the "core functions" test as it was set out in <u>Roeder v. Islamic Republic of Iran</u>, 333 F.3d 228 (D.C. Cir. 2003). <u>Id.</u> at 234. The approach is categorical: if the core functions of the entity are governmental, it is considered to be the foreign state itself. <u>Id.</u> If its core functions are commercial, then it is an agency or instrumentality of the foreign state. <u>Id.</u>

In this case, service upon each of the Syrian defendants in <u>Certain Underwriters</u> was

perfected under 28 U.S.C. § 1608(a)(3) through delivery of the required documents

(accompanied by Arabic translations) to the Head of the Ministry of Foreign Affairs via

international courier service. <u>Notice of Proof of Service</u> [#17].[10]  Obviously, § 1608(a) was the

applicable provision, as the Syrian Arab Republic is a foreign state.  Each of the other remaining

defendants, however, is also treated as the foreign state under the law.

Applying the <u>Roeder</u> core functions test, the Syrian Air Force Intelligence agency, Idarat

al-Mukhabarat al-Jawiyya, is characterized as the foreign state itself, because its core functions

are governmental, not commercial.  <u>See</u> <u>Gates v. Syrian Arab Republic</u>, 580 F. Supp. 2d 53, 64

(D.D.C. 2008) ("<u>Gates I</u>") (citing <u>Roeder</u>, 333 F.3d at 234).  Syria's Director of Military

Intelligence, General Muhammad al-Khuli, is characterized as the foreign state itself because "an

officer of an entity that is considered the foreign state itself under the core-functions test should

also be treated as the state itself for purposes of service of process under § 1608." <u>Nikbin v.</u>

<u>Islamic Republic of Iran</u>, 471 F. Supp. 2d 53, 65-66 (D.D.C. 2007).  The complaint asserts that

al-Khuli "performed acts within the scope of his office, which caused the terrorist acts described

below." <u>Second Amended Complaint</u> at ¶ 36.  An official-capacity claim against a government

official is a claim against the government itself. <u>Cicippio-Puleo v. Islamic Republic of Iran</u>, 353

F.3d 1024, 1034 (D.C. Cir. 2004).  Because each defendant is treated as the state itself under the

---

[10] Under the recently-decided opinion in <u>Gates v. Syrian Arab Republic</u>, 646 F.3d 1 (D.C. Cir. 2011), a claim that has been converted from a claim under 28 U.S.C. § 1605(a)(7) to one under § 1605A is not the same thing as a new claim requiring a new pleading, and no new service of process is required if it was adequately affected when the suit was filed under the earlier statute. <u>Id.</u> at 5-6.  <u>See also</u> Fed. R. Civ. P. 5(a)(2); <u>Terrorism Litig.</u> at 106-07 ("Thus, by its plain terms, § 1083 indicates that no further action under Rule 5 or otherwise should be required of plaintiffs before their case may move forward under § 1605.  More fundamentally, however, as emphasized above, this Court does not find that a change in the rule of decision applicable to personal injury or wrongful death claims under the FSIA terrorism exception results in new claims of relief for purposes of the pleading requirements in these cases.").

core functions test, and service was never made on al-Khuli in his individual capacity, Syria is

the only defendant against whom damages can be sought.  See Baker, 775 F. Supp. 2d at 73-74;

Gates I, 580 F. Supp. 2d at 64.

###### C.    Jurisdiction and Standing

1.    *Subject Matter Jurisdiction*

The FSIA provides "the sole basis for obtaining jurisdiction over a foreign state" in

United States courts. Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428, 434

(1989).  One of the enumerated exceptions to the FSIA is 28 U.S.C. § 1605A, the state-

sponsored terrorism exception to sovereign immunity.  Under § 1605A, a foreign state that is or

was a state sponsor of terrorism shall be liable to a United States citizen for personal injury or

death. 28 U.S.C. § 1605A(c).  In such an action, a foreign state is vicariously liable for the acts

of its officials.  Id.  Additional damages, including property damages, are available under §

1605A(d):  "After an action has been brought under subsection (c), actions may also be brought

for reasonably foreseeable property loss, whether insured or uninsured, third party liability, and

loss claims under life and property insurance policies, by reason of the same acts on which the

action under subsection (c) is based."  28 U.S.C. § 1605(d).  Under the language of the statute,

once a party with valid standing has brought an action under § 1605A(c), it is unnecessary for a

party filing suit under § 1605A(d) to establish standing separately; standing under § 1605A(d) is

derivative of that under § 1605A(c).  Furthermore, the legislative history of § 1605A(d) contains

a specific reference to the case at hand:

> My provision also addresses the problems that arose from overly
> mechanistic interpretations of the 1996 legislation.  For example,
> in several cases, such as Certain Underwriters v. Socialist People's
> Libyan Arab Jamahiriya, courts have prevented victims from
> pursuing claims for collateral property damage sustained in
> terrorist attacks directed against U.S. citizens.  My new provision
> fixes this problem by creating an explicit cause of action for these

kinds of property owners, or their insurers, against state sponsors
of terrorism.

154 Cong. Rec. S 54, 55 (Jan. 22, 2008) (statement of Sen. Frank Lautenberg).

Under § 1605A, "[a] foreign state shall not be immune from the jurisdiction" of the

United States courts in a case where "money damages are sought against a foreign state for

personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft

sabotage, hostage taking, or provision of material support or resources for such an act" if an

"official, employee, or agent of [the] foreign state" engages in such provision of material support

"while acting within the scope of his or her office." [11] 28 U.S.C. § 1605A(a)(1).  In addition to

the requirements of the sovereign immunity exception, a court shall hear a claim under § 1605A

if (1) the foreign state was designated as a "state sponsor of terrorism"[12] by the State Department

at the time the act took place and (2) the victim or plaintiff was a national of the United States at

the time the act took place. 28 U.S.C. § 1605A(a)(2); see also Acosta, 574 F. Supp. 2d at 25.

As to sovereign immunity, testimony both from expert witnesses and Abu Nidal terrorists

themselves makes clear the fact that Syria knowingly provided material support to the ANO for

---

[11] 28 U.S.C. § 1605A(h)(3) defines "material support or resources" as "the meaning given that
term in section 2339A of title 18."  18 U.S.C. § 2339A(b) defines "material support or
resources" as "any property, tangible or intangible, or service, including currency or monetary
instruments or financial securities, financial services, lodging, training, expert advice or
assistance, safehouses, false documentation or identification, communications equipment,
facilities, weapons, lethal substances, explosives, personnel."

[12] The term "state sponsor of terrorism" is defined at 28 U.S.C. § 1605A(h)(6):

> [T]he term "state sponsor of terrorism" means a country the
> government of which the Secretary of State has determined, for
> purposes of section 6(j) of the Export Administration Act of 1979
> (50 U.S.C. App. 2405(j)), section 620A of the Foreign Assistance
> Act of 1961 (22 U.S.C. 2371), section 40 of the Arms Export
> Control Act (22 U.S.C. 2780), or any other provision of law, is a
> government that has repeatedly provided support for acts of
> international terrorism.

its training operations, and participated in the logistical planning and operations concerning the EgyptAir hijacking, as well as the Rome and Vienna Airport attacks. Syria provided safe haven for the ANO at least as early as 1983.[13] Syria was designated by the State Department as a state sponsor of terrorism in December 1979, and has retained that designation to this day.[14]

As discussed in <u>Baker</u> (<u>supra</u> at n.2), each of the three victims of the EgyptAir hijacking were United States citizens at the time of the hijacking, and both they and their immediate families at the time of the attack had proper standing to bring a suit against Syria under § 1605A(c). <u>Baker</u>, 775 F. Supp. 2d at 75. Therefore, the <u>Certain Underwriters</u> plaintiffs have standing to bring a suit based on "reasonably foreseeable property loss . . . and loss claims under life and property insurance policies, by reason of the same acts," *i.e.*, the EgyptAir hijacking. 28 U.S.C. § 1605A(d).

   2. *Personal Jurisdiction*

As noted above, the FSIA establishes requirements for proper service upon a foreign state in 28 U.S.C. § 1608; plaintiffs properly served Syria under § 1608(a)(3). <u>Supra</u> at V.B. Furthermore, having determined that Syria, as a foreign state, is the only defendant against whom an action may properly be maintained (<u>id.</u>), there is no issue of due process under the Fifth Amendment, as "foreign states are not 'persons' protected by the Fifth Amendment." <u>Valore</u>,

---

[13] When a foreign sovereign allows a terrorist organization to operate from its territory, this meets the statutory definition of "safehouse" under 18 U.S.C. § 2339A(b):

> Insofar as the government of the Republic of Sudan affirmatively allowed and/or encouraged al Qaeda and Hezbollah to operate their terrorist enterprises within its borders, and thus provided a base of operations for the planning and execution of terrorist attacks—as the complaint unambiguously alleges—Sudan provided a "safehouse" within the meaning of 18 U.S.C. § 2339A, as incorporated in 28 U.S.C. § 1605(a)(7).

<u>Owens v. Republic of Sudan</u>, 412 F. Supp. 2d 99, 108 (D.D.C. 2006).

[14] <u>State Sponsors of Terrorism</u>, http://www.state.gov/s/ct/c14151.htm (last visited June 2, 2011).

700 F. Supp. 2d at 70 (quoting <u>Price v. Socialist People's Libyan Arab Jamahiriya</u>, 294 F.3d 82, 96 (D.C. Cir. 2002)).  Finally, "customary international law," which may call for a "minimum-contacts-like test" is inapplicable in these circumstances. <u>Valore</u>, 700 F. Supp. 2d at 72.  The Court has personal jurisdiction over Syria in this case.

> ### D.     Legal Standard for FSIA Default Judgment

Under the FSIA, a default judgment may only be entered if "the claimant establishes his claim or right to relief by evidence satisfactory to the court." 28 U.S.C. § 1608(e).  All uncontroverted evidence is accepted as true. <u>Id.</u>  <u>See also</u> <u>Campuzano v. Islamic Republic of Iran</u>, 281 F. Supp. 2d 258, 268 (D.D.C. 2003) (the "satisfactory to the court" standard is identical to the standard for entry of default judgments against the United States in Federal Rule of Civil Procedure 55(e)).

In evaluating plaintiffs' proofs, a court may "accept as true plaintiffs' uncontroverted evidence, which may take the form of sworn affidavits or prior transcripts." <u>Estate of Botvin v. Republic of Iran</u>, 510 F. Supp. 2d 101, 103 (D.D.C. 2007).  Such evidence may also include judicial notice of findings and conclusions of related proceedings. <u>Id.</u>; <u>see also</u> <u>Peterson v. Islamic Republic of Iran</u>, 264 F. Supp. 2d 46, 49 n.2 (D.D.C. 2003) ("<u>Peterson I</u>").

In light of defendants' failure to object or enter an appearance to contest the matters in this case, the Court accepts the uncontested evidence and sworn testimony submitted by plaintiffs as true.

> ### E.     Liability

The federal right of action in the FSIA provides, among other things, that a foreign state that is or was a state sponsor of terrorism shall be liable to a United States citizen for personal injury or death caused by provision of material support or resources for an act of torture, extrajudicial killing, aircraft sabotage, or hostage-taking, as well as any reasonably foreseeable

property loss by reason of the same acts, if an official of the foreign state engages in such provision of material support while acting within the scope of his office. 28 U.S.C. § 1605A(a-d).

The basis of Syria's liability is its provision of material support and resources to the ANO. The FSIA explicitly provides that "a foreign state shall be vicariously liable for the acts of its officials, employees, or agents." 28 U.S.C. § 1605A(c). Vicarious liability is a common law concept, wherein "[o]ne may be liable for the acts of another under theories of vicarious liability, such as conspiracy, aiding and abetting, and inducement." Acosta, 574 F. Supp. 2d at 26. As noted above, the court looks to common law as illustrated by the Restatement (Second) Torts when seeking to define a federal cause of action under 28 U.S.C. § 1605A(c). See Terrorism Litig., 659 F. Supp. 2d at 60; see also Bettis, 315 F.3d at 333.

The theory of civil conspiracy provides a basis of liability in this case; the Court declines to reach the issue of whether they might also be liable under other theories of vicarious liability. Acosta, 574 F. Supp. 2d at 26. The elements of civil conspiracy are: (1) an agreement between two or more persons; (2) to participate in an unlawful act, or a lawful act in an unlawful manner; (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement; and (4) which overt act was done pursuant to and in furtherance of the common scheme. Id. at 27 (citing Halberstam v. Welch, 705 F.2d 472, 477 (D.C. Cir. 1983)).

An agreement may be inferred from conduct. Bodoff v. Islamic Republic of Iran, 424 F. Supp. 2d 74, 84 (D.D.C. 2006) (citations omitted). As this Court has noted on a number of occasions, "sponsorship of terrorist activities inherently involves a conspiracy to commit terrorist attacks." Id. (quoting Flatow v. Islamic Republic of Iran, 999 F. Supp. 1, 27 (D.D.C. 1998)). It has been established, with evidence satisfactory to the Court, that Syria, through its officials

acting in their official capacity, provided funding, training, safe havens, access, and a variety of other supports to the ANO.  Former State Department officials and expert witnesses testified that the ANO would have been unable to accomplish the EgyptAir hijacking and the Rome and Vienna Airport attacks without Syrian aid.[15]  The elements of a civil conspiracy between Syria and the ANO are therefore satisfied.  See Baker, 775 F. Supp. 2d at 78.

The last element relevant to liability in this instance is whether the property damage caused by members of ANO who hijacked the plane was "reasonably foreseeable."  Based on the expert testimony of Colonel Lang (supra at IV.F), I find that the total destruction of the aircraft was reasonably foreseeable, given Syria's sponsorship of a notoriously violent terrorist organization to conduct a mid-air hijacking.  Syria is liable for the total destruction of the EgyptAir aircraft, along with the associated costs related to the destroyed aircraft, including charges for storage by the government of Malta, solicitors' fees for work performed in relation to the destruction of the aircraft, and costs for the claims survey process under which damage was assessed and payments distributed under the applicable policy.

**F.     Damages**

Plaintiffs have proven defendants' liability under 28 U.S.C. § 1605A(d) to the satisfaction of this Court, entitling them to damages for reasonably foreseeable property loss, *i.e.*, the total destruction of the aircraft, minus any recovered salvage value.

*1.     Property Damage*

The evidence in this case establishes that the aircraft was declared to be a constructive total loss under the applicable policy as a result of the damage sustained during the hijacking. Section IV, supra ("Facts") at ¶ 127.  The reinsurers therefore paid to the owner of the aircraft

---

[15] In cases involving the state sponsor of terrorism exception to the FSIA, courts rely extensively on expert testimony. Gates I, 580 F. Supp. 2d at 68 n.13.

the total value under the policy: $14,000,000. Facts at ¶¶ 126, 133.  Plaintiff-underwriters did not completely reinsure the applicable policy, but presented proof as to their share of the risk under the policy. Facts at ¶ 137.  This share of the risk also corresponds to their share of the proceeds from the subsequent salvage sale and the burden of consequential costs, such as the cost of the claims surveyor and the solicitors at Beaumont & Sons. Facts at ¶¶ 128-37.  The total recoverable loss is $11,043,660.83. Facts at ¶ 133.[16]

The plaintiff underwriters in the litigation, with the exception of La Réunion Aérienne, combined to reinsure almost the entire 75.55% portion of the risk reinsured through Leslie & Godwin. Facts at ¶ 135.  La Réunion Aérienne reinsured a further 8.5% of the risk outside of the 75.55%. Facts at ¶ 136.

a.   The Plaintiff-Underwriters Holding 75.5% of the Original Policy

The plaintiffs holding 75.5% of the original policy are entitled to that percentage of the total recoverable loss of $11,043,660.83, which equals $8,337,963.93.  The individual reinsurers are entitled to a percentage of that amount according to the percentage each holds of the 75.5% of the original policy.[17]  The following amounts are calculated according to the percentages provided in the table above, Facts at ¶ 137:

---

[16] In short, the total amount of damages (excluding interest) should be based on the following formula: $x$ = $14,000,000 (the total value of the aircraft under the MISR policy; Facts at ¶ 126) − $3,502,033 (the amount produced by the salvage sale; Facts at ¶ 128) + $45,000 (the reduction from the sale amount for equipment missing from salvage avionics; Facts at ¶ 129) + $61,113.83 (cost of work done by solicitors at Beaumont & Sons; Facts at ¶ 130) + $139,580 (the cost of the claims survey process; Facts at ¶ 131) + $300,000 (the cost paid to the government of Malta for storage costs; Facts at ¶ 132) = $11,043,660,83.

[17] That is, if $x$ equals the total recoverable loss, and the plaintiff underwriters other than La Réunion Aérienne are entitled to a portion of the amount equaling $x$ * 75.5%, each individual plaintiff underwriter will be entitled to ($x$ * 75.5%) * [the plaintiff-underwriter's share of the 75.5% of the London Order].

- Various Lloyd's syndicates, holding reinsurance policy number AE2141B, and a 70.919% share:  $5,913,200.64

- Sedgwick Aviation – Various Lloyd's Syndicates, holding policy number VS5057L, and a 9.088% share:  $757,754.16

- Allianz Cornhill Insurance, PLC, f/k/a Cornhill Insurance, PLC, [c/o] Pro Insurance Solutions, Ltd., holding policy number 277331, and a 0.547% share:  $45,608.66

- Aviation & General Insurance Company, Ltd., [c/o] Ruxley Ventures Ltd., holding policy number W8501890, and a 1.136% share:  $94,719.27

- English & American Insurance Company, Ltd., [c/o] Pro Insurance Solutions, Ltd., holding policy number 850017WAL15, and a 2.363% share:  $197,026.09

- Markel Insurance Company, Ltd., f/k/a Terra Nova Insurance Company, Ltd., holding policy number 85MA82399HA, and a 1.727% share:  $143,996.64

- Minster Insurance Company Ltd., holding policy number AV850325, and a 1.363% share:  $113,646.45

- MMO/New York Marine and General, holding a 3.181% share:  $265,230.63

- Nippon Insurance Company of Europe Ltd., [c/o] Pro Insurance Solutions, Ltd., holding policy number 850017WAL15, and a 0.727% share:  $60,617.00

- Riverstone Insurance (UK) Ltd., f/k/a Sphere Drake Insurance Ltd., holding policy number SWAEG00056Z, and a 1.0904% share:  $90,917.16

- Sovereign Marine & General Insurance Company Ltd., [c/o] Pro Insurance Solutions, Ltd., holding policy number 277331, and a 0.725% share:  $60,450.24

- SR International Business Insurance Company Ltd., f/k/a Switzerland Insurance

  Company (UK) Ltd., [c/o] Pro Insurance Solutions, Ltd., holding policy number

  850017WAL15, and a 0.364% share:  $30,350.19

- Tower Insurance Co., f/k/a National Insurance New Zealand, [c/o] Pro Insurance

  Solutions, Ltd., holding policy number 850017WAL15, and a 0.182% share:  $15,175.09

b. <u>La Réunion Aérienne</u>

La Réunion Aérienne is entitled to 8.5% of the total recoverable loss of $11,043,660.83

(Facts at ¶ 136), which equals $938,711.17.

<i>2. Prejudgment Interest</i>

It is within the Court's discretion to award plaintiffs prejudgment interest from the date of

the attack on November 23, 1985, until the date of final judgment. <u>Pugh v. Socialist People's

Libyan Arab Jamahiriya</u>, 530 F. Supp. 2d 216, 263 (D.D.C. 2008).  The decision to award

prejudgment interest, as well as how to compute that interest, rests within the discretion of the

court, subject to equitable considerations. <u>Id.</u> (citations omitted).  "Courts in this Circuit have

awarded prejudgment interest in cases where plaintiffs were delayed in recovering compensation

for their injuries—including, specifically, where such injuries were the result of targeted attacks

perpetrated by foreign defendants." <u>Id.</u>  Prejudgment interest is entirely appropriate in this case,

and necessary to fully compensate the victims for the injuries they sustained as a result of Syria's

material support of ANO.  Such awards compensate the victims for any delay due to litigation,

and prevent Syria from profiting from its terrorist attacks.  <u>See</u> <u>id.</u>

An appropriate measure of what rate to use when calculating prejudgment interest is the

prime rate, <i>i.e.</i>, the rate banks charge for short-term unsecured loans to credit-worthy customers.

<u>Oldham v. Korean Air Lines Co.</u>, 127 F.3d 43, 54 (D.C. Cir. 1997) (citing <u>Forman v. Korean Air

Lines Co., Ltd.</u>, 84 F.3d 446, 450 (D.C. Cir.), <u>cert. denied</u>, 519 U.S. 1028 (1996)).  The Court

accepted testimony from Dr. Markham regarding his economic analysis and the applicable prime rate of interest for each year from 1985 through 2010. Markham, T-4, 175-177; Pltf's Exh.93, Table 1.  Using his report and the current prime rate,[18] the Court averages the prime rate from 1985 through 2011, with a result of 7.03%.

Plaintiffs sustained injuries in the form of total destruction of the aircraft, for which they reimbursed EgyptAir.  The Court will award plaintiffs prejudgment interest on their actual property damage, minus salvage recovery, which equals $10,542,967.  Interest will be computed at a rate of 7.03% per annum from November 23, 1985 to the present.

## VI.    CONCLUSION

For the foregoing reasons, final judgments will be entered against defendants by way of a separate Judgment Order in the amounts set forth above, plus any applicable post-judgment interest allowed by law.  Furthermore, the case at No. 08-CV-504, Certain Underwriters at Lloyd's London v. Great Socialist People's Libyan Arab Jamahiriya ("Certain Underwriters II"), will be dismissed with prejudice.

A separate Order and Judgment will be issued consistent with this opinion.


JOHN M. FACCIOLA
U.S. MAGISTRATE JUDGE

---

[18] The prime rate as of July 2011 is 3.25%; it has not changed since 2009. Economic Data – FRED® of the Federal Reserve Bank of St. Louis, http://research.stlouisfed.org/fred2/series/MPRIME (last visited Sept. 2, 2011).